

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## NO. WR-50,961-10

---

## EX PARTE RODNEY REED, Applicant

---

## ON APPLICATION FOR A WRIT OF HABEAS CORPUS
## IN CAUSE NO. 8701
## IN THE 21ST DISTRICT COURT
## BASTROP COUNTY

---

**MCCLURE, J., delivered the opinion of the Court in which KELLER, P.J., HERVEY, RICHARDSON, YEARY, KEEL, and SLAUGHTER, JJ., joined. WALKER, J., dissented. NEWELL, J., did not participate.**

## O P I N I O N

In May 1998, a Bastrop County jury found Rodney Reed guilty of the capital murder of nineteen-year-old Giddings resident Stacey Lee Stites.[1] The indictment alleged that in April 1996, Reed strangled Stacey to death in the course of committing or attempting to

---

[1] Our recitation of the guilt-phase evidence, *infra* p. 4, is adapted from our opinion disposing of Reed's second subsequent 11.071 application. *See Ex parte Reed*, 271 S.W.3d 698, 702–12 (Tex. Crim. App. 2008); *infra* p. 29. In keeping with the naming convention used in that opinion, we refer to the victim in this case as "Stacey" and her mother as "Carol."

commit kidnapping and aggravated sexual assault. At the trial's punishment phase, the State introduced evidence linking Reed to five extraneous sexual assaults predating April 1996 and one attempted sexual assault in November 1996. Several of those assaults bore similarities to Stacey's murder. The jury answered the statutory special issues in favor of the death penalty, and the trial judge sentenced Reed to death.

In the years that followed, continuing through this proceeding, Reed has made multiple efforts to have his capital murder conviction overturned. He has primarily (but by no means exclusively) advanced the theory that he is innocent of Stacey's murder—specifically, that the biological evidence linking him to Stacey's body was deposited there because he and Stacey were in a consensual sexual relationship and that Stacey was actually killed by her jealous and domineering fiancé, Jimmy Fennell.

In this opinion, we explain why Reed's latest attempts to demonstrate his innocence, both substantively under *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), and procedurally under Article 11.071, Section 5(a)(2) of the Texas Code of Criminal Procedure,[2] do not warrant relief. We also explain why Reed has failed to prove that the State suppressed material evidence at the time of trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), or that the State presented materially false testimony at trial in violation of *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009). Ultimately, we deny relief and dismiss any remaining claims as abuses of the writ.

---

[2] Unless otherwise indicated, all mentions of "Articles" in this opinion refer to the Texas Code of Criminal Procedure, and all mentions of "11.071 applications" (or simply "applications") refer to applications for a writ of habeas corpus filed pursuant to Article 11.071 of the Texas Code of Criminal Procedure.

## I. OVERVIEW OF THE PRESENT LITIGATION

Reed filed his ninth subsequent (-10) 11.071 application in November 2019. He raised four claims: (1) a *Brady* claim; (2) a false testimony claim; (3) an ineffective assistance of counsel (IAC) claim; and (4) a claim that he could prove his innocence both substantively under *Elizondo*, 947 S.W.2d at 209, and as a gateway for reaching other constitutional claims under Article 11.071, Section 5(a)(2). We concluded that Reed's *Brady*, false testimony, and actual innocence claims (claims one, two, and four) satisfied the requirements of Article 11.071, Section 5. Accordingly, we remanded those claims to the habeas court "for further development." *Ex parte Reed*, No. WR-50,961-10 (Tex. Crim. App. Nov. 15, 2019) (not designated for publication).

The habeas court held an evidentiary hearing in July 2021, focusing mostly on Reed's most recent actual innocence claims. Reed called nineteen witnesses at the hearing; the State called twenty-nine. At the -10 hearing, the habeas court admitted what it later described as "numerous exhibits." On October 31, 2021, the habeas court made recommended findings of fact and conclusions of law (FFCLs) which, if adopted, would have us deny relief on all of Reed's remanded claims.

Among the "numerous exhibits" admitted at the -10 hearing were the records from Reed's trial and all of his prior state habeas proceedings. The habeas court's decision to admit these records was consistent with this Court's actual innocence jurisprudence. *See, e.g., Ex parte Reed*, 271 S.W.3d 698, 733–34 (Tex. Crim. App. 2008) (analyzing an actual innocence claim requires a court to "make a holistic evaluation of all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be

admitted under rules of admissibility that would govern at trial") (internal quotation marks omitted) (quoting *House v. Bell*, 547 U.S. 518, 537–38 (2006)). The upshot is that for us to fairly grapple with Reed's most recent actual innocence claims (not to mention his *Brady* and false testimony claims), we must first review all the evidence.

## II. BACKGROUND

### A. Trial (Guilt Phase)

The trial evidence showed that Stacey began working as a cashier and bagger at the Bastrop H-E-B grocery store in October 1995. In January 1996, Stacey and her mother Carol Stites moved to Giddings so that Stacey could live with her fiancé, Jimmy Fennell, a Giddings Police Department (GPD) patrol officer. Stacey and Fennell started dating a few weeks after they met at the May 1995 Smithville Jamboree—and according to Carol, they were "inseparable from that night on." By December 1995, Stacey and Fennell were engaged. Eventually, Stacey, Carol, and Fennell moved into the Rolling Oaks Apartments in Giddings. Stacey and Fennell shared an apartment on the second floor; Carol lived in a separate apartment just downstairs and "[c]atty-cornered" from Stacey and Fennell's.

With a wedding planned for May 11, 1996, Stacey transferred to the H-E-B's produce department to earn more money. The new assignment required Stacey to report to work at 3:30 a.m. to stock produce for the day. Stacey would usually wake up between 2:45 to 2:50 a.m., taking anywhere from five to twenty minutes to get ready for work. For work, Stacey wore blue pants, a white undershirt, and a red shirt with an H-E-B insignia on the front. She would typically leave her apartment wearing her pants and undershirt, and she would carry her red shirt to her vehicle along with a plastic cup of juice or water.

Although Stacey had access to Carol's Ford Tempo, she routinely drove Fennell's red Chevrolet S-10 extended-cab truck to work. When commuting to work, Stacey would take Highway 290 to Highway 21 and then Loop 150/Chestnut Street over the railroad tracks into Bastrop. The drive took approximately twenty-five to thirty minutes, with several stop signs, red lights, and at least one train crossing along the way—plenty of spots where a vehicle would have to come to a stop. When she finished her shift in the early afternoon, Stacey would usually go to Carol's apartment, take a nap, and then get up and work with Carol to prepare for the upcoming wedding.

On April 22, 1996, after finishing her shift and leaving work, Stacey arrived at Carol's apartment early in the afternoon. She ate lunch and took a nap. Fennell came home from work a few hours later. Because he had borrowed Carol's Ford Tempo that day, Fennell returned Carol's extra set of car keys to her by placing them on a shelf in her apartment. The three then briefly discussed their schedules for the following day. Stacey was scheduled to be at work at 3:30 a.m.; Fennell was not scheduled to work. Fennell and Stacey were planning to go to the insurance company (to add Stacey to Fennell's insurance on the truck) and the florist. When Fennell said he could drive Stacey to work, Carol replied that Stacey could drive herself to work and that she (Carol) could take Fennell to Bastrop in the afternoon—that way, Fennell could sleep in. Fennell declined Carol's offer, stating that he would rather drive Stacey to work himself.

Fennell then left in his truck to coach a little league baseball team with his friend and fellow GPD patrolman David Hall. Fennell returned to Carol's apartment between 8:00 and 8:30 p.m. Stacey met Fennell outside of Carol's apartment and, according to Carol, the

two ran upstairs laughing "as hard as they could." They seemed "happy, very happy, and in love."

According to Fennell, when he and Stacey returned to their apartment that evening, they showered together. Although Stacey was taking birth-control pills, the two did not have sex that night because, as Fennell put it, the "vitamin" pills Stacey was taking at that point in her prescription cycle allowed for a greater possibility of pregnancy. They also revisited their plans for the 23rd. Abandoning their earlier plan, Stacey and Fennell agreed that Stacey would take Fennell's truck to work and that Carol would take Fennell to meet Stacey in Bastrop when her shift ended. According to Fennell, Stacey went to sleep around 9:00 p.m., while he stayed up and watched the news.

The next morning, April 23, Stacey's coworker Andrew Cardenas arrived at the Bastrop H-E-B parking lot at around 3:30 a.m. and waited for Stacey to arrive. Cardenas would usually wait in his car for Stacey to arrive so that they could "keep an eye on each other, to make sure nobody was around and walk inside the store together." Cardenas regarded Stacey as a punctual employee, and when she failed to show up for work, he became concerned. Cardenas eventually went into the store to start his shift, but he kept an eye out for Stacey.

At 5:23 a.m., while on routine patrol, Bastrop Police Department (BPD) officer Paul Alexander spotted a red pickup truck parked in the Bastrop High School parking lot. Mindful that the truck was not parked there during his previous patrol of the area and that there were no other vehicles in the lot, Alexander contacted the dispatcher for a stolen-vehicle check. The dispatcher reported that the truck was registered to a "Fennell out of

Bastrop." When Alexander looked inside the cab with his flashlight, he noticed that the driver's seat was reclined and that there were books and clothing on the seats. Outside the driver's side door, on the ground, Alexander observed a small piece of a broken belt with a buckle. Alexander often saw "loose stuff" (wallets, shoes, books, etc.) left by students in the school parking lot, so he "just didn't think much" of the belt at the time. After noting that there was no shattered glass, that the ignition was intact, and that the driver's side door was locked, Alexander concluded that nothing was out of order and went back on patrol.

Still waiting for Stacey to arrive at work, Cardenas finally decided to call Carol between 6:30 and 7:00 a.m. When Cardenas told Carol that Stacey had not shown up for work, Carol became upset. She immediately called Fennell on the phone, waking him up. Carol told Fennell that Stacey had not made it to work. Fennell rushed down the stairs, putting on a shirt on the way down. He told Carol to call the authorities and tell them that he was going to look for Stacey. Carol had both sets of keys to her car, so Fennell took Stacey's set and left in Carol's Tempo to look for Stacey. Fennell drove from the Rolling Oaks Apartments to the Bastrop H-E-B and back, but there was no sign of Stacey or the truck. Meanwhile, Bastrop authorities had also started looking for Stacey.

At approximately 9:00 a.m., after authorities received the missing-persons report, BPD investigator Ed Selmala was dispatched to the Bastrop High School parking lot. Upon arrival, Selmala notified other law enforcement officers of the truck's location. While Bastrop authorities photographed the truck and documented other pieces of evidence, BPD officer Alexander was called back to the station to prepare a report as to why he had run the license plate on Fennell's truck earlier that morning.

Fennell's truck was initially taken to a local tow shop. Authorities asked Fennell to identify various items found in and around the truck. Fennell observed several things that were "out of the ordinary":

- One of the tennis shoes that Stacey normally wore to work was on the floorboard of the passenger's side of the truck;

- There was a foamy substance resembling saliva on the carpet covering the hump over the truck's transmission;

- There were broken pieces of green plastic in the console from the type of cup that Stacey usually took with her in the truck;

- The driver's seat was reclined at a forty-five-degree angle;

- The driver's seatbelt was buckled; and

- There was a smudge on the passenger-side back window.

Fennell also identified several items found outside the truck:

- Carbon copies of checks from his checkbook; and

- The piece of the belt with a buckle attached, which Fennell told investigators was part of the belt that Stacey normally wore to work.

Fennell's truck was later taken to a DPS garage in Austin, where a crime scene team began to process it for evidence. The team paused their initial search of the truck when Stacey's body was found.

Passing motorist Kenneth Osborn came across Stacey's body at around 2:40–2:45 p.m. in the "bar ditch" running alongside Bluebonnet Drive, a circular dirt road that enters and exits on FM 1441 in Bastrop County. When Osborn approached Stacey's body (which was visible from the roadway), he quickly realized that she was dead. He got back

into his vehicle, stopped at a nearby house, called the police, and then went back to Bluebonnet Drive to wait for the authorities.

BCSO investigator John Barton was one of the first law enforcement officers on the scene. He covered Stacey's body with a heavy blanket to prevent the media, circling above in a helicopter, from taking photographs. He also closed off the crime scene and began taking pictures of the area and Stacey's body. Shortly thereafter, Bastrop authorities, under the supervision of Texas Ranger L. R. "Rocky" Wardlow, called in DPS Crime Lab employees to process the scene.

The crime-lab team arrived at the Bluebonnet scene at approximately 5:12 p.m. Karen Blakley, who specialized in DNA and serology, was designated the team leader. The team included a trace analyst, a photographer and videographer (who recorded some portions of the crime scene investigation), a latent-print examiner, and a trainee in serology and DNA.

According to Blakley, Stacey's body was "propped up in a manner by a small mound of dirt that made her body sort of roll to one side, but it wasn't completely rolled, it was twisted so the upper part of the body was flat and her legs were folded over and her arms were above her head." Stacey was missing a shoe, but the bottom of her sock was clean, suggesting that she had not walked shoeless outside. An H-E-B name tag with the name "Stacey" was tucked in the crook of her leg. A white T-shirt, which Fennell later identified as belonging to him (but which, according to Fennell, both he and Stacey would occasionally wear), was strewn over some brush near Stacey's body. Stacey was clothed in a black bra and a pair of blue pants with a broken zipper.

Stacey's underwear was wet in the crotch and bunched around her hips. Viewing this as indicative of sexual assault, Blakley tested Stacey's vagina for the presence of semen. The initial test yielded a positive result. Blakley then collected additional swabs from Stacey's breasts, and a positive amylase test suggested that there was saliva on Stacey's breasts. Because rigor mortis had set in, Blakley could not determine if Stacey had been anally penetrated. "She was already very stiff, and in order for me to try to get to the anal area I could possibly cause injury or further damage and make it look like she had suffered something that she didn't."

According to Blakley, it "looked like a great force had been applied" to Stacey's neck. There was a mark on Stacey's neck that "was like an indentation but red, like it had cut into her skin." Significantly, there was a piece of webbed belt near Stacey's body on the side of the road. Its weave had a pattern resembling the mark on Stacey's neck. When the piece of belt found at the high school was brought to the scene, Blakley compared the two and concluded that they matched.

Documenting other injuries to Stacey's body, Blakley observed that there were scratches on Stacey's abdomen and arms, a wound resembling a cigarette burn on her arm, and shallow wounds on her wrists and back that looked like fire-ant bites. There was also a brown, leathery patch of skin, stiff to the touch, underneath her bra. There were abrasions on Stacey's abdomen consistent with the shape of a seat belt. There was "a green discoloration like an old bruise running down … her jawline." There were bruises around her thighs consistent with "bump[ing] into a desk or something sharp [or box-like], right around the thigh area." And there were bruises on at least one of her arms, one of them

seemingly fingernail-shaped. Blakley also documented a large amount of mucus running from Stacey's nose, down the side of her face, and into her hair.

To Blakley, this did not look like a crime of passion. She did not see multiple defensive wounds, and to her the crime scene looked "very clean." There were no indications that Stacey's body had been there very long. However, the green blanket that Barton had placed over Stacey's body had "attracted the heat and made a humid condition underneath," keeping it "wet and warm." There were areas where "the upper layer of [Stacey's] skin" was visibly "sloughing off." Blakley stated that this was all part of "the process of decomposition." Blakley also noted the lividity pattern on Stacey's body: "[T]hat's when the blood pools to the lowest point of the body, and it causes a red mottling. It's kind of spotty but generally red, and that is normal in a deceased person."

Terry Sandifer, the latent-fingerprint examiner, collected two Busch beer cans from an area across the road from where Stacey's body was discovered. When Sandifer processed the cans for fingerprints, she could not find any that were suitable for comparison.

Blakley returned to the lab that evening (April 23) at around 11:00 p.m. so that she could look at the vaginal swabs under a microscope. When she did, Blakley discovered intact spermatozoa—sperm cells with the "tails" still attached—which, in Blakley's opinion, indicated that the sexual activity was fairly recent. Blakley based this conclusion on "published documentation" stating that "26 hours is about the outside length of time that tails will remain on a sperm head inside the vaginal tract of a female." At trial, Reed's defense team tried to impeach Blakley on this point, but she rebuffed their efforts:

Q. The published documentation that you're referring to, would that be an article from 1981?

A. Yes, it would.

Q. By Mr. Willot[t] and Allard?

A. Yes.

Q. And in that study, did they also say that internal vaginal swabs, you can find semen up to 120 hours later?

A. That is semen, and all components of semen.

Q. And by your testimony you're saying that intact semen up to 26 hours, is that the figure you gave?

A. That's intact sperm, up to 26 hours.

Blakley quickly reported her findings to Ranger Wardlow. Wardlow viewed the presence of semen as a "smoking gun," surmising that the evidence of sexual assault gave the perpetrator a motive to kill. Wardlow theorized that identifying the man who left the semen would lead the authorities to Stacey's killer.

Roberto Bayardo, the Travis County Medical Examiner, autopsied Stacey's body the following afternoon, April 24, at 1:50 p.m. "Based on changes that occur after death in the body," Bayardo estimated that Stacey died "around" 3:00 a.m. on April 23, "[g]ive or take one or two hours." Bayardo noted that Stacey had pre- and post-mortem injuries. He differentiated between the two based on the absence of bleeding. Once the heart stops beating, there is no more bleeding and no more bruising. The wrist burn occurred after Stacey died, as did several scratches. Although Stacey's skull showed no outward signs of injury, Bayardo's internal examination revealed multiple bruises that "had the appearance

of injuries sustained by being struck on the head with the finger knuckles with a closed hand." Comparing the injury pattern on Stacey's neck with the pieces of webbed belt collected by authorities, Bayardo concluded that the belt was the murder weapon and that Stacey died as a result of asphyxiation caused by strangulation. He stated that asphyxiation takes approximately three to four minutes and that a person becomes unconscious within one to two minutes.

Because of the circumstantial evidence indicating sexual assault, Bayardo took vaginal swabs. Viewing the swabs under a microscope, Bayardo observed intact spermatozoa. To Bayardo, this suggested that the sperm had been introduced into Stacey's vagina "quite recently." Bayardo then took rectal swabs and viewed them under a microscope. Bayardo saw structures that looked like spermatozoa heads.

Visually examining Stacey's rectal area, Bayardo noticed that her anus was dilated and that there were some superficial lacerations on the posterior margin. In Bayardo's opinion, this was consistent with penile penetration. Based on his education and experience in determining whether a particular injury occurred before or after death, Bayardo concluded that Stacey sustained the injury to her anus at or around the time of her death and that the penetration was nonconsensual.

Because Blakley had prior commitments, DPS analyst Wilson Young took over the serological duties on April 24. Young conducted DNA testing on Stacey's blood, the vaginal and anal swabs, and the substance on Stacey's underwear. Generating DNA profiles from these samples, Young theorized that there was a single semen donor.

Conducting DNA testing on the saliva found on Stacey's breasts, Young concluded that the saliva belonged to the same individual who deposited semen in Stacey's vagina.

Young also helped to process Fennell's truck on April 25, accompanied by Sandifer (the latent-print examiner) and Ranger Wardlow. Blakley joined them the next day. In processing the truck and the carbon copies of Fennell's checks for prints, Sandifer did not discover anything remarkable. She could find only a few items with prints suitable for comparison. When she examined those prints, she was either unable to make a match or identified the prints as belonging to Stacey or Fennell. Young, meanwhile, was looking for blood or semen, but he did not find any. Although Young collected other items, including a portion of the mucus-like substance on the carpet over the transmission hump, he did not find anything that would help identify the perpetrator. Blakley, having seen Stacey's body, noted that the substance on the transmission hump looked similar to the mucus she had seen flowing from Stacey's nose.

Young, Wardlow, and Blakley all noted the reclined position of the driver's seat and the fact that the driver's seatbelt was fastened. Wardlow specifically noted the lap belt's "downward bow"; to Wardlow, it looked like someone had sat on top of the belt. The three then tested whether it was possible to pull a person from the driver's seat with the person buckled in. Putting Blakley (who was close to Stacey's height and weight) in the driver's seat, Wardlow and Young took turns pulling her from the vehicle by either the feet or the shoulders. Each time, Wardlow and Young were able to easily remove Blakley from the truck. Further, when Young, who was six-foot-two, sat in the reclined driver's seat and looked in the rearview mirror, he noticed that he had a clear view out of the back window

of the truck. When DPS finished processing the truck, it was returned to Fennell, who immediately took it to the dealership and traded it in.

Over the next eleven months, authorities focused their investigation on people that Stacey knew, and with a $50,000 reward offered by H-E-B, the leads came pouring in. For instance, a newspaper delivery person reported that Stacey's body was not on Bluebonnet Drive at around 4:00 a.m., when he drove by the site where her body was found. In all, officials interviewed hundreds of people, including Stacey's former classmates, boyfriends, and coworkers. Over twenty-eight male suspects were identified, some immediately and some during the ensuing investigation. Each suspect was asked to give blood, hair, and saliva samples. With the exception of one, Brian Haynes, all of the suspects agreed to provide samples. Although Haynes refused to consent, he was compelled to provide samples after authorities obtained a search warrant. Authorities also requested and obtained samples from David Hall (who, because of his friendship with Fennell, was at one point viewed as a suspect), but DNA testing excluded him as the semen donor.

As the last known person to see Stacey alive, Fennell was deemed a suspect from the start. Despite this, authorities never searched Fennell's apartment. However, Fennell was vigorously interrogated on several occasions. Fennell also voluntarily provided authorities with a blood sample, and even though DNA testing excluded him as the semen's donor, authorities still tried to make a case against him. Ruling out the possibility that Fennell used Carol's Tempo to facilitate the offense, authorities investigated alternative methods of transportation—they did not believe that Fennell could have walked the twenty-five to thirty miles from Bastrop to Giddings between 3:00 and 6:45 a.m. Ranger Wardlow

examined taxi records and the mileage on all of the GPD's vehicles, but this investigation revealed nothing. And although authorities canvassed the Rolling Oaks Apartments looking for anyone with useful information about the morning of April 23, no one reported being awake and about that morning. Finding no evidence to support Fennell's involvement in the crime, authorities ultimately eliminated him as a suspect.

David Lawhon emerged as a suspect when authorities discovered that he had murdered an Elgin woman named Mary Ann Arldt a few weeks after Stacey was killed. Investigators also received information that Lawhon had bragged about killing Stacey. A few people informed authorities that Lawhon and Stacey had been in a relationship, but authorities were unable to confirm any connection between the two. Lawhon was eventually excluded as the semen's donor through DNA analysis and eliminated as a suspect.

Investigator Selmala also became a suspect in August 1996 after he committed suicide in his home. Ranger Wardlow investigated Selmala's death. A note written by Selmala's girlfriend was found by his body. The note suggested that Selmala was distraught over his relationship with his girlfriend. Ultimately, Wardlow found no evidence suggesting that Selmala was involved in Stacey's death. Even so, Wardlow, anticipating that someone might try to link Selmala's suicide to Stacey's murder, obtained a blood sample from Selmala's body and submitted it to DPS for testing. DNA testing cleared Selmala as a suspect. Ultimately, all of the other potential suspects were excluded as a result of DNA testing.

Eventually, officials received information that led them to Rodney Reed, a Bastrop man who was approximately the same height as Young. At trial, officials testified that, throughout their investigation, they found nothing to indicate that Stacey knew Reed. Reed lived in the City of Bastrop, on Martin Luther King Drive, near the railroad tracks. Several of Reed's family members and friends, as well as his girlfriend, lived nearby. Bastrop High School was also located near the railroad tracks, about six-tenths of a mile from Reed's house.

Reed was frequently seen by BPD patrol officers walking in the area near his home late at night. BPD officer Michael Bowen, when he worked the night shift in 1995 through the early part of 1997, would see Reed almost every night between 9:00 p.m. and 3:00 a.m. or 4:00 a.m. When Bowen saw Reed, he was often walking along the railroad tracks. BPD officer Steven Spencer also reported "[o]ccasionally" seeing Reed in the early morning hours walking near the All Star Grocery, which was located at Loop 150/Chestnut and Pecan Street.

When investigators learned that DPS had a sample of Reed's DNA on file, they requested a comparison between Reed's DNA and the DNA developed from Stacey's vaginal swab. Michelle Lockhoff, a DPS DNA specialist, conducted DNA testing on the samples. When Reed's profile was compared with the sample taken from Stacey's body, Reed could not be excluded as the semen's donor.

BPD investigator David Board interviewed Reed after learning that the preliminary DNA results could not exclude him as the semen's donor. Board withheld the results of the DNA testing and Mirandized Reed, who waived his rights and gave a written statement. In

it, Reed stated, "I don't know Stacey Stites, never seen her other than what was on the news. The only thing that I do know is what was said on the news is that she was murdered." Pursuant to a search warrant, Reed's blood was drawn and turned over to the DPS lab.

Lockhoff subjected this sample to another, more discriminating type of DNA testing. Once again, Reed could not be excluded as the semen's donor. Because DPS's testing could not exclude Reed, DPS asked LabCorp, an independent lab, to conduct additional testing. Meghan Clement, the director of LabCorp's forensic identity testing department, received DNA samples from Stacey and Reed and conducted the requested tests. Like Lockhoff, Clement could not exclude Reed as the semen's donor. Recalling her prior experience as a serologist working on sexual-assault cases, Clement later testified that she had never found intact sperm more than twenty-four hours after commission of a vaginal sexual assault.

At trial, Reed mounted a two-prong challenge to the State's evidence. First, Reed sought to show that he and Stacey had been in a romantic relationship, and that his semen was present in Stacey's body because he and Stacey had had consensual sex. In her opening statement, Reed's trial lawyer stated, "There was interracial dating in this case, and you will hear from people who will talk to you about the fact that there was a secret affair." Second, Reed pointed to the possibility that someone else (particularly Fennell or Lawhon) had killed Stacey.

To prove a romantic relationship between himself and Stacey, Reed called Julia Estes, a Bastrop County resident and Reed family acquaintance, to testify. Estes stated that, sometime in early 1996, she saw Stacey and Reed chatting inside the Bastrop H-E-B. Estes

testified that she recognized Stacey from seeing her in the store and conversing with her. On cross-examination, Estes acknowledged that Reed and Stacey were just talking—it did not necessarily suggest a "secret affair" between them.

Reed also called Iris Lindley, a longtime friend of Reed's parents, to the witness stand. Lindley testified that, in early 1996, she was sitting on the porch at Reed's house, visiting with Reed's mother, when a woman drove up to the Reed household in a gray truck. When the defense asked Lindley to elaborate, the following exchange took place:

Q. Can you describe the person who approached?

A. Well, she was maybe 5'5", she had dark brown hair, she was kind of heavy, on the heavy side, not too heavy, and when she walked up she asked for Rodney and Ms. Reed told her Rodney wasn't there, and she said would you tell Rodney that Stephanie come by.

Q. Who came by?

A. Stephanie.

Q. Stephanie?

A. Uh-huh. Stacey or Stephanie.

Q. I'm sorry, Ms. Lindley, what did she say her name was?

A. Stacey.

The defense showed Lindley Stacey's driver's license and asked if she "look[ed] like the young lady that came by." Lindley responded that "she was a little heavy-faced." The defense then showed Lindley a picture of Stacey standing next to Carol. Lindley stated that the woman in *that* picture looked like "the young lady" in question. To Lindley, it seemed

like the young lady was looking for Reed "kind of like how a girlfriend looks for a boyfriend."

As mentioned, Reed also sought to show that someone other than himself might have murdered Stacey, focusing primarily on Lawhon and Fennell. Regarding Fennell, Reed hammered the Bastrop authorities' failure to adequately investigate him. Specifically, Reed showed that almost all of the information the authorities had gleaned about Stacey's whereabouts before she died, her routine and habits, and the items in Fennell's truck, came from Fennell himself. Reed also emphasized that investigators did not search Fennell and Stacey's apartment for evidence.

Tami Hannath, one of Stacey's high school friends, described Fennell as "a little bit more possessive" than Stacey's prior boyfriends. Hannath recounted an incident in which Fennell seemingly made Stacey hang up the phone (or disconnected the line himself) when he overheard her making plans to go out. Hannath also vaguely suggested that Fennell had once slashed Stacey's tires. The defense also tried to present the jury with evidence that, in October and December 1996, Fennell failed two separate polygraph examinations relating to Stacey's murder—but the trial judge sustained the State's objections to that evidence.

Finally, Reed presented his own DNA expert, Dr. Elizabeth Ann Johnson. Johnson conducted independent DNA testing on the semen and saliva found on Stacey's body. Her testing generated results that were consistent with DPS's—Reed could not be excluded as the semen/saliva donor. However, Johnson challenged the State's theory that Stacey was anally penetrated before she died. Specifically, Johnson testified that vaginal drainage,

which may cause semen to be deposited in "surrounding area[s]," can occur when a body is moved after intercourse.

To rebut the defense's suggestion that Fennell had something to do with Stacey's death, the State called former BPD police chief Ronnie Duncan. Duncan testified that he interviewed Fennell on the morning of April 23, 1996. During that interview, Fennell appeared to be "very concerned" for Stacey (who, at that point, was still missing). Later that morning, Duncan showed Fennell the piece of Stacey's belt found near the truck. At that point, Fennell's facial expression "went from concern to probably fright." He was not crying, but he was "visibly upset." And he "br[oke] down" shortly thereafter.

The State also recalled Karen Blakley to undermine the defense's "drainage" theory of how Reed's DNA might have ended up in Stacey's anus. Blakley explained that part of the forensic work she did in this case was "mapping" the pattern of semen on Stacey's underwear. Blakley testified that this "mapping" revealed "four small, maybe less than dime-sized spots" of semen on Stacey's underwear. The pattern was not consistent with what Blakley would expect to see with vaginal drainage. Based on the pattern and amount of semen on Stacey's underwear, Blakley surmised that "there wasn't much activity" or "movement" of Stacey's body after the sexual intercourse in this case.

Blakley also clarified her earlier testimony regarding the longevity of intact sperm in the vagina:

> Q.    [W]hat is the outside area of time that you would expect to find intact spermatozoa in the vaginal cavity?

A.      In a living woman, I would expect to find intact sperm, that means sperm with their tails still [on], no longer than 24 to 26 hours. That's in a living person.

Blakley conceded that she was aware of "one case where sperm was found in a body after 16 days." But in that case the victim was murdered in the mountains of Utah at a very high elevation and a very low temperature. Therefore, "the body was pretty much chilled as if [it] were in a refrigerator the entire time up to the 16th day they were able to find sperm." Other than "that one anomaly," Blakley was not aware of "anything contrary to what [she] had] testified to."

In closing, the State relied on Blakley's intact-spermatozoa testimony to argue that Reed sexually assaulted Stacey in the early morning hours of April 23:

> At eleven o'clock that night [Blakley] goes back to the lab, she puts [the vaginal swabs] under the microscope and bingo, she finds three fully intact spermatozoa. At that point she knows what she's got there. We all know what she's got there. Because we know, from the credible evidence, that that doesn't hang around for days on end. We know from the credible evidence that … that semen got in that girl's body within 24 hours of that eleven o'clock moment. Which is when? On [Stacey's] way to work.

>                          * * *

> We don't know how long prints last anywhere. They can last years. Semen, on the other hand, can be dated. And semen, specifically spermatozoa, only stays there about 24 hours.

The jury found Reed guilty of capital murder, and the trial proceeded to the punishment phase.

**B. Trial (Punishment Phase)**

At the punishment phase, the State presented evidence that:

- In August 1987, Reed physically and sexually assaulted a nineteen-year-old female named Connie York. According to York, during the assault, her attacker attempted to penetrate her anus. When Reed was tried for this offense in 1991, he claimed that he and York were in a secret relationship and that the sex was consensual. The jury acquitted Reed of sexual assault.

- In September 1989, while Reed was on bond for the York sexual assault, he physically and sexually assaulted the pseudonymous complainant, A.W., a twelve-year-old girl. DNA testing showed that Reed could not be excluded as the person who deposited semen in A.W.'s vagina. Photographs corroborated A.W.'s claim that her attacker repeatedly beat her and bit her face during the encounter. According to A.W., during the assault, her attacker penetrated her anus and restricted her breathing.

- In September 1991, Reed physically and sexually assaulted the mother of his children, Lucy Eipper Gibbs ("Eipper"). Eipper testified that, on another occasion, Reed penetrated her anus without her consent.

- In May 1995, Reed sexually assaulted his mentally handicapped girlfriend, Carolyn Rivas. Rivas asserted that Reed held a pillow over her face and penetrated her anus without her consent. A SANE examination revealed abrasions around Rivas's anus consistent with "anal rape."

- In October 1995, Reed sexually assaulted a woman named Vivian Harbottle underneath a train trestle in Bastrop. DNA testing showed that Reed could not be excluded as the person who deposited semen in Harbottle's vagina.

- In November 1996, in Bastrop, Reed physically assaulted, and attempted to sexually assault, a nineteen-year-old female named Linda Schlueter. The evidence showed that Schlueter's attacker used her car to flee the scene.

For his punishment case, Reed called a handful of witnesses to testify to his good character. Of note, defense witness Becky Recter testified that Reed was a "very positive" and "optimistic" person who "seem[ed] like a good guy." On cross-examination, the State asked Recter whether she was aware "that on December 23, 1987, he, along with Melvin Macey and a young man by the name of Don Manuci[,] abducted and repeatedly raped a lady by the name of Alice Bradford in Wichita Falls, Texas." Recter replied that she was

not aware of Reed's past. Similarly, defense witness Bernice Williams testified that she knew Reed to be "very honest and very respectful." The State asked Williams whether she was aware that Reed had been fired from the Bastrop Nursing Home for sexual harassment. Williams said she was not aware of that.

The defense also put on a forensic clinical psychologist who testified that Reed was at a low risk of committing violent acts in prison. In rebuttal, the State put on its own neuropsychologist, who testified that Reed was at a higher risk of committing violent acts in prison. Presented with the foregoing evidence, the jury answered the statutory special issues in favor of the death penalty, and the trial judge sentenced Reed to death.

### C. Direct Appeal

Reed's brief on direct appeal included a claim that the evidence was insufficient to support his capital murder conviction. We affirmed the trial court's judgment and sentence in December 2000. *Reed v. State*, No. AP-73,135 (Tex. Crim. App. Dec. 6, 2000) (not designated for publication), *cert. denied*, 534 U.S. 955 (2001).

### D. Reed's -01 Application

Reed filed his initial (-01) 11.071 application in November 1999. In it, he made his first claim of actual innocence, which took the same general shape as his trial strategy. Specifically, Reed endeavored to show that: (1) he and Stacey were in a romantic, sexual relationship in the months leading up to Stacey's death; and (2) someone else, particularly Fennell or Lawhon, murdered Stacey.

As relevant to Reed's present-day innocence narrative (which, as we later explain, focuses exclusively upon Fennell as an alternate suspect), Reed attached several exhibits to his -01 application.

- Jon Chris Aldridge, one of Reed's cousins, claimed in a 1999 affidavit that he saw Reed and Stacey together "several times" in the months leading up to Stacey's death. Aldridge also alleged that, in April 1996, he witnessed Fennell telling Reed that he "knew about him and [Stacey]." According to Aldridge, Fennell told Reed that he was "going to pay."

- Linda Kay Westmoreland claimed in a 1999 affidavit that Reed and Stacey had come to her house together on "three or four occasions" between late 1995 and April 1996. Westmoreland also claimed to have "heard" (from whom, she did not say) that Jimmy "Fenell" knew about Reed and Stacey seeing each other "and that he was jealous about it."

- Meller Marie Aldridge, Jon Aldridge's mother, stated in a 1999 affidavit that "one evening" she witnessed "Stacie" (whom Aldridge claimed to have recognized from H-E-B) driving up to the Reed residence in a truck and leaving with Reed. According to Aldridge, Reed's mother Sandra described "Stacie" as Reed's girlfriend.

- Shonta Reed, another of Reed's cousins, asserted in a 1999 affidavit that, sometime in March 1996, "Staci" had come by her (Shonta's) house "looking for Rodney, who was not there at the time." Shonta claimed that "Staci" returned later and "picked him up."

- Elizabeth Keehner claimed in a 1999 affidavit that, a few months before Stacey died, she saw Reed at the Bastrop H-E-B holding hands with a "very pretty young white girl" who "might" have been Stacey. Though Keehner did not know Stacey personally, she saw Stacey's picture in the newspaper after Stacey's death, and "[t]he familiarity was there."

- Walter Reed, Reed's father, asserted in an August 1999 affidavit that, in April 1999, he had a curious conversation with a man named Kelly Bonugli. According to Walter, Bonugli said that he knew where Stacey was the night she was killed and that he and his family had been "tailed" during the trial.

- Ron Moore, another of Reed's cousins, claimed in an October 1999 affidavit that, in January 1999, a woman named Jane Campos told him that she overheard "David"

Fennell and Curtis Davis talking about how Stacey was having an affair with Reed. Campos also told Moore that Davis told Fennell "not to worry" because "it was all taken care of."

- Duane Olney, Reed's habeas investigator, claimed in a June 1999 affidavit that, in March 1999, he spoke with a woman named Debra Pace who could corroborate Moore's affidavit.

Finally, Reed emphasized that Fennell had failed two polygraph examinations relating to Stacey's murder and that, at trial, defense witness Iris Lindley testified that she had previously seen a young woman named "Stephanie" or "Stacey" drive up to Reed's house and ask for "Rodney."

In response, the State obtained affidavits from Kelly Bonugli, Curtis Davis, Jane Campos, and Debra Pace, each of whom flatly denied the claims that Reed's witnesses had made about them. Further:

- In a follow-up affidavit executed in 2000, Jon Aldridge repeated what he said in his 1999 affidavit but added a few new details. Specifically, Aldridge said that he first met Stacey in March 1996 at a get-together at Shonta's house. According to Aldridge, Reed introduced Stacey to Aldridge as his "dat[e]." Aldridge further claimed that, later that evening, he, Reed, and Stacey drove around town in Stacey's truck buying and smoking crack cocaine. To impeach this claim, the State presented the habeas court with (1) toxicology screenings from Stacey's H-E-B work application and autopsy and (2) an NMS Lab Report dated March 28, 1998. The former showed that Stacey had tested negative for illegal drugs when she started working for H-E-B and at the time of her death. The latter, which involved a postmortem analysis of thirty-two centimeters of Stacey's hair, showed that Stacey had not used cocaine for at least the last thirty-two months of her life. Aldridge also spelled out in greater detail the incident in which Fennell (allegedly) told Reed that he knew about Reed and Stacey. Aldridge said that Fennell was driving a BCSO vehicle. Aldridge further claimed that he recognized Fennell "because he once booked me into the Bastrop Jail." To impeach this claim, the State presented the habeas court with the Bastrop Jail's booking logs, which showed that Fennell never booked Aldridge into the Bastrop Jail.

- In a follow-up affidavit executed in 2000, Meller Marie Aldridge repeated what she said in her 1999 affidavit, but like Jon Aldridge, she also added new details.

Specifically, she now claimed that Stacey had "waited on" her at the H-E-B customer service booth and that she had seen Stacey at the Bastrop H-E-B socializing with a Hispanic girl named "Rose." To impeach this affidavit, the State presented the habeas court with an affidavit from the Bastrop H-E-B's store director, Ron Haas. Haas stated that Stacey never worked in the customer service booth and that, to his knowledge, "Stacey never hung out regularly with any young Hispanic girl named Rose at our store."

- The State presented the habeas court with a 1998 witness statement it had previously obtained from Elizabeth Keehner. The statement showed that Keehner had originally told the authorities that the "very pretty white girl" she saw Reed with at H-E-B had "blondish colored hair" (Stacey's hair was brown). Keehner also originally stated that she had had a conversation with H-E-B employee Chris Hill in which Hill claimed that "everybody" at H-E-B knew Reed and Stacey were dating and that "he and other employees had seen Rodney pick up Stacey on several occasions for lunch." To impeach this claim, the State presented the habeas court with a 1998 witness statement it had previously obtained from Chris Hill. Hill said that he had worked at H-E-B during the time that Stacey was there, but only interacted with her once. He denied ever discussing Stacey's murder with Keehner, and he said he personally had no knowledge of Reed and Stacey ever having dated. Indeed, Hill had never heard anyone at H-E-B say that Stacey and Reed even knew each other. However, Hill did state that, "sometime after Stacey's murder," someone named Betty Wallace told him that she had seen Reed and Stacey talking at a picnic table outside H-E-B.

Ultimately, in October 2001, the habeas court adopted the State's proposed findings and conclusions. As a result, the habeas court generally declined to credit any of Reed's habeas witnesses. It concluded that Reed's evidence of a "secret affair" between himself and Stacey was "unpersuasive" and that there was no credible evidence that Fennell murdered Stacey. We later adopted the habeas court's findings and conclusions and denied Reed's first actual innocence claim. *Ex parte Reed*, Nos. WR-50,961-01, -02 (Tex. Crim. App. Feb. 13, 2002) (not designated for publication).

**E. Reed's -02 Application**

As mentioned, Reed's -01 application did not focus exclusively upon Fennell as an alternate suspect. Reed also tried to persuade the habeas court (and this Court) that Lawhon might have murdered Stacey. One way that Reed sought to implicate Lawhon, both at trial and in his -01 application, was to point out the similarities between Stacey's murder and Mary Ann Arldt's. One such similarity was the fact that investigators had found Busch beer cans near the bodies of both Stacey and Arldt.

To respond to this argument, the State attached to its -01 answer a May 13, 1998 DPS Crime Lab report showing the results of DNA testing that the State conducted on the beer cans found across the road from Stacey's body. According to the report, one of the cans yielded no interpretable DNA, but the other can yielded an interpretable DNA profile from which Lawhon was excluded as a possible contributor. Significantly, the report also stated that Stacey, GPD officer David Hall, and BPD investigator Ed Selmala could *not* be excluded as possible contributors.

In February 2001, Reed filed his first subsequent (-02) 11.071 application. In it, Reed claimed that the first time he had seen the May 1998 DPS Crime Lab report was in the State's answer to his -01 application. Reed therefore alleged that the State had violated *Brady* by failing to turn this report over to Reed's trial lawyers. Reed explained that this report would have severely undermined the State's trial theory that it was logistically impossible for Fennell to have murdered Stacey: "If Mr. Fennell's next door neighbor David Hall's DNA was found on the beer cans at the scene, then the mode of travel by Fennell to the scene and back becomes obvious."

Reed and the State jointly convinced the habeas court (without first seeking this Court's Section 5 authorization) to hold a hearing on the matter, which took place in March 2001. As relevant here, the -02 hearing revealed that, in January 2001, the State retested the beer cans using a more advanced form of DNA testing: short-tandem repeat (STR) testing. Stacey and Ed Selmala were both definitively excluded as potential contributors, but David Hall still could not be excluded as a potential contributor.

In February 2002, we concluded that Reed's -02 application did not satisfy Article 11.071, Section 5. We therefore dismissed Reed's -02 application as an abuse of the writ and "expressly reject[ed]" all of the habeas court's recommended findings and conclusions pertaining to the application. *Ex parte Reed*, Nos. WR-50,961-01, -02 (Tex. Crim. App. Feb. 13, 2002) (not designated for publication).

**F. Reed's -03 Application**

Reed filed his first federal writ in March 2004, but it was stayed so that Reed could exhaust his state-court remedies. Thereafter, Reed filed his second subsequent (-03) 11.071 application in March 2005. He attached several new witness statements:

- Martha Barnett stated in a 2002 affidavit that, on April 23, 1996, between 5:00 and 5:30 a.m., she saw "Stacy" Stites and "Jimmie" Fennell standing in front of a red pickup in front of the "Old Frontier" store outside of Bastrop.

- Jennifer Prater stated in a 2002 affidavit that, in the early morning hours of April 23, 1996, she and her husband Paul had seen a suspicious car on their property with two people inside. Jennifer claimed to have gotten a good look at the car's occupants because its interior lights were on. Jennifer stated, "I have seen a picture of Rodney Reed. I am absolutely sure that he is not the person I saw in the car that night." Further, "My mother in law showed me a picture of Stacey Stites in a newspaper … . As soon as I looked at the picture I knew that she was the woman I saw in the car."

- Brenda Prater stated in a 2002 affidavit that, in the early morning hours of April 23, 1996, between 1:00 and 3:00 a.m., she saw a light-colored car drive past her house. According to Brenda, "The driver was a man who had a darker comple[xion], but was not black. I thought he was Mexican. There was a woman in the passenger seat. She was light complected with big dark hair. … [And there] was a white male in the back seat." Brenda stated that, when she later saw a picture of Stacey, she immediately recognized her as the woman in the light-colored car.

- Mary Blackwell, one of Fennell's fellow cadets at CAPCO (the police academy Fennell attended), claimed in a 2004 affidavit that she once saw Fennell yelling angrily at Stacey inside of his truck. Blackwell also asserted that, on a separate occasion, she overheard Fennell telling another cadet that if he ever caught his girlfriend cheating on him he would strangle her with a belt.

- LeRoy Riddick, an Alabama-based medical examiner, stated in a 2003 affidavit that: (1) Bayardo's time-of-death estimate was not "reliabl[e]" because crime scene investigators did not document her rigor mortis, lividity, and body temperature; (2) the evidence of anal penetration in this case was inconclusive; (3) Stacey's injuries did not suggest sexual assault or conclusively establish that she died of ligature strangulation; and (4) the evidence collection methods used at the Bluebonnet Drive scene were subpar.

- Ronald Singer, the crime lab director at the Tarrant County Medical Examiner's Office, stated in a 2003 affidavit that: (1) investigators exercised poor security and control at the scene where Stacey's body was found; (2) investigators demonstrated poor technique in dealing with, and taking evidentiary samples from, Stacey's body; (3) the crime scene videotape itself was poorly done; and (4) Karen Blakley went beyond her area of expertise when testifying at Reed's trial, specifically regarding (a) how long Stacey had been deceased; (b) the identification and dating of bruises, burns, scratches, and bites; and (c) whether the crime was a crime of passion.

Reed also attached a copy of the Bluebonnet Drive crime scene video.

Reed's application referenced a 1998 book authored by Dr. William Green entitled, "Rape: The Evidential Examination and Management of the Adult Female Victim." The book surveyed studies conducted on the presence of nonmotile intact sperm in the cervix and vagina. Green noted that one study found intact sperm ten days after intercourse. Other

studies found the presence of intact sperm in the cervix or vagina anywhere from two days to nine days after intercourse.

In addition, Reed attached filings from two civil-rights actions against the City of Giddings: (1) Plaintiff's Original Petition, *Jimmy Lehman v. City of Giddings*; and (2) Plaintiff's Response, *Michael Craig Moore v. City of Giddings*. The former included an allegation that Fennell once put his handgun against an arrestee's head "and made threats similar to the way a terrorist would hold a hostage." The latter alleged that the GPD had a longstanding "policy, custom, or practice of excessive force." Further, Reed presented the Court with Bastrop County work records showing that Fennell's good friend and BCSO deputy Curtis Davis had taken sick leave the night that Stacey was murdered.

Finally, Reed attached a typewritten (but unsworn) statement by a man named James Randall Robinson. Robinson claimed to have seen "Stacey and Rodney together on many occasions." They would kiss and call each other "baby" and seemed to have a "good relationship." Robinson also claimed that he was "with [Jon] Chris Aldridge and Rodney [Reed] the afternoon after Jimmy Fennell stopped Chris and Rodney" and that he "heard them talking about this."

Reed raised seven claims in his -03 application: (1) an actual innocence claim, (2) a *Brady* claim, (3) a claim that his trial lawyers were ineffective, (4) a claim that the prejudice stemming from the alleged *Brady* and IAC violations warranted reversal; (5) a claim that Fennell and Rocky Wardlow gave false testimony at trial; (6) a "10-12 Rule" claim; and (7) a claim that his appellate lawyer was ineffective. Reed argued that the affidavits from Martha Barnett, Jennifer and Brenda Prater, and Mary Blackwell contained previously

unavailable facts in contemplation of Article 11.071, Section 5(a)(1). He also argued that his otherwise-barred IAC claims should be reviewed on their merits because no rational juror apprised of the mounting evidence of his innocence could have found him guilty of capital murder. *See* Art. 11.071, § 5(a)(2).

This Court determined that the alleged *Brady* violations concerning Barnett and Blackwell satisfied Article 11.071, Section 5. *Ex parte Reed*, No WR-50,961-03 (Tex. Crim. App. Oct. 19, 2005) (not designated for publication). We remanded those claims to the habeas court and dismissed "all [of Reed's] other claims" as abuses of the writ. *Id.*

Reed called several witnesses at the ensuing evidentiary hearing, only a few of which are relevant to Reed's present-day innocence narrative. First, Barnett elaborated on her sighting of Stacey and Fennell at the Old Frontier store on the morning of April 23, 1996. Barnett repeated many of the claims she had made in her affidavit, but she also added new details. Contrary to what she had said in her affidavit, Barnett testified that she saw Fennell and Stacey arguing inside the truck. On cross-examination, Barnett acknowledged that Fennell had previously arrested her for DWI.

Blackwell repeated her assertion that she once overheard Fennell telling another cadet that he would strangle his girlfriend with a belt if he ever caught her cheating. She added that she had attended Stacey's funeral and, in Blackwell's opinion, Fennell seemed to be putting on a show for the other funeralgoers—for instance, at one point, Fennell dropped to one knee in grief. To impeach Blackwell, the State presented evidence that none of Blackwell and Fennell's CAPCO classmates could corroborate Blackwell's claims.

Reed called LeRoy Riddick and Ronald Singer to testify at the -03 hearing, but the habeas court ruled that their testimony would go beyond the scope of this Court's remand order. However, the habeas court allowed Reed to obtain affidavits from Riddick and Singer and submit them after the hearing:

- In a 2006 affidavit, his second in Reed's case, LeRoy Riddick touched on the same topics he discussed in his 2003 affidavit: time of death; anal intercourse; cause of death; and evidence-collection practices. On the topic of Stacey's time of death, Riddick made the following observation: "In Ms. Stites'[s] case, the videotape and photos show that she was lying on her right side when found and that lividity occurred on the right side."

- In a 2006 affidavit, Ronald Singer touched on the same topics he discussed in his 2003 affidavit: crime scene control; the processing of evidence from Stacey's body; the poor quality of the videotape; and the deficiencies in Karen Blakley's trial testimony.

Reed also submitted, with the habeas court's permission, a post-hearing (2006) affidavit from Pamela Duncan, Fennell's girlfriend from August 1996 until September 1997. In the affidavit, Duncan described Fennell as abusive, possessive, controlling, and prejudiced toward African Americans. Duncan said that when she broke up with Fennell, he stalked her until he left Giddings (Fennell went to work for the Georgetown Police Department in Williamson County in November 1998), and that she was afraid for her and her children's safety. According to Duncan, this was "the worst time of [her] life."

Ultimately, the habeas court adopted the State's proposed findings of fact and conclusions of law. As a result, the habeas court generally declined to credit any of Reed's habeas witnesses. However, the State's proposed findings contained several inaccuracies. These "[r]egrettabl[e]" missteps prompted this Court to file and set the cause. *See Ex parte Reed*, 271 S.W.3d 698, 729 (Tex. Crim. App. 2008).

After laying out the pertinent facts, our opinion resolved three contested issues: (1) the extent to which we would adopt the habeas court's findings and conclusions; (2) whether Reed was entitled to relief on his Barnett-and-Blackwell-based *Brady* claims; and (3) whether, in light of all of the evidence he had adduced to date, Reed had shown by a preponderance of the evidence that he was actually innocent of Stacey's murder. *See* Art. 11.071, § 5(a)(2).

On the first issue, we noted that the record did not support some of the habeas court's findings and conclusions. We addressed the problematic findings and conclusions as follows:

> We attribute this inaccuracy (and other like findings) to the fact that the State generated the proposed findings[,] and they are therefore wholly representative of the State's interpretation of the evidence. Mindful of the role of an advocate, the [habeas] judge as a neutral arbiter should have more carefully scrutinized the State's proposed findings to ensure that they accurately reflect the evidence in the record before adopting them verbatim. Regrettably, the [habeas] judge's decision to adopt the State's proposed findings and conclusions verbatim has unnecessarily complicated our independent review of the record.

*Reed*, 271 S.W.3d at 729. Even so, we concluded that "the few instances … in which the findings [were] inconsistent or misleading" did not "justify a decision to totally disregard the findings that are supported by the record and are germane to our resolution of Reed's *Brady* claims." *Id.*

On the *Brady* claims, we concluded that Reed had failed to show that the State possessed the witness accounts of Barnett and Blackwell at the time of Reed's trial. We therefore denied relief on those claims. *Id.* at 733.

As for Reed's Section 5(a)(2) actual innocence claim, we explained that our analysis would balance the trial evidence against "all of the evidence that was not presented at his trial, namely the evidence presented in all three of Reed's applications." *Id.* at 734. Initially, we noted that "what separate[d] this case from the majority of gateway-innocence cases [wa]s the complete lack of a cohesive theory of innocence." *Id.* at 746. We described Reed's case for innocence as "seriously disjointed and fragmented" and said that it presented "numerous alternative but critically incomplete theories." *Id.* All in all, Reed "fail[ed] to tell a complete, rational exculpatory narrative that exonerate[d]" him. *Id.*

We "reject[ed] as unreliable" and therefore refused to credit "the witnesses who affirmed a relationship between Reed and Stacey" (Jon Aldridge, Linda Kay Westmoreland, Meller Marie Aldridge, Shonta Reed, Elizabeth Keehner, Walter Reed, Ron Moore, and Duane Olney). *See id.* at 747. We also found that James Robinson's statement was not credible. *Id.*

We went on to consider the evidence that, according to Reed, implicated Fennell in Stacey's murder:

- Fennell's deceptive polygraph results, "even though we question their reliability";

- The beer can DNA test results "that cannot exclude Officer Hall";

- Evidence that Curtis Davis took sick leave shortly after beginning his shift on the night of April 22, 1996; and

- Evidence that Fennell and the GPD had a reputation for violence.

*See id.* We acknowledged that this evidence "may indeed arouse a healthy suspicion that Fennell had some involvement in Stacey's death." *Id.* But in our view, this "healthy

suspicion" did not outweigh "[t]he evidence of vaginal assault . . . and the circumstantial evidence admitted against Reed at trial." *See id.*

We turned next to the opinions given by Riddick and Singer and Reed's reliance on William Green's book discussing spermatozoa in rape cases. First, addressing Reed's contention that "the evidence of anal intercourse [was] inconclusive," we noted that any "deficiency in the evidence suggesting anal intercourse" did not necessarily show that Reed and Stacey "engaged in consensual vaginal intercourse." *Id.* at 748. We reasoned that there was plenty of evidence apart from the anal-penetration evidence tending to show that Stacey was sexually assaulted: the state of Stacey's body and clothing at the Bluebonnet Drive scene; her injuries; her life circumstances; and other things. *See id.* at 748–49. We also noted that, when the police questioned Reed, he denied knowing her. In our view, "[t]his made Reed's claim of a consensual sexual relationship, offered for the first time at trial, look like a manufactured and implausible explanation … for the presence of his semen." *Id.* at 749.

Addressing Reed's argument that Blakley's testimony regarding the longevity of intact spermatozoa was false, we noted that Reed's habeas evidence was not tailored to the facts of this case. Green's book "was based on an analysis of cervicovaginal scrapings," while Blakley's analysis was based on "vaginal swabs." *Id.* But even assuming that "Blakley and . . . Bayardo underestimated the length of time that sperm will remain intact," we concluded that "given the other evidence in this case, Reed . . . failed to meet his burden." *Id.* at 750. In other words, even if the longevity of intact spermatozoa made it

*possible* that Reed and Stacey had consensual sex before April 23, 1996, the circumstantial evidence made that bare possibility seem highly unlikely.

Finally, we addressed Jennifer and Brenda Prater's statements. We first "question[ed] the[] reliability" of the Praters' statements because the Praters "did not come forward with this information until September 2002, even though the investigation into Stacey's death was well known in Bastrop."[3] *Id.* We also found Jennifer's credibility "suspect" because her husband, Paul, did not corroborate her account in an affidavit. *Id.* at 751. More importantly, however, the Praters' evidence "ha[d] no continuity with any of the other new evidence" and did not "fit within the chronicle of events that the trial evidence" supported. *Id.*

After "reviewing the cumulative force of all the foregoing evidence," we concluded that Reed had "failed to satisfy the gateway standard under Article 11.071, Section 5(a)(2)." *Id.* That is, Reed failed to prove by a preponderance of the evidence that he was actually innocent. We therefore refused to review Reed's remaining claims and otherwise denied relief. *Id.*

**G. Reed's -04 Application**

---

[3] Presiding over Reed's federal habeas proceedings, Federal District Judge Lee Yeakel found that this credibility determination was objectively unreasonable. Judge Yeakel pointed out that the record contained investigative notes proving that the police had spoken with Brenda and Paul Prater while investigating Stacey's death. *Reed v. Thaler*, No. 1:02-cv-00142-LY, order at 18–20 (W.D. Tex. Sept. 25, 2012). Judge Yeakel nevertheless found that the Praters' information was immaterial. *Id.* at 21–23. He ultimately denied relief. *See also Reed v. Stephens*, 739 F.3d 753, 787 (5th Cir. 2014), *cert. denied.*, 574 U.S. 973 (2014).

Reed filed his third subsequent (-04) 11.071 application in March 2007. As mentioned, in the -03 proceeding, Reed offered Pamela Duncan's affidavit in support of his actual innocence claim. In the -04 application, he offered it as *Brady* evidence. Because Reed could have discovered Duncan's affidavit before he filed his -03 application, we dismissed Reed's -04 application (along with his -05 application, *see infra*) under Article 11.071, Section 5. *Ex parte Reed*, No. WR-50,961-04, -05, 2009 WL 97260 (Tex. Crim. App. Jan. 14, 2009) (not designated for publication).

### H. Reed's -05 Application

Reed filed his fourth subsequent (-05) 11.071 application in July 2008. Reed presented this Court with a Williamson County indictment showing that, in December 2007, Fennell was charged with one count of aggravated sexual assault, one count of aggravated kidnapping, one count of improper sexual activity with a person in custody, and one count of official oppression. Per the indictment, all four charges stemmed from an October 26, 2007 encounter Fennell had with a woman given the pseudonym Amanda Smith. An accompanying search-warrant affidavit revealed that Amanda Smith had come to the Williamson County Sheriff's Office (WCSO) at 1:50 a.m. on October 26, 2007 to report that she had been sexually assaulted by a police officer.

According to Smith:

"Officer Fennell" drove her to a location which she believed to be a park, stopped the patrol unit, and got her out of the car. Fennell unhandcuffed her and asked her to dance for him outside of his patrol unit, then had her place her hands on the trunk of his patrol unit, pulled down her pants, and penetrated her vaginally from behind with his penis. The defendant asked [Smith] if she liked it, she said no and asked him to stop, and he did not. When the officer was finished, he drove her back to the original apartment

complex and dropped her off. The victim immediately reported the sexual assault by calling 9-1-1.

Smith picked Fennell out of a photo lineup as the officer who had assaulted her. A Georgetown Police Department Internal Affairs report corroborated that, shortly after Fennell dropped Smith off at her apartment complex, she was "screaming and yelling that she had been raped."

Reed produced a copy of Fennell's plea hearing, which showed that Fennell pleaded guilty to improper sexual activity with a person in custody and non-aggravated kidnapping. The State "waive[d]" counts one and four of the indictment (corresponding to aggravated sexual assault and official oppression) and recommended a partially-probated sentence that included Fennell permanently surrendering his peace officer's license. Reed alleged that the trial judge ultimately rejected the plea and that "Mr. Fennell [would] answer to charges of aggravated kidnapping and sexual assault at a trial set [for] the Fall of 2008." However, the record reflects that the trial court ultimately accepted Fennell's guilty plea. At the later -10 hearing, Fennell testified that he served "day for day" a ten-year prison sentence stemming from his guilty plea. *See infra.*

Reed also attached to his -05 application:

- A Travis County Sheriff's Office (TCSO) incident report describing a May 2004 encounter between Fennell and a woman named Angie Lee Smith ("Angie"). According to the report, just before 1:00 a.m. on May 9, 2004, Angie approached a Travis County Sheriff's deputy at a Shell station. Her hands shaking, Angie stated that she had just been pulled over in Georgetown by an "Officer J. Fennel." Fennell allegedly told Angie that he pulled her over because she had a crooked license plate. When Angie handed Fennell her driver's license, he said it was expired. Fennell asked Angie "what [she] wanted to do about it." When Angie offered to get everything up to date within a week, Fennell asked her for a "lap dance" instead. Angie stated that Fennell never made physical contact with her. The TCSO deputy

responding to Angie's call wrote that she "would make and maintain eye contact" and that "her statement stayed consistent."

- A print-off from a MySpace page administered by a person with the internet moniker "pointman_1." The page contained "sexually explicit and violent" imagery—for instance, there was "a picture of … a police officer dressed in [a] SWAT uniform holding a gun to a woman's head while the woman gives him oral sex." Reed alleged—but did not offer any concrete evidence—that "pointman_1" was Fennell.

- A written complaint that Fennell filed with D. E. Sosa, the Giddings City Manager, in August 1998. Among other things, Fennell complained that David Hall had said something to him during the investigation into Stacey's death that upset him. Fennell did not elaborate, but said that he had "forgive[n]" Hall for the comment. Fennell explained that Hall wanted a promotion and would "burn anyone to get" it. In his application, Reed alleged that this complaint showed that Hall was making statements in 1998 that implicated Fennell in Stacey's murder.

- An indictment filed against former Bastrop County Sheriff Richard Hernandez. The indictment, filed in July 2007, charged Hernandez with four counts of theft by a public servant, one count of misapplication of fiduciary property, and one count of abuse of official capacity. Some of the charges involved a pattern of conduct dating back to 1997–98, when Stacey's murder investigation was still ongoing. Reed argued that this alleged misconduct undermined the reliability of BCSO's investigation into Stacey's death.

Reed's -05 application raised *Brady*, *Elizondo*, and Section 5(a)(2) claims, but we dismissed the application under Article 11.071, Section 5. *Ex parte Reed*, No. WR-50,961-04, -05, 2009 WL 97260 at *6 (Tex. Crim. App. Jan. 14, 2009) (not designated for publication). We explained that the evidence of Fennell's crimes (relating to Amanda Smith) and misconduct (relating to Angie Smith) did not "exonerate Reed of Stacey's murder." *Id.* Those incidents showed only that Fennell had "engaged in despicable and reprehensible conduct as an officer with the Georgetown Police Department." *Id.* As for the "pointman_1" MySpace page, we noted that, other than "mere conjecture by Reed," there was no proof that the web page was Fennell's. *Id.* Therefore, this evidence, even if

newly discovered, did not establish a prima facie case for relief under *Brady* or *Elizondo*. As for Section 5(a)(2), we gave Reed every benefit of the doubt and "consider[ed] all of the evidence not presented at his trial." *See id.* at *5. But even adding all of this "new" evidence into the mix, we remained unpersuaded that Reed had shown by a preponderance of the evidence that no reasonable juror would have found him guilty beyond a reasonable doubt. *See id.* at *6.

### I. Reed's -06 Application

Reed filed his fifth subsequent (-06) 11.071 application in April 2009. The evidence supporting the application fell into two general categories: (1) "additional evidence of Jimmy Fennell's history of sexual assault, misconduct, and violence"; and (2) a "suppressed . . . account of [a witness] seeing Mr. Reed and Ms. Stites together prior to the murder." The attached evidence included:

- A January 2008 WCSO report in which a woman with the initials "B.A." claimed that a Georgetown officer named "Sgt. Fennel" had "raped" her on March 12, 2007. In essence, B.A. alleged that, after "Sgt. Fennel" arrested her for drug possession, he coerced her into sex to make the charges go away.

- A December 2007 WCSO report in which a woman named Kelly Ramos claimed that Fennell had "acted inappropriately" during a traffic stop in August 2007. Specifically, Ramos claimed that Fennell stared lewdly at her breasts during a traffic stop and told her that he would come by her apartment at around 3:00 a.m. so that they could "discuss" her situation.

- A February 2008 WCSO report in which a woman named Mary Ann Bone accused Fennell of asking her, during a police dispatch to Bone's house, whether he could "bend her over the couch and fuck her." Bone stated that she decided to speak with WCSO because she "just wanted to help the girl who was making the allegations" and "knew how it felt for no one to believe her."

- A December 2007 WCSO report in which a woman named Jamie Bolin claimed that Fennell made inappropriate comments to her during a late October/early

November 2007 domestic violence dispatch. When Fennell arrived, Bolin's boyfriend had already fled the scene. Fennell told Bolin "it sounded like she needed a new boyfriend" and began asking her personal questions. Fennell "looked at [Bolin] in a manner than made her uncomfortable." Bolin claimed that Fennell left shortly thereafter but returned an hour later to ask her more questions, including "what she did for fun and whether she had ever considered dating older men."

- A November 2007 WCSO report in which there was some suggestion that Fennell might be abusing his then wife, Aida Fennell. Specifically, one of Aida's coworkers, Keith Tubbs, told a WCSO investigator that Fennell had once called Tubbs asking if he (Tubbs) had made a phone call to Fennell's house. The conversation continued:

  > [Tubbs] further advised that Jimmy began to ask if Aida was seeing someone at [work]. During the conversation it was brought up that Aida had previously shown up at work with bruises on her face and claimed it was a result of being hit in the face by a phone when Jimmy became upset with her and threw a phone at her. Tubbs advised that Aida was nervous about Jimmy because he was jealous and had a temper and expressed concern about the death of his former fiancé[e] in Giddings.

- A Texas Rangers report dated January 15, 2008, in which a woman named Wendy Wallace claimed that Fennell and David Hall had stalked her in Giddings in 1996 or 1997.

Reed also attached what he described as a "suppressed . . . account" of a witness who allegedly saw "Mr. Reed and Ms. Stites together prior to the murder." The attached witness statement showed that, in January 2008, a woman named Jeannie Reese spoke with the Texas Attorney General's Office. Reese explained that she was a volunteer with Travis County Victim's Services. Reese asserted that, "[a]bout ten or twelve years ago," she was sent to Bastrop County to inform a family that one of their loved ones had died in a car crash. Reese stated that there were "a lot of people … outside the home." Everyone at the house was African American, "with the exception of one young woman who was white." She was very petite, "maybe 5'0 to 5'1 and weighed about 100–110 lbs. She was what I

would call tiny." The woman was holding hands with an African American man who was 5'11" or 6'0" and weighed "about 170 lbs."

Reese claimed that a week or two after that incident she saw a news story about a "missing girl" who lived in Bastrop. Reese thought the girl looked familiar, so she called the Sheriff's Department and "notified them that I thought that maybe the girl on t.v. was the girl I saw at that house." The Sheriff's Department representative told her that her information "had nothing to do with their case." Later, when Reese saw some news stories about Reed, she thought he looked familiar, too. Reese told the Attorney General's Office that Reed and Stacey "might have been the couple I saw at that house." But she clarified that she had "never met and [did] not know … Stacey Stites or Rodney Reed."

Reed's -06 application raised *Brady*, *Elizondo*, and Section 5(a)(2) claims, but we dismissed the application under Article 11.071, Section 5. *Ex parte Reed*, No. WR-50,961-06, 2009 WL 1900364 (Tex. Crim. App. Jul. 1, 2009) (not designated for publication). Echoing our reasoning in the -05 order, we noted that Reed's "allegations of Fennell's misconduct and domestic violence" did not exonerate Reed. *Id.* at *1. As for "the possible sighting of the victim and [Reed] together," we stated that Reese did not "positively identify either the victim or [Reed], and her description of the woman she saw [was] not consistent with descriptions of the victim." *Id.* Ultimately, we held: "The totality of the evidence before us still supports a guilty verdict. This application fails to meet the gateway standard of … Section 5(a)(2), fails to make a prima facie showing of actual innocence under *Elizondo* and *Herrera*, and fails to show a *Brady* violation." *Id.* at *2.

### J. Chapter 64 Litigation

Reed filed a Chapter 64 motion for DNA testing the same day the convicting court set his first execution date—July 14, 2014.[4] Among other things, the motion included a third affidavit from LeRoy Riddick (this one dated June 16, 2010), in which Riddick claimed that: (1) he was aware of multiple "[r]eliable scientific studies [that] have found morphologically intact sperm in the human vagina after two, four, five, six, seven and even 10 days"; and (2) based on the limited amount of semen found in Stacey's underwear and rectum, "it is highly unlikely that Mr. Reed and Ms. Stites had sexual intercourse within 24 or even 48 hours of Ms. Stites's death."

The convicting court held a hearing on Reed's Chapter 64 motion and orally denied it on November 25, 2014. On December 12, 2014, the convicting court signed findings of fact and conclusions of law supporting its ruling. Reed appealed the convicting court's ruling to this Court. Initially, we concluded that the convicting court's findings were incomplete; accordingly, we remanded the case to the convicting court for "additional findings." *Reed v. State*, No. AP-77,054, 2016 WL 3626329 (Tex. Crim. App. Jun. 29, 2016) (not designated for publication). After the convicting court made supplemental findings, we issued an opinion affirming the denial of testing. *See Reed v. State*, 541 S.W.3d 759 (Tex. Crim. App. 2017), *cert. denied*, 138 S. Ct. 2675 (2018). *But see also Reed v. Goertz*, 143 S. Ct. 955, No. 21-442 (Apr. 19, 2023) (holding that, in a 42 U.S.C. §

---

[4] The record of Reed's Chapter 64 litigation was not introduced at the -10 hearing. But under Texas Rule of Evidence 201, a court can *sua sponte* take judicial notice of facts—even adjudicative facts—so long as they are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* TEX. R. EVID. 201(b), (c). We take judicial notice of the record of Reed's Chapter 64 litigation, which is in this Court's possession.

1983 suit challenging the constitutionality of a state's procedures for seeking postconviction DNA testing, the statute of limitations begins to run not when the state trial court first denies testing, but when the ensuing state appellate litigation ends).

### K. Reed's -07 Application

Reed filed his sixth subsequent (-07) 11.071 application in February 2015. Among other things, Reed attached newly obtained statements from the State's trial experts:

- In a 2012 declaration, Roberto Bayardo, the medical examiner who autopsied Stacey's body, offered four "opinions and clarifications" regarding his trial testimony. First, Bayardo stressed that the time-of-death estimate he offered at trial was just that—an estimate. Second, Bayardo disputed Karen Blakley and Megan Clement's trial testimony that spermatozoa begin to break apart at 24–26 hours. Bayardo continued, "[T]he fact that I found 'very few' (as stated in the autopsy report) spermatozoa in Ms. Stites's vaginal cavity suggests that the spermatozoa was not deposited less than 24 hours before Ms. Stites's death." Third, Bayardo suggested that the State had mischaracterized his testimony regarding evidence of spermatozoa in Stacey's rectum. Fourth, Bayardo opined that "the presence of spermatozoa in Ms. Stites's vaginal cavity was not evidence of sexual assault. There was no indication that the spermatozoa in Ms. Stites's vaginal cavity w[ere] placed there [non-]consensually."

- In a 2012 email exchange between Reed's habeas lawyer Bryce Benjet and State's trial expert Meghan Clement, Clement stated that (1) processing rape kit samples can break the tails off of sperm cells, and (2) her testimony regarding the longevity of intact sperm was based on her experience as a serologist, not on any scientific literature.

Reed also attached new affidavits and statements from his own postconviction experts:

- Dr. Werner Spitz stated in a 2015 affidavit that Stacey's body should have been examined by a qualified pathologist in a controlled environment, rather than at the crime scene. Further, based on the lividity pattern on Stacey's body, the amount of rigor she showed on the crime scene video, the amount of residual sperm in her genital tract, and the signs of decomposition noted by Bayardo and others, Spitz considered it "indisputable" that Stacey died 20–24 hours before her body was filmed. If accurate, this would put Stacey's time of death at around 5:15–9:15 p.m.

on April 22, 1996. Spitz also stated that intact spermatozoa can be found in the vagina up to 72 hours after coitus. Finally, Spitz believed that Bayardo was mistaken to attribute Stacey's distended anus to penile penetration, since the human anus naturally relaxes upon death.

- In a 2015 statement, Dr. Michael Baden said that: (1) the distribution and intensity of Stacey's lividity showed that she was murdered before midnight on April 22, 1996; (2) Stacey was already dead with signs of decomposition when she was placed in the truck; (3) intact sperm can persist for two or three days after consensual vaginal intercourse; and (4) there was no evidence that Stacey engaged in anal sex before she died and no evidence that she was sexually assaulted.

- LeRoy Riddick submitted a fourth affidavit on Reed's behalf, this one executed in 2015. Riddick stated that based on the amount of rigor Stacey showed on the Bluebonnet Drive video, Stacey likely died "16–20 hours from the first documentation of the body at 5:15 p.m." This would correspond with a time of death in the 9:15 p.m. (April 22) – 1:15 a.m. (April 23) range. Further, based on the lividity pattern on Stacey's body, her "body was in a different position in which the right arm and shoulder were dependent [i.e., lower than the rest of her body] for at least 4–6 hours." Finally, Riddick asserted that morphologically intact sperm can be seen up to 72 hours after intercourse and that there was no evidence that Stacey's anus was penetrated before she died.

- In a 2015 affidavit, Robert Johnson, who held a Ph.D. in analytical chemistry and who worked for the Tarrant County Medical Examiner's Office, stated that he had reviewed the March 20, 1998 toxicology report prepared by National Medical Services (NMS). *See supra* p. 26. The gist of Johnson's affidavit was that, if Stacey's hair were re-tested using current analytic methods, "there is a good possibility that the testing can yield results that were previously undetectable."

- Dr. Merrill Lewen, a board-certified obstetrician/gynecologist, claimed in a 2015 affidavit that she had "regularly prescribe[d] birth-control pills to [her] patients … since [she] began [her] residency in 1990." Therefore, Lewen was "familiar with the brands of birth-control that were available in the mid-1990s." At trial, Fennell testified that he and Stacey did not have sex on the evening of April 22, 1996 because Stacey was on the "vitamin" phase of her birth-control regimen. The gist of Lewen's affidavit was that this testimony was false. Lewen was unfamiliar with any birth-control instructions stating that the patient is at a higher risk of pregnancy during "the placebo pill week." Further, "[n]o physician would have told a patient this information or put such information in a prescription, as it is simply false." Lewen had also never heard of anyone referring to the placebos as "vitamins."

- Kevin Gannon, a retired New York Police Department detective, claimed in a 2015 affidavit that he had reviewed the evidence in Reed's case. In Gannon's opinion, the evidence pointed to a murder that happened much earlier in the evening than the State had theorized. Based on Gannon's perception of Stacey's lividity, rigidity, and "decompositional changes," Gannon concluded that Stacey could not have been murdered between 3:00 and 5:00 a.m. on April 23, 1996. According to Gannon, the evidence supported a time of death between 7:00 and 11:00 p.m. on April 22. Gannon also claimed that (1) many police officers sit on top of their lap belts; (2) Stacey's fingernails were "closely cut," and a lay person is unlikely to have known that fingernails often contain incriminating evidence; and (3) the crime scene looked staged. Gannon asserted that these facts implicated Fennell in Stacey's murder.

- Joseph Warren, who held a Ph.D. in molecular biology, stated in a 2015 affidavit that, although studies varied, "[t]here is consensus among forensic biologists that intact sperm can be found inside a human woman more than 24 hours after intercourse." According to Warren, "Reliable testimony on this issue must come from accepted forensic biological science, which clearly indicates that intact sperm can survive for at least 72 hours in the body."

In addition, Reed produced a handful of new eyewitness accounts:

- Alicia Slater, a California resident, stated in a 2015 affidavit that she had worked at the Bastrop H-E-B from 1995 until May 1996. Slater said that she would sometimes talk with Stacey during their lunch breaks. Slater claimed that, "[o]n one occasion," Stacey revealed that she was "sleeping with a black guy named Rodney." Slater also "remember[ed] that some people at the HEB thought that . . . Jimmy Fennell committed the murder." She claimed that she did not come forward with this information any sooner because she: (1) did not want to be involved; (2) did not trust the police in Bastrop; (3) feared that there would be repercussions for her family; (4) assumed that the relationship between Reed and Stacey was common knowledge; (5) feared that if she said something, she would have to return to Bastrop to testify; and (6) did not realize the importance of what Stacey had said to her. But when Slater saw a Facebook post stating that Reed had an execution date, she "realized that it was now or never." Slater "felt morally compelled to tell someone" what she knew.

- Lee Roy Ybarra, a Bastrop resident, asserted in a 2015 affidavit that he was one of Stacey's coworkers at the Bastrop H-E-B. Ybarra claimed to have seen Stacey "talking with a young black man in the store" several times. Stacey's demeanor would change whenever this young man came around: "She seemed happy to see him and would be in a good mood." By contrast, whenever Stacey's fiancé came in the store to visit her, "she would become a nervous wreck. I know that there were times that Stacey would deliberately hide so that she didn't have to talk to him."

> After Stacey's death ("[m]uch later"), Ybarra read a newspaper article about Stacey's murder. The article contained a picture of the suspect. Ybarra had a sudden reaction: "I quickly said to myself that this is the same black man who used to visit [Stacey] at the store. It was then that I found out that the man's name was Rodney Reed." Ybarra claimed that he did not come forward with this information any sooner because no one ever asked him what he knew: "If anyone had asked, I would have gladly told them what I knew about Stacey Stites and Rodney Reed."

In a 2015 affidavit, a Travis County resident named Richard Scroggins described a disturbing incident that he witnessed at the Bastrop Whataburger in April 1996. Outside the restaurant, near the entrance, Scroggins claimed to have seen "a stocky-framed man with either a shaven head, or very little hair … screaming at the top of his lungs to a young, attractive, white young lady who appeared to be in her late teens or early twenties." The man was calling the woman awful names—"cheating, lying cunt . . . slut . . . whore"—and shaking his fist at her. According to Scroggins, the young woman asked the man, "Can we please not do this here[?] This is where I work. Let's talk about this when we get home." But the man would not stop. Many years later, "[b]etween five to ten years ago," Scroggins was reading an article in the Austin Chronicle about Stacey's murder when he saw some photographs of Fennell and Stacey. Scroggins "had no doubt that these were the two individuals from the encounter of April 1996." He claimed to have come forward with this information "just as soon as [he] realized that it might be relevant or helpful."

Finally, Reed submitted an affidavit of his own, dated November 21, 2014—just a few weeks shy of his first execution date. Among other things, Reed asserted that the last time he and Stacey had (consensual) sex was in the early morning hours of April 22, 1996. Reed also echoed Jon Aldridge's claim that Fennell had once told Reed "th[at] he knew I was messing around with his girl and that I was going to pay."

Reed's -07 application raised a claim of actual innocence, a claim under Code of Criminal Procedure Article 11.073, and a claim that his trial was tainted by "false, misleading, and scientifically invalid testimony." Reed further asked this Court to reconsider its prior habeas denials "[i]n light of the new forensic evidence" and the new eyewitness accounts.

We initially stayed Reed's execution "pending further order of this Court." *Ex parte Reed*, No. WR-50,961-07, 2015 WL 831673 (Tex. Crim. App Feb. 23, 2015) (not designated for publication). Then, in June 2016, Reed filed a "[s]upplement to his pending [-07] Application for Writ of Habeas Corpus," which we construed as his seventh subsequent (-08) 11.071 application. *See infra*. We concluded that portions of the -08 application satisfied Article 11.071, Section 5. So, in a single order, we remanded the -08 application and dismissed the -07 application for failing to satisfy Section 5. *Ex parte Reed*, Nos. WR-50,961-07, -08, 2017 WL 2131826 (Tex. Crim. App. May 17, 2017) (not designated for publication). In dismissing the -07 application, we explained that Reed had "failed to make a *prima facie* showing on any of his claims." *Id.* at *1.

**L. Reed's -08 Application**

In his -08 application, Reed alleged that, in the spring of 2016, BCSO deputy Curtis Davis agreed to be interviewed for a CNN documentary about Reed's case. During the interview, Davis told CNN that he and Fennell had spoken on April 23, 1996 (before Stacey was found dead) about Fennell's whereabouts on the evening of April 22. According to Davis, Fennell said that he had been drinking the night of April 22 and "stayed out late" so as not to disturb Stacey.

Reed alleged that this new information (1) added to his pending (-07) actual innocence claim, (2) constituted *Brady* evidence, and (3) showed that Fennell testified falsely at trial when he testified that he and Stacey spent the evening of April 22 together in their apartment. In May 2017, we remanded the -08 application for "resolution" of Reed's *Brady* and false testimony claims. *Ex parte Reed*, Nos. WR-50,961-07, -08, 2017 WL 2131826 (Tex. Crim. App. May 17, 2017) (not designated for publication). We held that Reed had failed to make a prima facie showing of actual innocence and so did not remand that claim. *Id.* at *1.

The evidentiary hearing on Reed's -08 application took place in October 2017. Reed called multiple witnesses, including Fennell (who immediately invoked, through counsel, his Fifth Amendment privilege against self-incrimination).

Reed also called Curtis Davis as a witness. Through Davis, Reed was able to introduce a transcript of the CNN interview. Based on the transcript, Davis told CNN that:

- On April 23, 1996, Fennell told Davis that, "[t]he night before," Fennell and some other police officers "had consumed a little bit of alcohol." Davis said he would not describe Fennell and his group as "drunk," because "that's not what he [Fennell] said," but they "drank a few beers . . . in and around the vehicle."

- Fennell took the truck home "later that night after practice." But Davis did not know exactly when that happened: "[I]f somebody was to ask me a direct question about what time [Fennell] got home that night, I couldn't answer that 'cause I [was never] told." Davis "assume[d]" that it was "10:00'ish, 11:00 maybe at night. You know, after he powed [sic] around with the guys a little bit."

- Fennell's "whole reasoning for … not coming straight back home was Stacey was asleep" and he "didn't want to disturb her."

On direct examination, Davis stated that the transcript accurately represented what he told CNN. On cross-examination, the State emphasized the fact that, by Davis's own admission,

Fennell did not expressly tell him what time he got home or even that Stacey was asleep when he got home. Davis had only "guessed" and "assumed" those things.

In addition, Michael Baden, who provided an affidavit for the -07 application, testified at the -08 hearing. In Baden's opinion, the forensic evidence suggested that Stacey died sometime before midnight on April 22, 1996. He based this conclusion on (1) the lividity patterns on Stacey's body; (2) her apparent level of rigor mortis; and (3) signs of decomposition in her body (e.g., "skin slippage"). Baden theorized that Stacey's body was in the truck, her face and arm angled downward, for four or five hours before it was moved. Baden also stated that the autopsy revealed no evidence that Stacey was "anally raped." He based this conclusion on the normality of postmortem anal dilation and the absence of blood and semen around Stacey's anus. Baden stated that if there was semen in Stacey's anus, it was likely the result of cross-contamination and/or vaginal drainage. Finally, Baden testified that spermatozoa can remain intact for more than 24 hours in the human body.

The habeas court adopted the State's proposed findings and conclusions. As a result, the habeas court found that:

- Fennell never told Davis what time he arrived home on April 22, 1996—Davis simply "surmised" that information;

- Fennell never told Davis that Stacey was asleep when he arrived home on April 22, 1996—Davis's claim that Stacey was asleep when Fennell got home was "an assumption"; and

- Baden did not testify that he would have been available to testify at Reed's capital murder trial or that, if he testified, he would have offered the same testimony that he presented on habeas.

We ultimately denied relief on the remanded claims based on our own review of the record. *Ex parte Reed*, Nos. WR-50,961-08, -09, 2019 WL 2607452 (Tex. Crim. App. Jun. 26, 2019) (not designated for publication), *cert. denied*, 140 S. Ct. 686 (2020). We further "dismiss[ed] any other grounds [Reed] raised in his -08 application as an abuse of the writ for failure to satisfy Article 11.071 § 5." *Id.* at *2.

**M. Reed's -09 Application**

Reed filed his eighth subsequent (-09) 11.071 application in June 2018, when the -08 application was still pending in this Court. The gist of the application was that the trial testimonies of Karen Blakley, Meghan Clement, and Roberto Bayardo had all been recanted, proven false, or otherwise undermined. Reed attached several exhibits in furtherance of this theme:

- In a 2018 letter made in response to a request from Reed's habeas lawyer Bryce Benjet, DPS Crime Lab employee Brady Mills stated that he did not believe that Blakley's trial testimony constituted professional negligence or misconduct. "However," Mills continued, DPS's review of Blakley's testimony had revealed some "potential limitations in the paper she cited during [her] testimony: Spermatozoa—Their Persistence After Sexual Intercourse, GM Willott and JE Allard, Forensic Science International, 19 (1982) pp[.] 135–154." Specifically, Mills noted that the Willott and Allard paper had analyzed data from *living* subjects who *self-reported* the time between intercourse and sample collection. Further, the Willott and Allard paper had itself referenced a "Davies and Wilson" study that "reported 72 hours as the longest time for intact spermatozoa to be found in the vagina." Mills concluded that "the literature varied greatly in the time given for finding spermatozoa (intact and otherwise) in the female reproductive tract."

- In a 2018 letter, Stephane Sivak, one of Bode Cellmark's Technical Leaders, alleged that Meghan Clement's testimony contained "unsatisfactory statements." Sivak classified the statements in question as "Error Type 3," meaning that Clement had inappropriately "cite[d] the number of cases and/or samples worked in the lab as a predictive value to bolster the conclusion that the DNA profile belong[ed] to a specific individual," or "otherwise testifie[d] beyond the scope of … her expertise." Sivak specifically criticized Clement's testimony that: (1) spermatozoa start losing

their tails "after a short period of time"; (2) she could not recall ever having found intact spermatozoa twenty to twenty-four hours after a sexual assault; and (3) her opinion was based on the "thousands of rape kits" she had processed as a serologist.

- In a 2018 affidavit, Purnima Bokka, one of Bode Cellmark's DNA analysts, stated that "[s]everal studies have been conducted to study the persistence of spermatozoa in body cavities." Bokka cited five such studies (publication dates ranging from 1972 to 2003—one of which was the aforementioned "Davies and Wilson" study) and noted that "[s]ome studies have shown that intact sperm are less commonly seen as late as 72 to 144 hours in the vaginal cavity." Bokka further stated that, with over 500 cases processed, she had never encountered intact sperm in her forensic casework.

- In a 2015 affidavit, Calvin "Buddy" Horton, one of Stacey's cousins, described an incident he witnessed "[o]ne Sunday evening" around five or six o'clock in October or November 1995. Specifically, Horton claimed that he was taking his kids to the Dairy Queen in Bastrop when he saw Stacey coming out of the Dairy Queen with "a black man." Seeing Stacey with a black man did not surprise Horton because his parents had told him that she dated black men. When Horton "hollered at [Stacey] to get her attention," Stacey and the man both looked directly at Horton, but neither came toward him. Stacey seemed "shocked" and "embarrassed"; she quickly left with the man without introducing him to Horton. According to Horton, Stacey and the man left in "a darker colored car that Stacey was driving." Horton further claimed that, "sometime after Stacey's death," he saw pictures of Reed on the news and recognized Reed as "the same man I saw with Stacey at the Dairy Queen in 1995."

In June 2019, in the same order in which we denied relief on Reed's -08 application, we dismissed Reed's -09 application as an abuse of the writ. In our view, Reed had failed to show prior unavailability under Section 5(a)(1) or actual innocence under Section 5(a)(2). *Ex parte Reed*, Nos. WR-50,961-08, -09, 2019 WL 2607452 (Tex. Crim. App. Jun. 26, 2019) (not designated for publication), *cert. denied*, 140 S. Ct. 686 (2020).

### III. THE INSTANT CASE: REED'S -10 WRIT

**A. Application and Remand Order**

Reed filed his ninth subsequent (-10) 11.071 application in November 2019, five months after we denied Reed's -08 application and dismissed his -09 application. Reed presents eight affidavits that he alleges contain previously-unavailable facts:

- Arthur Snow stated in a 2019 affidavit that, from December 2010 until September 2011, he was an inmate at the Stevenson Unit in Cuero, Texas. Snow asserted that, while in prison, he had joined the Aryan Brotherhood, a whites-only prison gang, and rose to become a "respected member of the gang." Snow claimed that, sometime in 2010, a white man named Jimmy Fennell approached him at the Stevenson Unit and asked for Aryan Brotherhood protection against the prison's "blacks and Mexicans." Snow further claimed that, on one occasion, Fennell told Snow that his (Fennell's) fiancée "had been sleeping around with a black man behind his back." According to Snow, toward the end of the conversation, Fennell said, "I had to kill my n*****-loving fiancé[e]."

- An unnamed insurance salesperson[5] claimed in a 2019 affidavit that, sometime in November 1995, she was at a "lodge hall" gathering where Fennell was moonlighting as a security guard when she struck up a conversation with Stacey. The salesperson convinced Stacey to apply for a life insurance policy. As she was filling out the form, Stacey remarked, "I really don't know why I need life insurance since I am so young." Fennell allegedly replied, in the salesperson's presence, "If I ever catch you messing around on me, I will kill you and no one will ever know it was me that killed you." From Fennell's tone, the salesperson sensed that Fennell's comment "was not presented as a joke." The salesperson "took it as a threat on [Stacey's] life." The salesperson further claimed that, in 2015, she wrote letters to Governor Greg Abbott and Attorney General Ken Paxton to tell them what she knew. The salesperson said that she never heard back from them.

- Former BCSO deputy Charles Wayne Fletcher stated in a 2019 affidavit that he worked with Fennell for a time and that he and his wife were friends with Fennell and Stacey. Fletcher claimed that, on one occasion in March 1996, Fletcher was at Fennell and Stacey's apartment, and it seemed to Fletcher that Fennell and Stacey's relationship was "not in a good place." They "were short with each other and raised their voices . . . when they spoke." According to Fletcher, Fennell confided in him during that visit that "he believed Stacey was 'fucking a n*****.'" Fletcher further

---

[5] In a footnote to his -10 application, Reed explained that, "out of respect for [this] witness's safety concerns" and "in light of Mr. Fennell's release from prison," he had redacted all identifying information from this witness's affidavit. Reed represented that the State knew the witness's identity and that State investigators had already interviewed her. The insurance salesperson later testified at the -10 hearing. *See infra* p. 67 (testimony of Rubie Volek).

stated that he attended Stacey's funeral, and that before, during, and after the service, Fennell seemed "cold, empty, and emotionless."

- Former Lee County Sheriff's Office (LCSO) deputy Jim Clampit stated in a 2019 affidavit that he attended Stacey's funeral. Clampit alleged that, during the viewing services, he was standing next to Fennell when he heard Fennell say "something along the lines of, 'You got what you deserved.'" According to Clampit, Fennell was directing this comment at Stacey's body. Clampit was "shocked and floored" by Fennell's words, because it did not strike Clampit as "something a grieving partner would say to their murdered fiancé[e]."

- Former BCSO deputy Richard Derleth stated in a 2019 affidavit that he knew Fennell through his work and that he "vaguely knew Stacey Stites from her job at … H-E-B." According to Derleth, he sometimes chatted with some of the other Bastrop H-E-B employees. One time, before Stacey died, a checker at H-E-B told Derleth that Stacey's coworkers "would keep a look-out for Jimmy Fennell to see if he would come into the store." The checker allegedly told Derleth that if H-E-B employees saw Fennell coming into the store, "they would tell Stacey and she would run and hide from Jimmy." The checker also stated that the employees were "concerned that if they did not alert Stacey to Jimmy's presence in the store before he found her, he would start a verbal fight with her." Derleth claimed that he told a few people at "the Sheriff's Office" about what he knew, but he was not sure what they did with the information. He also stated, "[I] mostly kept [this information] to myself because I tried to avoid creating a problem for the employees at H-E-B who shared this with me."

- Former Giddings resident Brent Sappington stated in a 2019 affidavit that, in early 1996, when he and his wife Vicki were at his father Bill's apartment in the Rolling Oaks Apartments in Giddings, he (Brent) heard "a lot of loud noises and banging" coming from the apartment above. To Brent, it sounded like "loud arguing and fighting." When Brent asked Bill "what that was," Bill said that it was "Jimmy yelling and screaming and 'getting into it' with Stacey." Brent claimed that Bill had previously told him that he had heard Fennell yelling abusive things at Stacey at night.

- Vicki Sappington, Brent's wife, stated in a 2019 affidavit that her father-in-law Bill Sappington lived at the Rolling Oaks Apartments in Giddings. According to Vicki, Bill was "very concerned about the way Jimmy treated Stacey." Bill heard "loud noises and thumping sounds at all times of the night from arguments above him." Fennell's language toward Stacey was abusive, aggressive, and angry, and Bill believed that Fennell was physically abusing Stacey. Further, Bill was "devastated" when Stacey died. He told Brent and Vicki that he had contacted law enforcement to tell them what he knew, but they told him "that Jimmy would not do that type of

thing and was not involved in Stacey's death." According to Vicki, until the day Bill died, he "never believed that anyone other than Jimmy Fennell could be responsible for Stacey's murder."

- In a 2019 affidavit, former Bastrop H-E-B employee Rebecca Peoples described Stacey as "very nice, very pretty, and very strong." According to Peoples, Stacey often spoke about her engagement, saying that she was afraid of her fiancé (but never explaining why). Peoples claimed that Stacey also "mentioned that she was having an affair with a black man." Peoples stated that she did not come forward with this information sooner because she did not realize its importance and no one had ever asked her about it.

Reed also directs our attention to much of the pre-existing body of evidence, including:

- Investigative reports regarding Stacey's murder (report excerpts from the Texas Rangers, DPS Crime Lab, BCSO, and BPD);

- Affidavits and letters from scientific and forensic experts (Merrill Lewen, Roberto Bayardo, Werner Spitz, Michael Baden, Leroy Riddick, Brady Mills, Stephane Sivak, Purnima Bokka, and Kevin Gannon);

- Witness statements and affidavits from lay witnesses (Rodney Reed, Alicia Slater, Lee Roy Ybarra, Calvin Horton, Richard Scroggins, Pam Duncan, and Curtis Davis); and

- Investigative reports regarding Fennell's crimes and misconduct (the incidents relating to Aida Fennell, "Amanda Smith," "B.A.," Angie Smith, Kelly Ramos, Mary Ann Bone, Jamie Bolin, and the Jimmy Lehman lawsuit).

Reed's -10 application makes four allegations. First, Reed alleges that the State violated *Brady* by suppressing the information that former Bastrop-area law enforcement officers Charles Fletcher, Jim Clampit, and Richard Derleth possessed. Second, Reed alleges that the affidavits of Arthur Snow, Charles Fletcher, the unnamed insurance salesperson, the Sappingtons, and Richard Derleth show that Fennell testified falsely at trial. Third, Reed alleges that his new evidence makes it clearer than ever before that he

did not receive effective assistance from his trial counsel. And fourth, Reed alleges that his new evidence is so probative of his innocence as to "satisf[y] both *Elizondo* and Article 11.071, Section 5(a)(2)."

On November 15, 2019, we held that Reed's *Brady*, false testimony, and actual innocence claims satisfied Section 5. *See Ex parte Reed*, No. WR-50,691-10, 2019 WL 6114891 (Tex. Crim. App. Nov. 15, 2019) (not designated for publication). We remanded those claims to the habeas court "for further development." *Id.* at *2.

### B. The State's Answer and the Pre-Hearing Disclosure

The State answered Reed's -10 application in April 2020, arguing that:

- Reed's *Brady* claim was barred by laches and was meritless in any event;

- Reed's false testimony claim was barred by laches; could not afford him relief because its legal basis, *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009), does not apply retroactively; and was meritless in any event; and

- Reed's actual innocence claim was meritless because most of Reed's evidence was not "newly available"; most of what *was* newly available could have been developed sooner; and what could not have been developed sooner was unreliable.

On July 6, 2021, the habeas court held a status hearing. At this hearing, Reed's habeas team accused the State of additional *Brady* violations. Andrew MacRae, one of Reed's habeas lawyers, explained that, on June 25, 2021, he had received two letters from one of the State's habeas lawyers, Matthew Ottoway.

In the first letter, Ottoway stated that he had recently discovered certain "witness interview summaries . . . created by the trial prosecution team in preparation for the underlying 1998 criminal prosecution." Ottoway did not divulge who prepared these summaries, but he outlined their contents as follows:

- "[H-E-B store manager] Ron Haas stated that he had heard rumors at HEB that [Reed] knew Stacey Stites and would sometimes visit her at HEB. Mr. Haas said that Andrew Cardenas might have mentioned that [Reed] and Stacey Stites were acquaintances."

- "[H-E-B employee] Andrew Cardenas stated that Jose Coronado said he saw [Reed] speaking with Stacey Stites at HEB and got the impression from Jose that [Reed] and Stacey Stites knew each other. Mr. Cardenas denied seeing [Reed] in the store or speaking with Stacey Stites."

- "[H-E-B employee] Jose Coronado denied telling anyone that [Reed] came into HEB and visited with Stacey Stites."

Ottoway attached the witness interview summaries to the letter. The letter ended with a disclaimer: "You are being given this information in an abundance of caution to provide you anything that might conceivably be considered exculpatory or mitigating. The State does not vouch for the veracity of these statements."

In the second letter, Ottoway wrote that, in preparation for the upcoming evidentiary hearing, one of the State's potential habeas witnesses made a statement that "might conceivably be considered exculpatory or mitigating." Specifically:

> Suzan Hugen … a former HEB employee, stated that she saw [Reed] and Stacey Stites at the store on one occasion, maybe about a week before Stacey Stites's death. Ms. Hugen said that Stacey Stites introduced [Reed] to her as a good or close friend and that they appeared friendly, giggling, and flirting. Ms. Hugen said that [Reed] was with another man who was friends with the son of a woman who worked in the photo lab and that [Reed] was friends with this woman's son as well. Ms. Hugen also believed that Stacey Stites would not have locked her seatbelt in the way it was found. She believes that she told this information to a man working security named "Paul," who was short, skinny, wore glasses, had salt-and-pepper hair, and may have worked for a police department. It was possibly [BPD officer] Paul Alexander, but Ms. Hugen was not sure.

This second letter ended with the same disclaimer as the first.

Having presented the habeas court with this information, Reed asked the court to (1) order the State to identify which member of the prosecution team prepared the witness interview summaries in question, (2) order further discovery, and (3) add (what Reed regarded as) these newly discovered *Brady* violations to the scope of the upcoming (-10) evidentiary hearing. The habeas court denied Reed's second and third requests but granted the first.

The State's disclosure letters formed part of the basis for Reed's tenth subsequent (-11) 11.071 application, which he filed in December 2021. We resolve Reed's -11 application in a separate order.

**C. Expert Reports**

Before the evidentiary hearing on Reed's -10 application, both sides consulted with experts and had them reduce their opinions to written reports.

**1. Reed's Experts**

Reed's expert Dr. Andrew Baker, the chief medical examiner for the Hennepin County Medical Examiner's Office, authored a report dated March 12, 2020, in which he reached four overarching conclusions.

First, Baker disagreed with Bayardo's testimony that Stacey's death could be "estimat[ed]" as being "around 3:00 a.m. on April 23, 1996 … give or take one or two hours." Based on the degree of rigor mortis observable on the time-stamped Bluebonnet Drive scene video, Baker concluded that Stacey must have died "hours before" the State's theorized time of death. Further, the "antigravitational" lividity patterns on Stacey's body at the Bluebonnet Drive scene showed that: (1) Stacey "died in a different position, and her

body was moved some time after death," and (2) Stacey's body was in "some other position for many hours longer than the two hours allowed by a time of death between approximately 3:00 a.m. and 5:00 a.m."

Second, Baker criticized Blakley's testimony that there was "published documentation [stating] that 26 hours is about the outside length of time that tails will remain on a sperm head inside the vaginal tract of the female." Baker observed that, in the very Willott and Allard study that Blakley referenced, there was "a table summarizing prior studies of the persistence of sperm in the vagina after intercourse." The table included one study (Davies and Wilson) finding "sperm with tails up to 72 hours after intercourse" and another (Silverman and Silverman) concluding that "the proportion of sperm with tails did not vary with time since intercourse."

Third, Baker disagreed with Blakley's testimony that "[o]ftentimes one can tell if a bruise is recent just by the color." Baker initially noted that Blakley was not a physician, and he went on to assert that Blakley's testimony was "seriously flawed." Even as early as 1991, Baker explained, it had been "established" that "red, blue, purple, and black [coloration] can appear at any time in the evolution of a contusion; and bruises of identical age and cause, even on the same person, may appear different."

Fourth, Baker criticized Bayardo's testimony regarding Stacey's anal injuries. Baker stated that anal dilation in a deceased person "is a perfectly normal postmortem phenomenon" and therefore "means nothing" in terms of its tendency to show anal penetration. Baker also claimed that the autopsy photos did not show anal lacerations. He

accused Bayardo of mistaking "visible anal crypts and papillae (normal anatomy)" for "evidence of laceration."

Reed's habeas lawyers also prepared, before the hearing took place, a document that they styled a "Peer Review Report" (PRR). The PRR stated that its "signatories . . . include[d] forensic pathologists from across the United States, as well as from Canada, the United Kingdom, and Hong Kong." The PRR reached conclusions that were generally consistent with Baker's report:

- "The proffered testimony at Mr. Reed's trial regarding Ms. Stites'[s] time of death was incorrect and without scientific merit. Ms. Stites died hours before 3 a.m. on April 23, 1996."

- "The supplied testimony regarding the length of time sperm persist was false and created far too narrow a window of time for recent sexual activity."

- "The supplied testimony regarding purported anal findings, and their presumed significance, was false."

The PRR also claimed that Stacey's autopsy "provided no physical findings that would allow a conclusion that a sexual assault . . . occurred."

## 2. The State's Experts

State's expert Deborah Davis, Ph.D., a professor of psychology at the University of Nevada, submitted a paper titled, "Areas of Potential Witness Memory Testimony." In the paper, Davis stated that:

> [I]n assessing potential issues of accuracy of eyewitness testimony[,] an expert will consider factors that can compromise accuracy at each of three stages of memory: (1) Encoding (when the events or person are witnessed), (2) Storage (the interval between the original events and any subsequent recounting of them), and (3) Retrieval (when the events are retrieved from memory and recounted to others).

Davis emphasized that, over time, "memory is subject to a large number of potentially damaging influences." Fading occurs for all memories; source dissociation (i.e., when the association between an event and its context weakens or dissolves) occurs more and more; the potential for new information to interfere with the original memory increases; thought processes can change; beliefs about what happened can change; and clarity and certainty tend to diminish.

State's expert Dr. Suzanna Dana, a forensic pathologist for Central Texas Autopsy, PLLC, authored a report dated June 11, 2021, in which she offered three overarching opinions. First, Dana thought that the lividity patterns on Stacey's body were "totally consistent" with the position in which the body was found ("laying face up on an incline such that the right side of the body . . . [was] at a lower[,] more dependent position than the left side"). Dana concluded that Stacey's body was placed "in the area and position in which it was found shortly after her death, or no later than 6 hours after death." Dana further claimed that the lividity pattern on Stacey's body was "inconsistent with the theory that [she] was in a face down position with her right arm lower than the rest of the body . . . for a period of several hours."

In addition, based on the "residual rigor mortis" depicted on the Bluebonnet Drive video, the typical progression of rigor mortis, and the environmental conditions in Bastrop on April 23, 1996, Dana placed Stacey's time of death "between 3 AM and 5 AM of the day the body was found." Dana stated that the "degree of heating" present in Bastrop on April 23, 1996 (a high of 79 degrees Fahrenheit) "would accelerate the normal development and loss of rigor by possibly one or two hours." In Dana's opinion, "[i]f death

had occurred before midnight" on April 22, "there should be no rigor apparent at all" in the crime scene video, but there should be "obvious unequivocal signs of decomposition." And Dana stated that there was no "definitive evidence . . . of decomposition" when Stacey's body was found—at least not to the point of "decompositional purge fluid" flowing from Stacey's mouth, as Reed's experts had theorized. Further, the "skin slip[s]" and third-degree-burn-like areas were more consistent with "prolonged exposure to the sun" than decomposition. Dana also noted that a 3:00–5:00 a.m. time of death was consistent with other known facts. For example, Stacey was dressed for her 3:30 a.m. work shift, and she usually left the house around 3:00 a.m.

Second, Dana was "unable to verify the presence or absence of anal injuries" in her review of the autopsy photos. She noted that "[t]he anus does appear to be widened but this could be due to postmortem relaxation." Ultimately, Dana could not give an opinion as to whether there was "any anal/rectal manipulation or penetration in this case."

Third, Dana stated that the presence of intact spermatozoa "usually is more consistent with the sperm being deposited within hours of death." She gave this opinion fully cognizant of "the literature that intact spermatozoa can be observed in postmortem samples taken days after death." But in Dana's experience, she had not personally observed intact spermatozoa in cases where the sampling was done more than twelve hours after death.

Finally, Dana criticized the State's evidence-collection processes in this case. She believed that the "undressing of the body and the subsequent taking of swabs and other physical evidence at the scene was inappropriate and dangerous for loss of evidence and

possible contamination of samples." In Dana's opinion, those things should have taken place "in a controlled environment at the place of autopsy under the direct supervision of a trained forensic pathologist." Dana stated that it was not possible to know how much sperm was present on and in Stacey's body and clothing without sampling multiple areas "as well as the entirety of the vaginal vault." And since there was no documentation of how the rectal swabs were obtained at the time of autopsy, Dana concluded that there was no way to know "if semen … was actually deposited in the rectum or had flowed to the anus . . . from the vagina."

State's expert Dr. Norma Jean Farley, a deputy chief medical examiner at the Bexar County Medical Examiner's Office, authored a report dated July 1, 2021. In it, she stated the following opinions:

- The lividity patterns on Stacey's body were consistent with the positioning of her body at the Bluebonnet Drive site;

- The forensic and circumstantial evidence suggested that Stacey was killed between 3:00 and 5:00 a.m. on April 23, not in the late evening hours of April 22; and

- Spermatozoa begin to degenerate within hours of ejaculation and eventually lose their tails, so it was "possible, but less likely" that the sexual contact in this case occurred before the day of Stacey's death.

**D. The -10 Hearing**

**1. Reed's Witnesses**

The -10 hearing began on July 19, 2021. Reed called nineteen witnesses. First, Andrew Baker primarily testified to the opinions expressed in his pre-hearing report. *See supra* p. 59. But he was also asked to comment on various aspects of Dana's pre-hearing report. *See supra* p. 62. Baker noted that he and Dana agreed that Stacey's rigor appeared

to be "on the wane" by the time the crime scene video was made. But he questioned Dana's assertion that the environmental conditions in Bastrop at the time could affect the rigor progression by "one or two hours." Baker was adamant that time-of-death is *at best* an estimate—it "cannot be determined with certainty." Baker also criticized Dana's claim that intact spermatozoa "usually [are] more consistent with the sperm being deposited within hours of death." Baker cited published research available at the time of trial showing that Blakley's "26 hour" testimony was incorrect.

On cross-examination, Baker conceded that the following factors might have accelerated the rigor process: "antemortem exertion" (i.e., strenuous physical activity right before death); warm climate; humidity; and the heavy blanket over Stacey's body. The State also asked Baker about the positioning of Stacey's body when she was found (propped up on a mound of dirt, partly on her back, partly on her side) and Riddick's 2006 affidavit, *see supra* p. 33, in which Riddick seemed to suggest that the lividity patterns on Stacey's body were unremarkable. Baker tentatively agreed that if Stacey's body was lying on a mound with her right side lower than her left side, then the lividity pattern on her right side was where one would expect it to be. The State also asked Baker whether it was significant that Stacey was seemingly dressed for work on April 23, 1996. Baker stated that, as a medical examiner, it was not his job to gauge the significance of non-forensic circumstantial evidence like that. "That would be the Court's job to figure out; it's not the medical examiner's."

Charles Fletcher essentially testified to the contents of his 2019 affidavit, *supra* p. 54, in which he claimed that Fennell told him that he thought Stacey was "fucking a

n*****." But Fletcher added at least one new detail: At the hearing, Fletcher stated that he recalled Curtis Davis being present when Fennell made this comment. It came out during Fletcher's testimony that Curtis Davis was deceased. Fletcher claimed to have learned of that fact just "yesterday." On cross-examination, Fletcher asserted that he waited so long to come forward because he wanted to protect his family. He also ominously suggested that he did not want what happened to Ed Selmala, *see supra* p. 16, to happen to him.[6]

Rubie Volek revealed herself as the unnamed insurance salesperson who had alleged in a 2019 affidavit that she once heard Fennell threaten to kill Stacey if he ever caught her "messing around." *Supra* p. 54. Volek generally testified to the contents of her affidavit. On cross-examination, Volek claimed that she had tried to contact Bryce Benjet in the early 2000s (in response to a newspaper ad that Benjet had placed) but was unsuccessful. Volek claimed that she attempted to contact the Governor and Attorney General in 2015 when she learned about Reed's impending execution.

Jim Clampit's live testimony generally tracked the contents of his 2019 affidavit, *supra* p. 55, in which he claimed that Fennell uttered something along the lines of "You got what you deserved" at Stacey's funeral. On cross-examination, Clampit stated that he did not realize the importance of this information at the time. But "as the case became publicized," he decided he needed "to say something to somebody." The State also showed

---

[6] At the -10 hearing, it came out that there is a conspiracy theory that Bastrop authorities murdered Ed Selmala because of his role within the investigation into Stacey's death. When asked about the conspiracy theory, Fletcher stated, "You don't shoot yourself with your off hand."

that, in 1982, Clampit's former employer, the Texas Parks and Wildlife Department, suspended Clampit from his duties for committing perjury while testifying in uniform.

Arthur Snow testified somewhat consistently with his 2019 affidavit, *supra* p. 54, but some key details changed. At the -10 hearing, Snow testified that what Fennell actually said to him was, "You wouldn't believe how easily a man's belt would break when you strangle a n*****-loving whore." However, those were not the words Snow used in his affidavit:

> Toward the end of the conversation Jimmy said confidently, "*I had to kill my n*****-loving fiancé[e].*"

(Emphasis added). Further, on cross-examination, Snow stated that Fennell did not approach him personally. According to Snow, another Aryan Brotherhood member told Snow that Fennell wanted protection. But Snow's affidavit said otherwise:

> In about 2010, *a white man named Jimmy Fennell ("Jimmy") approached me at the Stevenson Unit* wanting the protection of the Aryan Brotherhood. *Jimmy said he needed protection*[.]

(Emphasis added).

Snow claimed that he was no longer affiliated with the Aryan Brotherhood and that it was never his desire to join the gang. Snow asserted that, in some sense, it was the State's fault that he had joined. The State, Snow explained, "promote[s] racism" in its prisons, so Snow had to join the Aryan Brotherhood just "[t]o stay alive." But again, that was not the gist of Snow's affidavit:

> I was brought up to be prejudiced against black people. As a kid, I remember my grandparents using the word "n*****" to describe black people. They used the term so casually. As a result of my upbringing, I adopted the same

values and beliefs I was taught. *I didn't know any other way to be, and so when I went to prison, I joined the Aryan Brotherhood.*

(Emphasis added).

Snow was adamant that, even if there were some differences between his affidavit and his testimony, the core of what he was saying about Fennell was true. As for any inconsistencies, "If you believe me, you believe me. If not, I don't give a shit. I really don't, man. I'm telling the truth, and if you want to play a word game, play it … He said what he said, man. I don't care after that." Snow eventually invoked his Fifth Amendment right against self-incrimination but agreed to keep testifying after a "cooling-off break."

When cross-examination resumed, the State questioned Snow about who had prepared his affidavit. Snow stated that individuals from the Innocence Project had prepared his affidavit for him based on information that he had previously given them and that he signed it in front of them when he was in the Hays County Jail. The State then produced jail visitation records showing that nobody from the Innocence Project visited Snow on the date his affidavit was signed. The State also covered Snow's lengthy criminal history.

Michael Bordelon, a prison inmate who claimed to have befriended Fennell when they were incarcerated together, testified that, sometime toward the end of 2012, he had a conversation with Fennell in which Fennell said that his fiancée was "screwing a N-word" but that he "took care of the problem." Bordelon claimed that, as Fennell said this, he made a neck-throttling gesture with his hands. Bordelon said that the conversation ended with Fennell telling him, "[T]hat damn 'N' is going to do the time."

Reed offered into evidence an affidavit that Bordelon executed in February 2020 describing these events. Of note, the affidavit did not include the allegation that Fennell made a neck-throttling gesture when speaking about his fiancée. When the State asked Bordelon to explain the differences between his affidavit and his testimony, Bordelon stated, "As time goes on, you remember other things." Bordelon admitted on cross-examination that he decided to come forward with this information after watching an episode of the television program *Dr. Phil* covering Reed's case.

Former Bastrop H-E-B employee Victor Juarez testified that, in 1996, he saw Reed and Stacey together at a Dairy Queen or a Wal-Mart. According to Juarez, he was driving at the time. On cross-examination, Juarez admitted that he decided to come forward with this information after watching an episode of the *Dr. Phil* show.

Former Bastrop H-E-B employee Rebecca Randall testified that she used to see Reed and Stacey chatting together inside the store. She further claimed that, on one occasion, she saw them having a quiet conversation while standing very close to one another. Finally, Randall stated that she "possibly" saw Stacey playing basketball with one of "the Reed brothers" at Fisherman's Park. Randall suggested that she did not come forward with this information sooner because nobody had "approached" her.

Former Bastrop H-E-B employee Paul Espinoza testified that he once saw Fennell enter the store, march up to Stacey in an aggressive way, and "scold[]" her. According to Espinoza, Stacey looked scared and embarrassed. Later, Espinoza went to check on Stacey in the cooler area. She was crying and wiping away tears, but she said she was fine. Espinoza stated that he was able to identify the man in the store as Fennell "[t]hrough

newspapers and the media." He claimed that he did not come forward with this information sooner because, as a "minorit[y]," he was scared of what the town might have done to him.

Former Bastrop H-E-B employee Suzan Hugen claimed to have been friends with Stacey, whom she described as a good person. Hugen testified that, on one occasion, when she and Stacey were walking out the door of the H-E-B, Fennell pulled up in his truck with a "mad" look on his face. According to Hugen, Stacey's "entire demeanor changed." She quit laughing, went "white as a ghost," and said, "I got to go. I'll see you tomorrow." Hugen stated that she saw hand marks on Stacey's wrist that she recognized, from personal experience, as a sign of abuse. Hugen also testified that, on another occasion, she (Hugen) met Reed inside the store. According to Hugen, Stacey introduced Reed to her as "my very good friend, Rodney." Hugen claimed that Stacey was "very flirty with him, giggly, happy. It seemed like more than a friendship." Hugen claimed that she told BPD officer Paul Alexander that Reed and Stacey were friends.

Forensic pathologist Gregory Davis testified that he agreed with everything in Dr. Baker's report and the PRR. *Supra* p. 61. Of note, when Reed's habeas lawyers sought to introduce the PRR through Davis, the State objected. The State argued that the PRR was neither peer-reviewed nor a report from an actual pathologist; Reed's habeas lawyers themselves prepared the PRR, and they had been taking it to various pathologists and asking them if they agreed with its conclusions. Davis signaled that he agreed with the PRR's conclusions, but the habeas judge did not allow the document in evidence. On cross-examination, Davis conceded that it was "theoretically possible" that the facts of a warm,

humid day in Texas, coupled with a heavy blanket and direct sun, could "speed the process of rigor."

Richard Scroggins testified consistently with his 2015 affidavit, *supra* p. 48, in which he claimed that he had seen a man screaming vulgarities at a young woman outside a Whataburger in Bastrop in April 1996. Scroggins claimed that he was able to identify the man as Fennell from a picture he saw in the *Austin Chronicle* in 2005. He "believe[d]" the young woman "to be Stacey Stites."

Brent Sappington testified more or less consistently with his 2019 affidavit, *supra* p. 55, in which he claimed to have heard Fennell "yelling and screaming" at Stacey in the apartment above his father's. However, Brent added that, on one occasion, at church, his father had approached an Assistant District Attorney named Ted Weems and a police officer named Garnett Danewood to tell them what he heard at his apartment. According to Brent, "They just simply told him that they already had their suspect, that they didn't need nobody's help, . . . to mind your own business, to hush his mouth."

Vicki Sappington testified in line with her 2019 affidavit, *supra* p. 55, in which she claimed that her father-in-law had told her that he heard Fennell "yell[ing] and scream[ing]" at Stacey in the apartment above him. On cross-examination, Vicki agreed that if her father-in-law had "heard something" the night of April 22, 1996, he surely would have said something to her.

Cynthia Schmidt, a GPD dispatcher from 1992–98, testified that a GPD officer named Gary Joe Bryant once told her that Fennell had previously said to him, "If I ever catch [Stacey] fucking a n*****, I'll kill her." Schmidt stated that the Texas Rangers came

to interview people at the GPD station about a week after Stacey died. According to Schmidt, the Rangers' goal was to ascertain whether "Jimmy could have had anything to do with [Stacey's] murder." Schmidt said that the interviews took place in the break room with the door ajar and GPD employees lined up in the hall outside. "And so not wanting to speak out with the door open," Schmidt allegedly said "no," while nodding "yes," when the Rangers asked her if she thought Fennell was involved in Stacey's death. When the State asked Schmidt why she did not just ask the Rangers to shut the door, Schmidt explained that she *did*—she had "motioned" for the Rangers to shut the door—but they did not get the hint. In a written declaration admitted in evidence during Schmidt's testimony, Schmidt stated that it was not until she was "contacted by Mr. Reed's defense team" that she felt like she was "finally put in a position" to share what she knew. Finally, Schmidt claimed that she attended Stacey's viewing and heard Fennell mutter, "At least the bitch got to wear the damn dress."

Alicia Slater's testimony was generally consistent with her 2014 affidavit, *supra* p. 47, in which Slater claimed that Stacey told Slater that she (Stacey) was sleeping with a black man named Rodney. On cross-examination, Slater stated that she did not start reaching out to anyone about the Reed case until after she watched a documentary and saw several Facebook articles about Reed's case. Slater later acknowledged that she had appeared on the *Dr. Phil* show to discuss what she knew about Reed's case.

Calvin "Buddy" Horton testified consistently with his 2014 affidavit, *supra* p. 53, in which Horton claimed that he had seen Reed and Stacey leaving the Dairy Queen in Bastrop together in October or November 1995. Horton also reiterated that he was not

surprised "to see Stacey with a black man," the implication evidently being that Stacey had previously dated black men. On cross-examination, Horton conceded that he executed his affidavit "19-plus years" after the events in question.

Brenda Dickinson, who worked at the Bastrop H-E-B from 1994 through 2004 and claimed to have been friends with Stacey, testified that Stacey was initially excited about her engagement, but that over time, she (Stacey) began to see Fennell in a different light. He became jealous, controlling, and threatening. Dickinson testified that she went to an H-E-B Christmas party with Stacey in 1995. Stacey said that Fennell was not there because she did not want him there—he would only "make a scene." At a certain point, Stacey said she needed to get home because it was "past [her] curfew." Dickinson also claimed that she once saw Stacey "talking to an African American man in the store." When Dickinson asked Stacey who her "secret admirer" was, Stacey giddily responded, "He's just a friend." According to Dickinson, Stacey said that her friend's name was "Rodney." Dickinson also stated that, on one occasion, Stacey told her she was going out to lunch with "Rodney."

Lastly, Reed called Fennell to the witness stand. Fennell acknowledged that the last time he was subpoenaed to testify in relation to the Reed case (for the -08 hearing, in 2017) he had invoked the Fifth Amendment on the advice of counsel. He testified that he decided to testify at this hearing because he was no longer in prison.

Fennell stated that "[a] piece of [him] was ripped out" when Stacey died. He testified that he started taking Xanax to cope with the grief and anxiety. He claimed that he could not remember the funeral because he was "so deep in depression." But he was certain that he did not tell Stacey's body that she "got what [she] deserved."

Reed's lawyers adduced evidence showing that Fennell emptied his bank account on the morning of April 23, 1996. When they asked Fennell about it, Fennell initially denied that he closed his bank account on the 23rd. Then, he stated that he could not recall whether he had closed his account that day. When Fennell was shown a bank slip proving that his account was closed and the funds withdrawn on April 23, Fennell said he had no reason to disagree with the bank records. On cross-examination, Fennell testified that, when his truck was found on the morning of April 23, his checkbook, which had been inside the center console, was gone. According to Fennell, that might have been why he contacted his bank. A BPD report was admitted showing that, on April 23, 1996, BPD chief Ronnie Duncan had indeed told Fennell to contact his bank.

Regarding his criminal offenses and sexual misconduct, Fennell stated that, around the time of Stacey's murder, he "snapped." Fennell testified that the wound caused by Stacey's murder had "festered up" in him, culminating in a sex addiction. That addiction, Fennell testified, was the first "domino" to fall in terms of his sexual miscreancy. Fennell claimed to have accepted responsibility for his actions. He also claimed that, in prison, he "turned to God" and "started getting the help that [he] needed." Fennell testified that, while in prison, he received a bachelor's degree in ministry and a master's degree in theology.

Fennell also testified that he never associated with the Aryan Brotherhood or met an inmate named Arthur Snow. He denied telling anyone that he had to kill his "N-word-loving fiancé[e]" or that "You wouldn't believe how easy a man's belt would break when you strangle a N-word-loving whore." Fennell stated that he knew Michael Bordelon from the Estes Unit, but he denied making any of the statements that Bordelon accused him of

making. Fennell further denied the accusations of Charles Fletcher, Jim Clampit, and Richard Derleth. He denied that he was violent towards Stacey.

Significantly, Fennell admitted that, earlier in life and on more than one occasion, he had used the "N-word." When asked to clarify, Fennell responded, "I didn't say I never said that word. I said I didn't use it all the time like people said I [did]." Fennell stated that he stopped using "that word" when he became a police officer—he tried to be "more professional about how [he] addressed people."

Finally, Fennell stated that, in preparation for the hearing, he had been in contact with the Attorney General's office. Specifically, Fennell affirmed that he had (1) texted with OAG investigator Missy Wolfe, (2) participated in "a couple of meetings with the lawyers," and (3) reviewed his trial testimony. When Reed's habeas lawyer accused Fennell of underselling the extent to which he had communicated with the State's habeas team, Fennell conceded that he had exchanged close to 100 text messages with Wolfe in preparation for the hearing.

### 2. The State's Witnesses[7]

State's expert Deborah Davis testified in line with her report concerning the limitations on human memory at various stages. *See supra* p. 61. The State gave Davis several hypotheticals corresponding to the people who had come forward over the years claiming to have remembered evidence relevant to the Reed case. Davis consistently stated

---

[7] For brevity's sake, we do not include all of the State's witnesses in this summary. However, we have taken all of the relevant evidence, from the -10 hearing and elsewhere, into account in assessing Reed's actual innocence claims.

that there were reasons to doubt such claims, including: the passage of time; the lack of contemporaneous reporting; media influences; the person not realizing the event's significance; poor opportunities for observation; stereotypes; and suggestibility. Importantly, Davis agreed with the State that "media" (e.g., social media, newspaper, television) accounts can sometimes constitute "outside influences that could [distort] a person's memory" of an event. She also stated that memory is influenced, at least in part, by the person's attentiveness at the moment of encoding: "[I]f you don't think something is important at the time, you're less likely to pay attention to it."

State's expert Suzanna Dana essentially testified to the contents of her report concerning time of death, the inconclusive evidence of anal penetration, and the relevance of intact spermatozoa. *See supra* p. 62. Regarding intact spermatozoa, Dana stated that the studies Baker cited for the proposition that spermatozoa can remain intact for longer than 26 hours had been done with live individuals—and "you can't really take those studies from live people and use them to evaluate findings in a dead person." Dana also disagreed with Baker's description of the rigor "curve" (the process by which rigor begins, increases, plateaus, decreases, and ends). It was Dana's belief, based on what she regarded as the correct, affected-by-the-ambient-circumstances rigor curve, that Stacey died around 3:00–5:00 a.m. (or "thereabouts") on April 23, 1996. However, Dana agreed with Baker that a bruise's color and appearance has no bearing on its age. Dana stated that Blakley's testimony to the contrary was potentially misleading and beyond Blakley's expertise.

Like Dana, State's expert Norma Jean Farley testified consistently with her report concerning time of death, the relevance of intact spermatozoa, and the non-dispositive

evidence of anal penetration. *See supra* p. 64. Farley added that, in her opinion, the evidence suggested that Stacey was carried to, and placed at, the Bluebonnet Drive crime scene: "[I]t looks like someone was carrying her. The knees are bent, the arms are over the head, she's being laid there." Farley also agreed with Drs. Baker and Dana that one cannot "accurately date" a bruise based on its color.

Amber Moss, who worked in the DPS Crime Lab in Garland, Texas, testified that she had performed postconviction DNA testing in this case. Moss explained that the original DNA testing in this case was known as "DQ alpha and D1S80" testing. Moss stated that those kinds of tests are "less discriminating than what we do today." Reviewing the original (1997–98) DNA results, Moss noted that testing done on the vaginal swabs and Stacey's underwear had produced results "consistent with Rodney Reed['s]" DNA profile. Further, the "male DNA on the breast swabs was consistent with Rodney Reed." Finally, under the original forensic testing, the following items were found to contain amylase, "a nonspecific constituent of saliva": left breast swab, right breast swab, two stains from Stacey's blue pants, and a stain from the black back brace found in Jimmy's truck.

Turning to her own postconviction testing, Moss stated that the first thing she did was to conduct presumptive testing on several pieces of physical evidence. Of note, most of the vaginal swabs presumptively tested positive for the presence of semen; the rectal swabs presumptively tested negative for the presence of semen; and spermatozoa were detected on the "rectal swab sperm search slide."

Moss explained that the procedure used during this postconviction testing was to develop a DNA profile from the agreed-upon items of physical evidence before developing

a profile from Reed's known sample. As to the following items, Moss was able to generate an interpretable DNA profile and compare that profile to Reed's (results in italics):

> (01-02) Vaginal swab from victim collected during investigation in paper fold (sperm and epithelial fractions)—*Reed could not be excluded from the sperm and epithelial fractions.*

> (01-05) Rectal swab from victim in paper fold (sperm and epithelial fractions)—*Reed could not be excluded from the sperm and epithelial fractions.*

> (01-09-AB) Right breast swab from victim in tube (epithelial fraction)—*Reed could not be excluded.*

> (01-10) Stain from victim's blue panties (sperm and epithelial fractions)—*Reed could not be excluded from the sperm fraction, and "[t]he previously obtained Y-STR profile from the epithelial fraction is consistent with the Y-STR profile of Rodney Reed."*

> (04-03-AA) Austin DPS DNA extract for #46 [the back brace collected from Jimmy's truck] in tube—*Reed could not be excluded as the contributor of the major component in the male DNA profile.*

> (04-03-AF) Austin DPS DNA extract for #16 [blue pants] #2 in tube—*Reed could not be excluded as the contributor of the major component in the male DNA profile.*

Allison Heard, the DNA Section Supervisor for the DPS Crime Lab in Austin, testified that, in 2019, she reinterpreted the data underlying the 1998 and 2001 beer can DNA reports. Heard stated that, under modern-day combined probability of inclusion (CPI) statistics and analytical thresholds, an analyst would not be able to draw any conclusions from the underlying data—he or she could say only that the DNA in question was part of a "complex mixture." Heard testified, "Based on the most up-to-date manual interpretation guidelines that we have, I cannot make any conclusions as to who may have contributed DNA to this profile."

Crystal Dohrmann, Fennell's sister, testified that Fennell and Stacey seemed very happy together. Dohrmann said that Fennell was devastated by Stacey's death. Fennell's mother, Thelma, testified that Fennell and Stacey were "crazy about each other." She described Stacey as playful and happy and said that Stacey and Fennell were like "kids in love." Thelma testified that Fennell was so crushed by Stacey's death that she had to give him a Xanax pill before Stacey's funeral just to "get him through." Mark Brown, Fennell's cousin, testified that Stacey fit in well with the Fennell family. Fennell was in love with her—they were simply "stuck together." According to Brown, after Stacey died, Fennell was "broken." Debra Oliver, Stacey's sister, testified that Stacey was excited to marry Fennell and that Fennell was a crying "mess" the morning of Stacey's disappearance. Oliver stated that, even after Fennell's "problems" came to light, she never suspected that Fennell had something to do with Stacey's death.

Etta Wiley, Charles Fletcher's ex-wife, testified that she met Fennell and Stacey at a party on Lake Bastrop. She did not remember visiting Fennell and Stacey's apartment (or Fennell and Stacey visiting theirs) or having dinner or going bowling with them, as Fletcher had claimed. According to Wiley, Fletcher never said anything to her about Fennell acting inappropriately at Stacey's funeral, never accused Fennell of using racial slurs, and never said that he suspected Fennell of being involved in Stacey's death. Wiley testified that everything in Fletcher's affidavit was "a lie."

Ted Weems, the former County and District Attorney for Lee County, testified that he used to go to church with the Sappingtons. Weems testified that, on one occasion, Bill Sappington (Brent's Sappington's father) approached him wanting to give information

about the Stites murder case. Bill, who was one of Stacey and Fennell's neighbors, told Weems he had heard "loud arguing many times" coming from Stacey and Fennell's apartment. Weems told Bill that he should take this information to the Bastrop County authorities because Stacey's murder was not a Lee County case. Weems did not know if Bill ever followed through on that advice, but he was certain that he did not tell Bill to "hush his mouth" or "mind his business," or that Bastrop County "already had their suspect" and "didn't need anyone's help."

Ron Haas, the former "unit director" for the Bastrop H-E-B, described Stacey as a hard worker and an ideal employee. He stated that everybody at the store was sad when Stacey died. Haas testified that Stacey took the produce job because "[s]he was getting married" and "wanted more hours." Through Haas, the State introduced Stacey's H-E-B work application. Under "marital status," Stacey had checked "single" but wrote "going to get married." On cross-examination, Haas stated that he had encouraged his employees to cooperate with the authorities investigating Stacey's death.

### E. The Habeas Court's FFCLs and Reed's Objections

Both sides submitted proposed FFCLs. On October 31, 2021, the habeas court adopted the State's proposed FFCLs nearly verbatim. As a result, the habeas court generally credited all the State's habeas witnesses, including Fennell, and declined to credit any of Reed's witnesses. The court recommended that we deny relief on all of the remanded claims.

In February 2022, Reed filed in this Court his "Amended Memorandum and Objections to Findings of Fact and Conclusions of Law." Among other things, Reed

criticized the habeas court for adopting the State's proposed FFCLs. He also argued that the habeas court had erred to: (1) disbelieve the witnesses who described an intimate relationship between Reed and Stacey; (2) disbelieve the witnesses who described a tumultuous relationship between Fennell and Stacey; (3) disbelieve the witnesses who alleged that Fennell knew about Reed and Stacey's relationship; (4) credit Fennell's "self-serving and unsubstantiated testimony"; (5) disbelieve Reed's forensic experts; (6) find that Bayardo had not recanted his trial testimony; (7) find the State's witnesses, both lay and expert, more credible than Reed's witnesses; and (8) misapply the facts to the law and reach "several incorrect legal conclusions." Reed further accused the habeas court of misrepresenting the record and Fennell of perjuring himself at the hearing.

### F. Analysis

#### 1. Deference Owed to the Habeas Court

Before we can apply the law to the facts of Reed's case, we must first sort out the facts. Our writ jurisprudence has consistently recognized that, while the habeas court is the original factfinder on postconviction habeas, this Court is the ultimate factfinder. *Ex parte Reed*, 271 S.W.3d at 727. In the ordinary case, that task is expedited by the habeas court making recommended FFCLs that, if record-supported, this Court can endorse with all due confidence. The problem in this case is that, as has happened at least once before in Reed's postconviction proceedings, the habeas court "unnecessarily complicated" our independent review of the record by failing to "carefully scrutinize[]" the State's proposed FFCLs. *See id.* at 729.

The habeas court's recommended FFCLs in this case contain multiple oversights which come directly from the State's proposed FFCLs.[8] That said, the last time a habeas court "unnecessarily complicated" our independent review of the habeas record in this way, we did not deem it necessary to "totally disregard" the habeas court's recommended FFCLs. Instead, we suggested that we would view the habeas court's FFCLs "skeptical[ly]" and "proceed cautiously with a view toward exercising our own judgment." *See id.* at 727.

That is how we will proceed in this case. As in the -03 case, the habeas court's FFCLs in this case are "largely supported by the record." *Id.* at 728. But, especially given our prior call for "careful scrutin[y]" of litigant-drafted proposed FFCLs, we will "proceed cautiously" when contemplating the habeas court's FFCLs. *See id.* at 727–29. While we may draw upon them where appropriate to inform our assessment of witness credibility and historical fact, we will not rely upon them to the exclusion of all other considerations. So proceeding, we will grapple with the record independently—claim by claim, item by item, witness by witness—with a view toward exercising our own judgment. *See id.*

---

[8] For instance, the habeas court's FFCLs:
- Misstate the year the ODI was entered, Finding 8;
- Confuse Charles Fletcher for Jim Clampit, Finding 26; and
- State that Suzan Hugen "testified that Stites called off her bridal shower" as a reason for discrediting her, when the totality of Hugen's testimony shows that that was not what she said, Finding 96.

This list is by no means exhaustive.

We will analyze Reed's most recent (-10 application) actual innocence claims first. In analyzing those claims, we will make findings that will affect Reed's *Brady* and false testimony claims. We will analyze those claims second and third, respectively.

### 2. CLAIM FOUR: "Mr. Reed's actual innocence showing satisfies both *Elizondo* and Article 11.071, Section 5(a)(2)."

Under *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996), if a habeas applicant shows by clear and convincing evidence that, in light of some newly discovered evidence, no reasonable juror would have convicted him, the applicant is entitled to a new trial. An *Elizondo* claim proceeds from the assumption "that the trial that resulted in his conviction [was] error-free." *See id.* at 208. So, because a conviction that results from a constitutionally error-free trial is entitled to great respect, an *Elizondo* claimant must do more than merely raise doubts about his guilt—he must produce "affirmative evidence" of innocence. *See Ex parte Franklin*, 72 S.W.3d 671, 677–78 (Tex. Crim. App. 2002).

Meanwhile, Article 11.071, Section 5(a)(2) states:

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that: . . . by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt[.]

We have construed this language as a "codification of the Supreme Court's *Schlup v. Delo* standard." *Reed*, 271 S.W.3d at 733 (citing *Schlup v. Delo*, 513 U.S. 298 (1995)). Therefore:

> [T]o mount a credible claim of innocence [under Section 5(a)(2)], an applicant must support his allegations of constitutional error with reliable evidence—whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence—that was not presented at trial. The applicant bears the burden of establishing that, in light of the new evidence, it is more likely than not that no reasonable juror would have rendered a guilty verdict beyond a reasonable doubt. To determine whether an applicant has satisfied the burden, we must make a holistic evaluation of all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. We must then decide how reasonable jurors, who were properly instructed, would react to the overall, newly supplemented record. In doing so, we may assess the credibility of the witnesses who testified at the applicant's trial.

*Id.* at 733–34 (internal quotation marks and citations omitted). Importantly, even in the *Schlup* context, "actual innocence means factual innocence, not mere legal insufficiency." *See Bousley v. United States*, 523 U.S. 614, 623 (1998). That said, if a capital habeas applicant makes the necessary showing under Section 5(a)(2), he can potentially have an otherwise-barred constitutional claim considered on the merits.

*Elizondo* and *Schlup* both demand that the claimant present the reviewing court with some "new" evidence. But it is not entirely clear whether "new" means the same thing in both contexts. We have said that, for *Elizondo* purposes, "newly discovered evidence" means evidence that was not known to the applicant at the time of trial *and could not have been known to him even in the exercise of due diligence. E.g.*, *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006). On the other hand, when we resolved the Section 5(a)(2)/*Schlup* claim Reed raised in his -03 application, we considered "*all* of the evidence that was not presented at [Reed's] trial," leaving for another day the question of "exactly what new evidence, not presented at trial, may be considered in the purview of Section 5(a)(2)." *Reed*, 271 S.W.3d at 734 (emphasis added). Strictly speaking, this Court has yet to say whether, in the Section 5(a)(2)/*Schlup* context, the newly-discovered-evidence

inquiry has a diligence component. *See also Hancock v. Davis*, 906 F.3d 387, 389 (5th Cir. 2018) ("The Supreme Court has not explicitly defined . . . 'new reliable evidence' under the *Schlup* actual innocence standard, and there is a circuit split.").

But we need not resolve that issue in this case. As we will explain, even if all of Reed's post-trial evidence is taken into account, Reed still has not demonstrated that he is more-likely-than-not innocent of Stacey's murder. That said, where Reed relies on evidence that could have been marshaled at trial, we will note that fact. *Cf. Schlup*, 547 U.S. at 332 (in assessing a *Schlup* claim, a court may consider "how the timing of the submission … bear[s] on the probable reliability of that evidence"). We leave for another day the question of what kinds of post-trial evidence should be considered in a Section 5(a)(2) analysis.

### a. Reed's Present-Day Innocence Narrative

In our opinion disposing of Reed's -03 application, we noted the following:

> At trial, to raise reasonable doubt during the guilt phase, Reed mounted a two-prong challenge to the State's evidence. First, Reed pointed to the possibility that another person, particularly [Jimmy] Fennell and [David] Lawhon, had committed the offense. And as a secondary theory, Reed focused on showing that he had a romantic relationship with Stacey and that his semen was therefore present in Stacey's body because of consensual intercourse.

*Reed*, 271 S.W.3d at 710. That was an accurate description of Reed's defensive posture at trial. And over the years, these two themes (the "alternate suspect" and "romantic relationship" themes) have been mainstays of Reed's ongoing innocence narrative.

But the passage of time and the filing of successive applications have narrowed some of Reed's chosen themes and broadened others. The "alternate suspect" theme, once

containing a gallery of alternate suspects,[9] has gradually narrowed to a single suspect: Fennell. The "romantic relationship" theme, once limited to a smattering of (frankly unimpressive) lay witnesses, has expanded to include a large amount of forensic and scientific evidence. And Reed's broader innocence narrative now contains evidence that undermines the State's case in ways that neither directly exculpate Reed nor directly implicate anyone else.

We will therefore analyze Reed's current innocence narrative in three phases. In phase one, we will examine Reed's assertion that, before Stacey died, he and Stacey were in a romantic, sexual relationship. This will require a review of: (i) the eyewitness accounts that, if credited, would tend to support such a relationship; and (ii) the body of forensic and scientific evidence suggesting that Reed's semen could have been deposited in Stacey's body several days before she died. In phase two, we will examine the theory that Fennell murdered Stacey. This will require a deep dive into: (i) the body of evidence that this Court previously described as raising a "healthy suspicion" that Fennell had something to do with Stacey's death; (ii) evidence that Fennell knew, suspected, and/or feared that Stacey was having an affair with a black man; (iii) evidence that Fennell was abusive toward Stacey;

---

[9] This gallery has included: David Lawhon; the unidentified occupants of a white truck; Gregory Corner; Ed Selmala; David Hall; Curtis Davis; and a dark-skinned man in a light-colored car. Because Reed has long since abandoned these characters as viable suspects and focused exclusively on Fennell, our actual innocence analysis does not discuss the evidence implicating these alternate suspects. So, among other things, we will not discuss: Robert and Wilma Robbins's witness statements describing a mysterious white truck; the Walter Reed/Kelly Bonugli saga; and Jennifer and Brenda Prater's affidavits describing a dark-skinned man in a light-colored car. Even if we were inclined to explore these alternate-suspect theories in greater depth in this opinion, our bottom-line conclusion (that Reed has not demonstrated that he is more-likely-than-not innocent of Stacey's murder) would not change.

(iv) evidence suggesting that Stacey actually died several hours before 3:00 a.m. on April 23, 1996 (when, by Fennell's own timeline, Stacey was at home with him); and (v) Fennell's extraneous conduct following Stacey's death. Finally, in phase three, we will examine the evidence that does not fit into either of the preceding categories.

### b. Phase One: The Romantic, Sexual Relationship

Phase one, the "romantic relationship" theme, has two subcategories of evidence: (i) eyewitness accounts; and (ii) forensic and scientific evidence relating to spermatozoa.

### i. Eyewitness Accounts

At trial, Reed called two witnesses whose testimony, if credited, would contribute to the theory that Reed and Stacey were in a romantic, sexual relationship before Stacey died. Julia Estes testified that, in early 1996, she saw Reed and Stacey talking inside the Bastrop H-E-B. *See supra* p. 18. And Iris Lindley testified that, in early 1996, she witnessed a young white woman named "Stephanie" or "Stacey" approach the Reed household in a gray truck and ask for Rodney. *See supra* p. 19.

On habeas, across his many writ applications, Reed has adduced testimony and statements from several lay witnesses adding to the "romantic relationship" theme. If true, the information provided by Jon Aldridge, *supra* p. 25, Linda Kay Westmoreland, *supra* p. 25, Meller Marie Aldridge, *supra* p. 25, Shonta Reed, *supra* p. 25, Elizabeth Keehner, *supra* p. 25, Chris Hill, *supra* p. 27, James Robinson, *supra* p. 31, Jeannie Reese, *supra* p. 42, Alicia Slater, *supra* pp. 47 (affidavit), 72 (testimony), Lee Roy Ybarra, *supra* p. 47, Reed himself, *supra* p. 48, Calvin "Buddy" Horton, *supra* pp. 53 (affidavit), 72 (testimony), Rebecca Peoples, *supra* p. 56, Victor Juarez, *supra* p. 69, Rebecca Randall,

*supra* p. 69, Suzan Hugen, *supra* p. 70, and Brenda Dickinson, *supra* p. 73, arguably support Reed's assertion that he and Stacey were in a romantic, sexual relationship in the months leading up to Stacey's death.

It is the "if true" in the preceding sentence that proves a bridge too far for Reed to cross. We have previously expressed grave doubts about the credibility of many of Reed's witnesses on this front (Jon Aldridge, Linda Westmoreland, Meller Marie Aldridge, Shonta Reed, Elizabeth Keehner, James Robinson). Many of them have never testified in open court subject to cross-examination (the same witnesses plus Chris Hill, Jeannie Reese, Lee Roy Ybarra, Reed himself, Rebecca Peoples). Some admitted that their knowledge of the Reed case was informed, at least in part, by news reports, television shows, or internet research (Alicia Slater, Lee Roy Ybarra, Calvin Horton, Victor Juarez). Others came forward after so many years, and gave such implausible explanations for the delay, that it is difficult as a factfinder to discern how many of their claims are based in truth and how many have been distorted by the passage of time and other influences (Alicia Slater, Lee Roy Ybarra, Calvin Horton, Rebecca Peoples, Victor Juarez, Rebecca Randall, Suzan Hugen, Brenda Dickinson). In some instances, the delay approached or even exceeded two decades.

While we acknowledge that it is possible for someone to accurately remember events from that long ago, many of Reed's witnesses admitted that they did not initially realize the importance of the information they claimed to possess (Alicia Slater, Calvin Horton, Rebecca Peoples, Brenda Dickinson). Others possessed information that was relatively unremarkable, even mundane (Lee Roy Ybarra, Victor Juarez, Rebecca Randall,

Suzan Hugen). And we are inclined to credit Professor Davis's testimony that, "if you don't think something is important at the time, you're less likely to pay attention to it"—and thus less likely to accurately recall it later. *See supra* p. 75. Finally, to some extent, this entire category of evidence (the gist of which is that Stacey openly associated with her "secret" boyfriend Reed) is in tension with Reed's *other* allegation that Fennell was a jealous, possessive boyfriend whose ire Stacey actively sought to avoid. *See infra*.

We pause at this juncture to discuss the affidavit and testimony of Suzan Hugen in greater detail. Hugen testified at the -10 hearing that Stacey once giddily introduced Hugen to her "very good friend, Rodney." To Hugen, "[i]t seemed like more than a friendship." *See supra* p. 70. In the preceding paragraph, we found that Hugen waited a long time to relay this information to anyone. The habeas court made a similar finding. Reed objected to the habeas court's finding in this regard, noting that Hugen testified that she told BPD officer Paul Alexander what she knew a long time ago, when Reed was still just "a suspect."

But the fact that Hugen said that she spoke with Alexander in the 1990s does not mean that the habeas court—or this Court—must believe her. At least to the level of confidence associated with the preponderance standard, we find ourselves unable to credit Hugen's account. The record shows that Hugen initially (sometime before June 25, 2021) informed the State that she had told "a man working security [at H-E-B] named 'Paul' . . . who may have worked for a police department" what she knew. Per the State's summation, "It was possibly [BPD officer] Paul Alexander, but Ms. Hugen was not sure." By the time of her testimony (July 21, 2021), however, Hugen was far less circumspect; she testified unequivocally that the man she spoke with in 1997 was Paul Alexander. This

sudden, unexplained boost in confidence does not speak well for Hugen's credibility or the accuracy of her recollection.

We emphasize that, both in gauging witness credibility and in assigning probative weight to each witness account, we have considered each item in isolation and in relation to the remaining items of evidence. That is, we have examined each "brick" and contemplated its place in the "wall" of evidence that Reed has marshaled on this score. *Accord* 1 KENNETH S. BROWN ET AL., MCCORMICK ON EVIDENCE § 195 at 999–1000 (7th ed. 2013) ("An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. . . . A brick is not a wall."). The problem for Reed is that his sources are so disparate in what they describe, and so internally inconsistent, that even after contemplating this "wall" in its entirety we are left with the indelible impression that Reed has not carried his burden. The situation might be different if Reed's witnesses could credibly and consistently corroborate one specific, dateable event. But there is nothing of the sort in this "wall" of evidence.

Further, even at trial, Reed was able to put evidence of a boyfriend-girlfriend relationship between himself and Stacey in front of the jury—and the jury convicted him anyway. Granted, the trial evidence of a romantic relationship between Reed and Stacey was, to put it mildly, unpersuasive. But it is not as though Reed's postconviction case for a romantic relationship is some ironclad thing in comparison, incapable of being undermined through vigorous cross-examination. We do not dispute that Reed would have been in a better position at trial if he had had the above-catalogued witnesses at his disposal. However, "better position at trial" is a far cry from "by a preponderance of the evidence,

no rational juror could have convicted." The fact that some evidence of a romantic relationship between Reed and Stacey was already before Reed's jury makes it that much harder for Reed to show on habeas that, if only the jury knew about this other body of similar evidence, more likely than not, his trial would have ended differently.

### ii. Scientific Evidence—Intact Spermatozoa

At trial, Karen Blakley testified that she had "published documentation [stating] that 26 hours is about the outside length of time that tails will remain on a sperm head inside the vaginal tract of the female." Roberto Bayardo testified that intact spermatozoa indicated that the "semen was placed in the vagina quite recently." And Meghan Clement explained that, in her experience as a serologist, "finding intact sperm at more than probably about 20 hours, 20 to 24 hours" was a rare occurrence. Clement continued, "I don't ever recall finding intact sperm more than that, from the time of the sexual assault [to] the time the collection was made." The State used Blakley's, Bayardo's, and Clement's testimony to argue in closing that Reed deposited semen in Stacey's vagina in the early morning hours of April 23, 1996.

On habeas, across his many writ applications, Reed has adduced evidence and testimony from several sources in an effort to dismantle the State's 24–26-hour time frame. Over the last twenty-plus years, the following experts have provided evidence that, if credited, would imply that Blakley and Clement (and to a lesser extent, Bayardo) underestimated the length of time that spermatozoa can remain intact in the vagina: William Green, *supra* p. 30, LeRoy Riddick, *supra* pp. 44, 46, Joseph Warren, *supra* p. 47, Roberto Bayardo, *supra* p. 45, Werner Spitz, *supra* p. 45, Michael Baden, *supra* pp. 46

(affidavit), 51 (testimony), Brady Mills, *supra* p. 52, Purnima Bokka, *supra* p. 53, Andrew Baker, *supra* pp. 59 (report), 64 (testimony), and Gregory Davis, *supra* p. 70. By and large, the consensus among this group appears to be that spermatozoa can remain intact in the vagina for at least 72 hours post-coitus. Further, at the -10 hearing, State's expert Suzanna Dana agreed that some of Blakley's spermatozoa-related testimony "could be" described as misleading, *see supra* p. 76, and State's expert Norma Jean Farley testified that, to the extent Blakley's trial testimony was presented as a direct quotation of the Willard and Allard study, her testimony "misrepresent[ed]" the study's findings, *see supra* p. 76.

Despite this sizeable body of evidence, Reed's efforts to undermine the State's 24–26-hour window run into two significant headwinds. First, at the -10 hearing, Reed's own experts stated that there was scientific literature available at the time of trial undermining the 24–26-hour window. Reed has not shown (indeed, does not even assert) that the scientific community's understanding of spermatozoa longevity has meaningfully advanced since the time of his trial. So, under our actual innocence jurisprudence, the evidence Reed has marshaled on this point either cannot factor into the analysis (for *Elizondo* purposes) or carries less probative weight (for *Schlup* purposes).

To be sure, this Court has suggested that, at least in some cases, a writ applicant may "proffer some additional evidence to establish his claim of actual innocence . . . even when a small portion of that evidence was available at an earlier time." *See Brown*, 205 S.W.3d at 546. But that brings us to the second, more fundamental headwind: At best, Reed's evidence shows that his semen *could have been* deposited outside of the 24–26-

hour window. It does not come close to showing that his semen actually *was* deposited outside that window.

In his 2010 affidavit, Dr. Riddick stated, "If the sexual intercourse had been as recent as 24 or 48 hours before Ms. Stites's death, there likely would have been a large amount of semen present, and there is no such record in the autopsy report." In his 2012 declaration, Dr. Bayardo stated, "[T]he fact that I found 'very few' (as stated in the autopsy report) spermatozoa in Ms. Stites's vaginal cavity suggests that the spermatozoa was not deposited less than 24 hours before Ms. Stites's death." In his 2015 affidavit, Dr. Spitz stated, "The amount of sperm found on the slides is more consistent with a longer interval between intercourse and the time the sample was collected." But each of these assertions is notably tentative ("there likely would have been"; "suggests"; "more consistent"). For that reason, Reed's evidence on this point seems to reflect "differing opinions," *cf. Reed*, 271 S.W.3d at 748, not a scientific consensus that Reed's semen was deposited more than 24–26 hours before Blakley swabbed Stacey's vagina. Further, none of these assertions included a citation to supporting scientific literature; each was stated as though it was self-evident. And, in our view, that bodes poorly for the impression each would have made upon Reed's jury.

The question then becomes, if Reed's jury had been informed that it was scientifically *possible* that Reed's semen was consensually deposited more than 26 hours before Blakley swabbed Stacey's vagina, would it have concluded in the face of the remaining evidence that Reed's semen actually *was* consensually deposited at some unknown, earlier time? Our opinion in the -03 habeas proceeding explains why, more likely

than not, the jury would still have resolved this issue against Reed: The circumstantial evidence pointed powerfully toward the conclusion that Stacey was sexually assaulted. *See Reed*, 271 S.W.3d at 748–50. For instance, Stacey was found clothed only in a black bra and a pair of blue pants with a broken zipper and her underwear was wet in the crotch and bunched around her hips. And from there, it takes no great leap in logic to conclude by a preponderance of the evidence that the reason Stacey had semen in her vagina is that her assailant left it there.

At this juncture, one might think that this evidence, limited though it may be, nevertheless leaves open the possibility that Reed and Stacey had consensual sex on April 22, 1996, and that Stacey was sexually assaulted and killed by a different man wearing a condom on April 23, 1996. But, in the first place, a showing of actual innocence calls for "affirmative evidence," *see Franklin*, 72 S.W.3d at 678, not conjecture. And on this record, there is scant evidence to support the theory that Stacey was sexually assaulted by a man wearing a condom. Further, Reed's jury was well aware of this theory. At trial, Reed's counsel asked Bayardo, "If a man was using a condom and he had sexual intercourse with a woman after she had sexual intercourse with a man who did not use a condom, would it be possible . . . for the man who has the condom to transfer the semen and sperm from the vagina to the rectum if he had anal sex with the woman?" Bayardo responded, "Yes, it would be possible." Finally, crediting Reed's claim that he and Stacey had consensual sex on April 22, 1996 would require the jury to believe that, after Reed deposited semen in Stacey's vagina, Stacey put her underwear back on, worked a full shift at H-E-B, came home, visited with her family, and then went to bed, all in the same damp, semen-soaked

underwear. More likely than not, the jury would have rejected that version of events—even if it had been informed that spermatozoa can remain intact for upwards of 72 hours post-coitus.

### c. Phase Two: Did Jimmy Fennell Kill Stacey Stites?

The evidence supporting the theory that Fennell killed Stacey can be broken up into five subcategories: (i) the "healthy suspicion" evidence; (ii) evidence that Fennell knew, suspected, and/or feared that Stacey was having an affair with a black man; (iii) evidence that Fennell was abusive toward Stacey; (iv) evidence suggesting that Stacey actually died on the night of April 22, 1996, when she was alone with Fennell; and (v) Fennell's disturbing conduct following Stacey's death.

### i. The "Healthy Suspicion" Evidence

In our opinion disposing of Reed's -03 application, and specifically in our analysis of Reed's Section 5(a)(2)/*Schlup* claim, we "consider[ed] the following evidence that, according to Reed, suggest[ed] Fennell's involvement in Stacey's murder":

- Fennell's deceptive polygraph results, "regardless of their admissibility, even though we question their reliability";

- The beer can DNA results "that cannot exclude Officer Hall";

- Evidence that Fennell's friend Curtis Davis took sick leave shortly after beginning his BCSO shift on the night of April 22, 1996; and

- Evidence that Fennell and the GPD had a reputation for violence, including (1) a "state-civil-rights lawsuit filed against the City of Giddings . . . and Fennell for using excessive force against suspects a year before Reed's trial"; (2) a federal civil rights action initiated against the GPD alleging "excessive force" and "specific instances of . . . misconduct"; and (3) an affidavit from Fennell's ex-girlfriend Pam Duncan, describing Fennell as hostile, possessive, and racist, and accusing him of stalking her after they broke up.

*See Reed*, 271 S.W.3d at 747. Weighing this evidence, we reasoned: "Although this . . . evidence may indeed arouse a healthy suspicion that Fennell had some involvement in Stacey's death, we are not convinced that Reed has shown by a preponderance of the evidence that no reasonable juror, confronted with this evidence, would have found him guilty beyond a reasonable doubt." *Id.*

Focusing solely upon this evidence, the Herculean task of demonstrating actual innocence is more difficult for Reed now than it was in the -03 proceeding. That is because, at the -10 hearing, the State introduced evidence undermining the otherwise-highly-curious beer can DNA results. DPS analyst Allison Heard testified at the -10 hearing that, "[b]ased on the most up-to-date manual interpretation guidelines," an analyst in 2021 looking at the beer can DNA data generated in 1998 and 2001 would be unable to "make any conclusions as to who may have contributed" the DNA on the beer can in question. Heard's report reflected only that the DNA profile in question was "consistent with a mixture."

To be sure, there has also been evidence adduced since the -03 proceeding that is broadly consistent with the "healthy suspicion" evidence. Among other things, there is the evidence concerning Fennell's bank account, *see supra* p. 74 (-10 hearing); Detective Gannon's observation that police officers often sit on top of their buckled seatbelts and his opinion that it looked like a police officer had staged the crime scene, *see supra* p. 46 (-07 application); and Curtis Davis's CNN interview, *see supra* p. 50 (-08 hearing). But even taking this evidence into account, the loss of the beer can DNA evidence severely weakens the theory that Fennell killed Stacey. Hall's non-exclusion from the beer can was perhaps

Reed's only evidence-based avenue of explaining how Fennell could have murdered Stacey, left his truck at the Bastrop High School by 5:23 a.m., and returned to Giddings in time for Carol to rouse him from his apartment. With Hall's DNA on a beer can near Stacey's body, one could at least imagine the possibility of Hall serving as Fennell's wheelman. Without that result, the evidence returns to a state where it is much harder to see, logistically, how Fennell could have murdered Stacey and made it back to Giddings so quickly. It might be possible to imagine ways in which Fennell could have accomplished this feat. But, as mentioned, a showing of actual innocence calls for "affirmative evidence," *see Franklin*, 72 S.W.3d at 678, not imagination.

### ii. Evidence that Fennell Knew, Suspected, or Feared that Stacey was Sleeping with a Black Man

One way that Reed has sought to make an affirmative showing that Fennell murdered Stacey has been to adduce evidence that, in the months leading up to Stacey's death, Fennell knew, suspected, or feared that Stacey was having an affair with a black man. If true, the information provided by Jon Aldridge, *supra* p. 25, Linda Kay Westmoreland, *supra* p. 25, Ron Moore, *supra* p. 25, Duane Olney, *supra* p. 26, James Robinson, *supra* p. 31, Reed himself, *supra* p. 48, Charles Fletcher, *supra* pp. 54 (affidavit), 65 (testimony), Arthur Snow, *supra* pp. 54 (affidavit), 67 (testimony), Michael Bordelon, *supra* p. 68, and Cynthia Schmidt, *supra* p. 71, would tend to support that theory.

But here again, Reed's case founders on the "if true." We have already expressed serious misgivings about the credibility of many of these witnesses (Jon Aldridge, Linda Westmoreland, Ron Moore, Duane Olney, James Robinson). Many have never testified in

open court subject to cross-examination (the same witnesses plus Reed himself). Others waited a long time, decades even, to come forward and gave what we regard as unpersuasive explanations for the delay (Charles Fletcher, Arthur Snow, Michael Bordelon). Many could not keep their stories straight from when they executed their affidavits to when they finally testified (same witnesses). Some admitted that either they or their significant others had seen television programs or conducted internet research on the Reed case (Charles Fletcher, Michael Bordelon). Some witnesses made claims that were so outlandish that they cannot be taken seriously (Charles Fletcher suggesting that Ed Selmala was murdered, Cynthia Schmidt suggesting that she had communicated with the Texas Rangers via hand signals and silent nodding).

We specifically find that, even under the preponderance standard, Arthur Snow's account does not warrant this Court's credence or belief. In his affidavit, Snow claimed that Fennell told him he "had to kill [his] n*****-loving fiancé[e]." *See supra* p. 54. Snow later testified that Fennell's exact words were, "You wouldn't believe how easy a man's belt would break when you strangle a n*****-loving whore." *See supra* p. 67. In our view, Snow severely tarnished his credibility on the witness stand. The utterance he ascribed to Fennell in his affidavit changed, and it changed in a way that made it less descriptive of the actual offense. Stacey was strangled with her own belt, not "a man's belt." The record suggests, and the habeas judge's FFCLs corroborate, that Snow became cagey and defensive on cross-examination, at one point invoking and then quickly withdrawing his Fifth Amendment right against self-incrimination. He gave inconsistent accounts about whether Fennell had approached him personally, and why he (Snow) originally joined the

Aryan Brotherhood. Finally, the -10 habeas judge, observing Snow's testimony and demeanor firsthand, said that Snow was "not a credible or reliable witness." We agree.

That said, our assessment of the strength of Reed's evidence on this point should not be mistaken for a vote of confidence in Fennell himself. Fennell admitted at the -10 hearing that, earlier in life, he used the "N-word." He denied harboring a racial prejudice, but over the years, multiple people with varying degrees of credibility have accused Fennell of using racial slurs and being prejudiced against black people. It is certainly possible that, as a matter of historical fact, Fennell really did have a deep-seated fear that Stacey was having an affair with a black man.

But there is a wide gulf between "it is possible that X" and "it has been proven more likely than not that X." Even viewed holistically, Reed's evidence has not accomplished the latter. Even if it did, showing that Fennell suspected or feared that Stacey was sleeping with a black man is a far cry from showing that, more likely than not, he strangled Stacey to death. It would be a brick, maybe even an important brick, in the "Fennell killed Stacey" wall. But it would not by itself complete the wall. Among other obstacles, there would still be the ever-present logistical implausibility of Fennell murdering Stacey, leaving his truck at the Bastrop High School, and then returning to Giddings in a matter of hours.

### iii. Evidence that Fennell was Abusive and Violent Toward Stacey

At trial, the defense called one witness to suggest that Fennell and Stacey's relationship was not as idyllic as the State would have the jury believe. Specifically, Tami Hannath testified that Stacey was normally a very outgoing, social person, but that once she started seeing Fennell, she began spending less time with her friends. Hannath

described Fennell as "a little bit more possessive" than Stacey's prior boyfriends. She also described an incident in which she was on the phone with Stacey, making plans for them to go out and see a movie. When Fennell got home (Hannath recognized his voice over the phone) and Stacey started to tell Fennell about her plans to go out, "the phone just hung up." Hannath also vaguely suggested that Fennell had once slashed Stacey's tires. Additionally, Hannath claimed that Stacey and Fennell had changed their wedding date multiple times, and that she never saw Stacey's engagement ring. *See supra* p. 20.

On habeas, across his many writ applications, Reed has adduced testimony and statements from several lay witnesses contributing to the allegation that Fennell was an abusive and violent boyfriend. If true, the information provided by Martha Barnett, *supra* pp. 29 (affidavit), 32 (testimony), Mary Blackwell, *supra* pp. 30 (affidavit), 32 (testimony), Richard Scroggins, *supra* pp. 48 (affidavit), 71 (testimony), Rubie Volek, *supra* pp. 54 (affidavit), 66 (testimony), Charles Fletcher, *supra* pp. 54 (affidavit), 65 (testimony), Jim Clampit, *supra* pp. 55 (affidavit), 66 (testimony), Richard Derleth, *supra* p. 55, Arthur Snow, *supra* pp. 54 (affidavit), 67 (testimony), Michael Bordelon, *supra* p. 68 (testimony and affidavit), Brent Sappington, *supra* pp. 55 (declaration), 71 (testimony), Vicki Sappington, *supra* pp. 55 (declaration), 71 (testimony), Rebecca Peoples, *supra* p. 56, Paul Espinoza, *supra* p. 69, Suzan Hugen, *supra* p. 70, Cynthia Schmidt, *supra* p. 71, and Brenda Dickinson, *supra* p. 73, would lend at least some credence to that allegation.

For the most part, Reed's showing on this point does not get past "if true." This Court has already expressed grave doubts about the credibility of some of these witnesses (Martha Barnett, Mary Blackwell). Some of them have never testified in open court subject

to cross-examination (Richard Derleth, Rebecca Peoples), while others who *did* testify tarnished their credibility on the witness stand (Arthur Snow, Michael Bordelon, Suzan Hugen, Cynthia Schmidt). Some witnesses admitted that they had paid attention to media descriptions of the Reed case (Richard Scroggins, Paul Espinoza). Other accounts were openly based on interpretations of tone (Rubie Volek) or hearsay (Vicki Sappington). Many witnesses gave implausible explanations for not saying anything sooner (Charles Fletcher, Jim Clampit, Paul Espinoza, Brenda Dickinson). In our view, all things considered, Reed has not marshalled the kind of evidence one might expect from someone claiming to be able to prove, by a preponderance of the evidence, a decades-old assertion about an engaged couple.

Our generally bleak assessment of Reed's evidence on this point has one notable exception: the declaration and testimony of Brent Sappington. At the -10 hearing, former Lee County official Ted Weems corroborated that, at some undetermined point in time, Bill Sappington approached him at church and told him that he had heard "loud arguing many times" coming from Fennell and Stacey's apartment. *See supra* p. 79. In his affidavit, Brent described hearing "a lot of loud noises and banging" coming from Fennell and Stacey's apartment; in his testimony, Brent described a sound "like a bunch of tables and chairs being turned over with a bunch of screaming and hollering." Meanwhile, Weems said that Bill told him he had heard "loud arguing" coming from Fennell and Stacey's apartment.

Ultimately, many of the reasons that have caused us to afford other witnesses' accounts little probative weight in the analysis apply just as readily to Brent's. Brent was

attesting, in 2019 and 2021, to events and conversations from the mid-1990s. And his affidavit was in tension with his testimony in at least one important respect: In his affidavit, Brent could not recall whether he had heard the loud argument in question during the daytime or the nighttime—yet in his testimony, Brent was certain he heard it at night. Further, Brent gave a bizarre, unconvincing explanation for the tension: Brent claimed that his memory of the event was better in 2021 than it was in 2019. Brent admitted that he had seen media reports indicating that Reed was innocent and that Fennell was guilty. And his explanation for not coming forward sooner (Brent claimed that he did not think his testimony would do any good because Fennell was "a law enforcement [sic]") strains credulity.

We are therefore inclined to regard Brent's affidavit and testimony as proven by a preponderance only insofar as they have been corroborated by Weems's testimony. That is, Reed has shown that it is more likely than not that, at some undetermined point in time, Bill Sappington approached Ted Weems at church and told him that he had heard "loud arguing many times" coming from Fennell and Stacey's apartment. In terms of proving Fennell's guilt (and thus Reed's innocence), that is clearly not nothing. But this evidence stops well short of demonstrating that, more likely than not, Fennell strangled Stacey with her own belt, dumped her body in Bastrop County, and traveled back to Giddings in time for Carol to rouse him from his apartment.

This is especially so because the jury already heard from one witness, Tami Hannath, who hinted that Fennell was a jealous, "possessive" boyfriend who had possibly slashed Stacey's tires. *See supra* p. 20. The fact that some evidence of Fennell's toxicity

was already before the jury makes it that much harder for Reed to show on habeas that, if only the jury knew about this other body of similar evidence, more likely than not, his trial would have ended differently.

### iv. Scientific Evidence Suggesting that Stacey Died Hours Before 3:00 a.m. on April 23, 1996

Another way that Reed has sought to make an affirmative showing that Fennell murdered Stacey has been to marshal forensic and scientific evidence suggesting that Stacey died several hours before 3:00 a.m. on April 23, 1996—when, by Fennell's own timeline, Stacey was home alone with him. At trial, Travis County Medical Examiner Roberto Bayardo testified that there is no "precise scientific way of making a determination of . . . time of death." According to Bayardo, "we can only make estimates." Even so, Bayardo stated that, "[b]ased on . . . changes that occur after death in the body," he would estimate Stacey's time of death as being "around 3:00 a.m. on April 23, 1996 . . . [g]ive or take one or two hours." If credited, this estimate would put Stacey's death somewhere between 1:00 and 5:00 a.m. (or thereabouts, depending on how much one reads into the word "around") on April 23, 1996.

On habeas, across his many writ applications, Reed has adduced a great deal of evidence challenging Bayardo's time-of-death estimate:

- LeRoy Riddick claimed in a 2003 affidavit that, for Stacey's time of death to be reliably determined, crime scene investigators would have needed to measure and record her level of rigor mortis, post-mortem lividity, and body temperature. Because they did not, Riddick initially asserted that Bayardo's 3:00 a.m. estimate was not "reliabl[e]." *See supra* p. 30. Riddick repeated these claims in a 2006 affidavit. *See supra* p. 33. In a 2015 affidavit, Riddick theorized that Stacey died between 9:15 p.m. on April 22 and 1:15 a.m. on April 23. Further, based on Stacey's lividity, Riddick concluded that her body rested with her right arm and shoulder

"dependent" (lower than the rest of her body) for at least 4–6 hours before she was moved to the Bluebonnet Drive site. *See supra* p. 46.

- Bayardo himself emphasized in a 2014 declaration that "[e]stimates regarding time of death are just that—estimates—and the accuracy of the estimate is subject to various factors." Bayardo stated that his time-of-death estimate "should not have been used at trial as an accurate statement of when Ms. Stites died." *See supra* p. 45.

- Werner Spitz stated in a 2015 affidavit that, in his opinion, Stacey was murdered "prior to midnight on April 22, 1996" and "she laid in a different position for about 4-5 hours before she was moved to the location where her body was found." *See supra* p. 45.

- Michael Baden claimed in a 2015 declaration that, in his opinion, "Ms. Stites was dead before midnight on April 22nd when she was alone with Mr. Fennell." He based this opinion on: (1) the distribution and intensity of Stacey's lividity; and (2) the "viscous fluid" found in Fennell's truck, which Baden believed to be "post-mortem purge fluid." *See supra* p. 46. At the -08 hearing, Baden testified consistently with his affidavit, adding that Stacey's level of rigor mortis also supported an April 22 death. *See supra* p. 51.

- Kevin Gannon stated in a 2015 affidavit that, in his opinion, Stacey was murdered "sometime between 7:00 p.m. and 11:00 p.m. on April 22, 1996." He based this opinion on "the presence of livor mortis [lividity], rigor mortis, and decompositional changes to the color of Stacey's body as viewed in the video and as described in the written report." *See supra* p. 46.

- Andrew Baker stated in his 2020 report that, in his opinion, Stacey must have died "hours" before 3:00 a.m. on April 23, 1996. Baker claimed that this was because "her rigor mortis was already waning when her body was examined and videotaped at the scene." Further, based on the "antigravitational" lividity patterns on Stacey's body, Baker concluded that Stacey "died in a different position" and that her body rested in that position for "many hours" before being moved to the Bluebonnet Drive site. *See supra* p. 59. At the -10 hearing, Baker testified consistently with his report. *See supra* p. 64.

- Gregory Davis seconded Baker's conclusions at the -10 hearing, as well as those of the PRR. *See supra* p. 70. The PRR stated that the "only two explanations" for Stacey's level of rigor "are either that she died hours after 5:00 a.m. . . . or she died hours before 3:00 a.m." Based on Stacey's decompositional state, the PRR seemed to favor the latter explanation. *See supra* p. 61.

On the other hand, at the -10 hearing, the State presented the following witnesses disputing Reed's evidence on this point:

- Suzanna Dana asserted in a 2021 report (and testified at the -10 hearing) that, in her opinion, Stacey died "between 3 and 5 AM of the day the body was found." She based this opinion primarily on the level of rigor mortis depicted on the crime scene video. Dana also claimed that the lividity patterns on Stacey's body were "consistent with the position the body was found in." *See supra* pp. 62 (report), 76 (testimony).

- Norma Jean Farley asserted in a 2021 report (and testified at the -10 hearing) that the forensic and circumstantial evidence suggested that Stacey was killed between 3:00 and 5:00 a.m. on April 23, 1996, not in the late-night hours of April 22. *See supra* pp. 64 (report), 76 (testimony).

Reed's efforts to prove that Stacey died hours before 3:00 a.m. on April 23, 1996 run into several significant headwinds. First, at the -10 hearing, Reed's own experts stated that the science underlying time-of-death determinations is the same today as it was in 1996. Reed has not otherwise shown (indeed, does not even assert) that the scientific community's understanding of "postmortem interval" has meaningfully advanced or even changed since the time of trial. So, under our actual innocence jurisprudence, the evidence Reed has marshaled on this point either cannot factor into the analysis (for *Elizondo* purposes) or carries less probative weight (for *Schlup* purposes).

We have previously stated that, in some cases, a writ applicant may "proffer some additional evidence to establish his claim of actual innocence . . . even when a small portion of that evidence was available at an earlier time." *Id.* at 546. Even so, Reed runs into a second headwind at this juncture: His theories keep changing. In the -01 application, Reed did not attempt to challenge Bayardo's time-of-death estimate (despite the fact that, according to Reed's own experts, there was scientific evidence available even then that

could have been marshaled on that score). Then, in the -03 proceeding, Reed presented the Court with two pieces of evidence relevant to Stacey's time of death: Riddick's claim that Bayardo did not have enough data to reliably estimate Stacey's time of death, and Barnett's claim that she saw Stacey alive at approximately 5:00–5:30 a.m. on April 23, 1996. Finally, in the -07 application, Reed attempted to show that Stacey must have died hours before 3:00 a.m.; and Reed has stuck with that theory ever since.

So, over the last two decades, Reed has gone from (1) seemingly having no qualms with Bayardo's time-of-death estimate, to (2) asserting that the lack of data made it impossible for someone to reliably determine Stacey's time of death, to (3) asking this Court to find that Stacey was alive as late as 5:30 a.m., to (4) asking this Court to find that Stacey died several hours before 3:00 a.m. Reed's inability or unwillingness to stick to a single consistent theory seriously undermines his assertion that, more likely than not, the theory he is advancing in *this* proceeding is the correct one. In this regard, little has changed since 2008—then as now, Reed has failed to advance a singular, cohesive theory of innocence. *See Reed*, 271 S.W.3d at 746.

But, for argument's sake, we will set those inconsistencies aside and review this category of evidence on its own merit. Reed's evidence runs into yet a third headwind, this one arguably more fundamental than the others: It simply fails to persuade. At the -10 hearing, Drs. Baker and Davis both stressed that (1) even under ideal circumstances, estimating time of death is an imprecise science; and (2) qualified, experienced medical examiners could look at the same data and reach different conclusions about time of death. Reed's evidence on this score therefore fails to show that, as a matter of historical and

scientific fact, Stacey died several hours before 3:00 a.m. on April 23, 1996. At most, it shows that a medical examiner could within reason conclude that she died hours before 3:00 a.m. As a result, Reed's evidence "merely presents differing opinions that a jury could reject." *See Reed*, 271 S.W.3d at 748. And in the actual innocence context, that kind of evidence will not carry the day. *See id.*

What's worse, Reed's experts' opinions about Stacey's time of death are based entirely on rough visual estimates and secondhand descriptions of Stacey's rigidity, lividity, and decompositional state. It is difficult to place much stock in Reed's experts' pronouncements in these regards (i.e., about when Stacey *must have* died, or when she *cannot possibly* have died) when the data underlying those pronouncements are so subjective and inexact. That difficulty is only exaggerated by Reed's experts' refusal to account for (supposedly) non-forensic considerations like the attire Stacey's body was found in and her work schedule. It may be, as Baker stated, that it is ultimately the factfinder's job to decide the relevance of non-forensic considerations such as these. But the same could be said of everything Reed's experts testified to, and to the extent that Reed's experts were reaching conclusions that were in tension with the non-forensic circumstantial evidence, it is not unreasonable to expect Reed's experts to account for that tension. And they did not.

### v. Fennell's Extraneous Conduct Following Stacey's Death

Yet another way that Reed has sought to make an affirmative showing that Fennell murdered Stacey has been to adduce evidence of Fennell's disturbing behavior following Stacey's death. Specifically, Reed has presented the Court with:

- An indictment, search warrant affidavit, and record of a plea hearing showing that, in October 2007, Fennell had sex with a woman (Amanda Smith) in his police custody. The woman alleged that Fennell "raped" her; ultimately, Fennell pleaded guilty to kidnapping and improper sexual activity with a person in custody. *See supra* p. 38. At the -10 hearing, Fennell claimed to have served his ten-year prison sentence "day for day."

- A TCSO report in which a woman (Angie Smith) accused Fennell of asking her for a lap dance during a May 2004 traffic stop. *See supra* p. 39.

- A print-off from a MySpace page run by a person with the internet moniker "pointman_1." The page contained "sexually explicit and violent" imagery. Reed alleged that "pointman_1" was Fennell. *See supra* p. 40.

- A WCSO report in which a woman (B.A.) claimed that a Georgetown officer named "Sgt. Fennel" "raped" her on March 12, 2007. *See supra* p. 41.

- Another WCSO report in which a woman (Kelly Ramos) accused Fennell of staring lewdly at her breasts during an August 2007 arrest. Ramos claimed that Fennell told her that he would come by her apartment at around 3:00 a.m. so that they could "discuss" her situation. *See supra* p. 41.

- Another WCSO report in which a woman (Mary Ann Bone) accused Fennell of asking her, during a police dispatch to her house, whether he could "bend her over the couch and fuck her." *See supra* p. 41.

- Another WCSO report in a which a woman (Jamie Bolin) alleged that Fennell hit on her during a late October/early November 2007 domestic violence dispatch to the woman's apartment. *See supra* p. 41.

- Another WCSO report in which one of Aida Fennell's coworkers alleged that Aida "had previously shown up at work with bruises on her face." According to the coworker, Aida said that her bruises were the "result of being hit in the face" when Jimmy "became upset with her and threw a phone at her." The coworker said that Aida had "expressed concern about the death of [Fennell's] former fiancé[e] in Giddings." *See supra* p. 42.

- A 2008 Texas Rangers report in which a woman named Wendy Wallace accused Fennell of stalking her in 1996 or 1997. *See supra* p. 42.

Initially, we note that only one of these extraneous incidents made it past the "offense report" stage of proof: the October 2007 incident culminating in Fennell's convictions for kidnapping and improper sexual activity with a person in custody. That does not necessarily render the remaining incidents irrelevant to the theory that Fennell killed Stacey; the fact that a string of women have accused Fennell of sexually violent and/or oppressive behavior could be seen as increasing the likelihood that Fennell inflicted sexual violence on Stacey. But it does have some bearing on the weight to be given to these accounts. The October 2007 incident is compelling evidence that Fennell once engaged in violent and/or oppressive acts; the other instances obviously carry less weight in the analysis. Yet Reed did not call any of Fennell's accusers to testify at the -10 hearing.

Even so, there is little doubt that, taken as a whole, Fennell's extraneous conduct is a brick in the Fennell-killed-Stacey wall. The problem for Reed is that, if we accept the premise that extraneous conduct can shed light on the identity of Stacey's killer, there is no principled reason to treat Fennell's extraneous conduct as relevant to that inquiry but Reed's extraneous conduct as some kind of third rail. And, once that threshold is crossed, we find that Reed's extraneous conduct points far more forcefully toward the conclusion that Reed killed Stacey. As mentioned, at the punishment phase of Reed's trial, the State introduced evidence that Reed sexually assaulted at least five women before Stacey's murder (Connie York, minor A.W., Lucy Eipper, Vivian Harbottle, Carolyn Rivas) and attempted to sexually assault another after (Linda Schlueter). *See supra* p. 22. If credited, this evidence strongly suggests that, despite Reed's claim of a consensual "secret" rendezvous between himself and Stacey, Reed in fact sexually assaulted Stacey. And from

there, it takes no great leap in logic to conclude that, if Reed sexually assaulted Stacey on the morning of April 23, 1996, by a preponderance of the evidence, he is most likely the person who strangled her, as well. There is little if any evidence to support the theory that, while Reed may have sexually assaulted Stacey, someone else killed her.

We are aware, of course, that evidence of Reed's extraneous conduct was not put before the jury during the guilt phase of Reed's capital murder trial. And our actual innocence jurisprudence has sometimes suggested that, in an actual innocence analysis, a court must balance the "new" evidence of innocence against the evidence that the State adduced in the guilt phase of trial. *See, e.g.*, *Ex parte Chaney*, 563 S.W.3d 239, 274 (Tex. Crim. App. 2018) ("[T]he court must weigh the newly discovered evidence against the State's case at trial to determine the probable impact the evidence would have had at trial if the new evidence had been available.") (citing *Elizondo*, 947 S.W.2d at 206).

But our analysis does not treat Reed's extraneous conduct as guilt-phase evidence— nor indeed as evidence that Reed is *guilty* of anything, in the sense that a jury might declare someone "guilty" of a crime at the conclusion of a criminal trial. A court reviewing an actual innocence claim has no occasion to decide whether the claimant is guilty of anything, including the crime of conviction. But it does have an occasion and the authority to scrutinize the claimant's assertion that he is innocent. Just so, our analysis treats Reed's extraneous conduct, not as some additional evidence that Reed is guilty, but as evidence undermining his claim of innocence. We have never held that the State is prohibited, in a postconviction context, from adducing evidence undermining an applicant's showing of

actual innocence. *See Bousley*, 523 U.S. at 623–24 (noting that, in seeking to rebut a claim of actual innocence, "the Government is not limited to the existing record").

We are also aware that none of Reed's extraneous conduct has yet resulted in a criminal conviction. Indeed, when Reed was tried for sexually assaulting Connie York, he was acquitted. But here again, this is not a criminal proceeding that will decide whether Reed is "guilty" or "not guilty"—of capital murder or anything else. This is a postconviction proceeding that will decide (among other things) whether Reed has adequately demonstrated his innocence. As we explained when it came to Fennell's extraneous conduct, the fact that these extraneous instances did not culminate in criminal convictions does not necessarily make them irrelevant to the innocence inquiry. It just means that we must temper whatever probative weight we might otherwise have assigned to them. The bottom line is that, even viewed with appropriate skepticism, the evidence of Reed's extraneous conduct still casts a considerable pall over his claims of innocence.

### d. Phase Three: Everything Else

Over the years, Reed has adduced a fair amount of evidence that does not fit neatly into the "consensual sexual relationship" or "Fennell killed Stacey" categories. For instance:

- LeRoy Riddick stated in his 2003 affidavit that: (1) crime scene investigators "did not engage in the required steps that would have allowed Dr. Bayardo to reliably determine" Stacey's time of death; (2) "the evidence of anal intercourse . . . is not conclusive in this case"; (3) Bayardo's opinion that Stacey died as a result of "asphyxia due to ligature strangulation associated with sexual assault," is not reliable; and (4) the evidence collection methods used at the crime scene were subpar. *See supra* p. 30. Riddick also repeated these claims in his 2006 affidavit. *See supra* p. 33.

- Ronald Singer stated in his 2003 affidavit that: (1) "the law enforcement authorities who investigated Stacey Stites'[s] death exercised poor security and . . . control at the scene where her body was found"; (2) the "law enforcement authorities depicted on the [crime scene video] demonstrated poor technique in dealing with, and taking evidentiary samples from, Ms. Stites'[s] body"; (3) the crime scene video itself was poorly done, because it started and stopped multiple times and did not capture important events; and (4) Karen Blakley testified "well beyond her area of expertise" at Reed's trial. *See supra* p. 30. Singer also repeated these claims in his 2006 affidavit. *See supra* p. 33.

- Roberto Bayardo stated in his 2012 declaration that (1) had he been asked at trial if spermatozoa and/or semen were found in Stacey's rectal cavity, he would have said that they were not; and (2) the fact that there was "spermatozoa in Ms. Stites's vaginal cavity was not evidence of sexual assault." *See supra* p. 45.

- Meghan Clement stated in a 2012 email that: (1) the processing of rape kits could separate sperm tails from heads; and (2) her testimony regarding the longevity of intact spermatozoa was based on her professional experience rather than scientific literature. *See supra* p. 45.

- Werner Spitz stated in his 2015 affidavit that: (1) Stacey's distended anus was a normal decompositional process, not evidence of anal penetration; and (2) "[t]he examination of the body at the crime scene was inappropriate." *See supra* p. 45.

- Michael Baden stated in his 2015 statement that Stacey's autopsy revealed "no evidence of anal intercourse or of sexual assault." *See supra* p. 46. Baden later testified consistently with this claim at the -08 hearing. *See supra* p. 51.

- Brady Mills stated in a 2018 letter that DPS's review of Karen Blakley's trial testimony revealed some "potential limitations in the paper she cited during [her] testimony: Spermatozoa—Their Persistence After Sexual Intercourse." *See supra* p. 52.

- Stephane Sivak stated in a 2018 letter that Meghan Clement's trial testimony contained "unsatisfactory statements." Specifically, Clement had inappropriately "cite[d] the number of cases and/or samples worked in the lab" to bolster her conclusions and otherwise "testifie[d] beyond the scope of . . . her expertise." *See supra* p. 52.

- Andrew Baker stated in a 2020 report that (1) contrary to Karen Blakley's testimony, it is not possible to date bruises by their color; and (2) Stacey's anal

dilation, as documented at her autopsy, did not suggest anal penetration. *See supra* p. 59. Baker also testified at the -10 hearing along these lines. *See supra* p. 64.

- Gregory Davis testified at the -10 hearing that: (1) contrary to Karen Blakley's testimony, it is not possible to date bruises by their color; and (2) the dilation of Stacey's anus, as documented at her autopsy, did not suggest anal penetration. *See supra* p. 70.

Taking this evidence into careful consideration, it does not get Reed across the actual innocence finish line. None of this information affirmatively demonstrates Reed's innocence. That is, it neither (1) affirmatively shows that Reed did not kill Stacey nor (2) affirmatively shows that someone else did. At best, this category of evidence weakens the State's case in chief. But that is not the point of an actual innocence claim. *See Franklin*, 72 S.W.3d at 677 ("When a defendant seeks [actual innocence relief] after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubts about his guilt.") (quoting *Herrera v. Collins*, 506 U.S. 390, 443 (1993) (Blackmun, J., dissenting)); *see also Schlup*, 513 U.S. at 329–30 (distinguishing the standard to be applied in procedural actual innocence claims from the "standard that governs review of claims of insufficient evidence").

Take, for instance, Reed's ongoing efforts to dismantle the State's theory that Stacey was anally penetrated before she died. Even if Reed could definitively prove that Stacey was not anally penetrated before she died, that would not detract from the evidence suggesting that Reed forced Stacey to have vaginal intercourse. *See Reed*, 271 S.W.3d at 748 ("Any deficiency in the evidence suggesting anal intercourse does not necessarily support Reed's theory that he and Stacey engaged in consensual vaginal intercourse.

. . . Compelling, independent circumstantial evidence showed that Reed forced Stacey to have vaginal intercourse.").

Or take Reed's efforts to show that Karen Blakley's bruise-dating testimony was unsupported, or that Meghan Clement was not qualified to testify about sperm longevity. None of these efforts affirmatively demonstrates that Reed is innocent. At best, they show that the State's experts gave unsupported or unqualified testimony. But that is not the kind of due-process violation this Court's actual innocence jurisprudence is designed to address. *See Franklin*, 72 S.W.3d at 677 ("[O]ur holding in *Elizondo* was meant to act as a mechanism for freeing the innocent[.]").

To be sure, there is nothing prohibiting an actual innocence claimant from undermining the State's case in the process of proving his innocence. One can imagine scenarios in which dismantling the State's case is an important part of a habeas applicant's actual innocence showing. If an applicant's evidence is in tension with some otherwise-intact facet of the State's case, one would understandably expect the applicant to be able to account for that tension. And one way the applicant could do that would be to show that one facet of the State's case was bunk.

But that is not the situation we face here. It is not as though but for some otherwise-intact facet of the State's case, Reed would be able to establish his innocence to the necessary level of confidence. Given its questionable credibility and weight, Reed's affirmative evidence of innocence (i.e., the "consensual relationship" and "Fennell killed Stacey" evidence) does not amount to a more-likely-than-not showing that Reed is factually innocent of Stacey's murder. That being the case, the evidence in this phase does

not get Reed to where he needs to go: an affirmative, fact-and-conduct-based showing of innocence. *Cf. Ex parte Fournier*, 473 S.W.3d 789, 792 (Tex. Crim. App. 2015) (emphasizing *Elizondo*'s "fact- and conduct-centric notions of actual innocence").

Taking all of the foregoing phases of evidence into account, Reed has not shown by a preponderance of the evidence that no rational jury would have convicted him in light of his post-trial evidence of innocence. His lay witnesses have given accounts that are questionable at best when viewed in isolation and disharmonious when viewed holistically. His scientific and forensic experts have relied (and continue to rely) on science that has been available since the time of Reed's trial, and even looking past the prior-availability issue, Reed's scientific and forensic evidence does not affirmatively show that Reed is innocent. It reflects "differing opinions," *Reed*, 271 S.W.3d at 748, not a scientific consensus pointing toward Reed's innocence. Finally, to whatever extent Fennell's extraneous conduct shifts suspicion away from Reed and toward Fennell, Reed's extraneous conduct, added to the evidentiary mix, shifts the suspicion back to Reed (and them some). Reed's history of sexual assault seriously discredits his assertion—of which he is trying to persuade this Court—that he and Stacey had consensual sex. These observations suffice to dispose of Reed's procedural, Section 5(a)(2)-based innocence claim as well as his substantive, *Elizondo*-based innocence claim. Because it does not warrant relief under either rubric, claim four is denied.

### 3. CLAIM ONE: "Material newly discovered … evidence was suppressed in violation of *Brady v. Maryland*."

In claim one, Reed alleges that the State failed to turn over to Reed's trial lawyers material information in the possession of Charles Fletcher, Jim Clampit, and Richard Derleth (who, in 1996–98, were all law-enforcement officers in and around Bastrop). Specifically, Reed alleges that:

- In early 1996, an employee at the Bastrop H-E-B told Derleth (then a BCSO deputy) that H-E-B staff would alert Stacey any time Fennell walked into the store so that she could hide from him. *See supra* p. 55.

- In March 1996, Fennell told Fletcher (then a BCSO deputy) that he believed Stacey was "fucking a n*****." *See supra* p. 54.

- Fletcher attended Stacey's funeral and saw firsthand Fennell's "cold, empty, and emotionless" behavior at the services. *See supra* p. 54.

- At Stacey's funeral, and within earshot of Clampit (then an LCSO deputy), Fennell muttered that Stacey "got what she deserved." *See supra* p. 55.

The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This rule applies equally to impeachment evidence and exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and it puts a duty on individual prosecutors to "learn of any favorable evidence known to others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To demonstrate that he is entitled to post-conviction relief on *Brady* grounds, Reed has the burden to show that (1) the State failed to disclose evidence; (2) the evidence was favorable to him; and (3) the evidence was material. *See Diamond v. State*, 613 S.W.3d 536, 545 (Tex. Crim. App. 2020). The first two elements must be proven by a

preponderance of the evidence. *See id.* Evidence is material under *Brady* if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles*, 514 U.S. at 433. Materiality is gauged collectively, not item by item. *Id.* at 436.

### a. Richard Derleth: The Jimmy Fennell Alert System

As mentioned, Richard Derleth claimed in an affidavit that, in early 1996, an unidentified "member of the check-out staff" at the Bastrop H-E-B told him that whenever H-E-B staff would see Jimmy Fennell come into the store, they would alert Stacey, "and she would run and hide from Jimmy." According to Derleth, this staff member said that "they were concerned that if they did not alert Stacey to Jimmy's presence . . . he would start a verbal fight with her."

As we suggested in analyzing Reed's actual innocence claims, we find ourselves unable to credit Derleth's account. First, Derleth did not testify at the -10 hearing, so his credibility and memory were never put to the test. Second, Derleth's affidavit itself suggests that his recollection is hazy. For instance, Derleth frequently refers to his source ("a member of the check-out staff") as "they." This makes it seem like Derleth cannot even remember the gender of the H-E-B employee who told him about the Jimmy Fennell alert system—and Derleth claimed to have interacted with this person regularly.

To be sure, there is some evidence in the habeas record that, if credited, would tend to corroborate Derleth's claim. Lee Roy Ybarra, Rebecca Peoples, Paul Espinoza, Suzan Hugen, and Brenda Dickinson all made statements that, if credited, would tend to support the notion that Stacey told her co-workers that she disliked and/or feared Fennell. The

problem for Reed is that, even adding these proverbial bricks to the wall, Derleth's claim about the historical facts still comes up short of the more-likely-than-not line. As mentioned, there are nontrivial reasons to afford each of these potentially corroborating accounts little probative weight. To the extent that these witness accounts do not culminate in a more-likely-than-not showing that Reed is innocent, they also do not culminate in a more-likely-than-not showing that Derleth's account is historically accurate. That is not to say that we find that these witnesses are all lying or that their accounts are incredible across the board. It is simply to say that, even if these accounts have *some* tendency to corroborate Derleth's affidavit, they do not corroborate it so forcefully as to push it past the preponderance line.

Because Reed has not come forward with sufficient credible evidence to show that, more likely than not, the events described in Derleth's affidavit actually happened, he has not met his burden to show that the State suppressed evidence of a Jimmy Fennell alert system at the Bastrop H-E-B. Therefore, this *Brady* sub-allegation fails. *Cf. Brogdon v. Blackburn*, 790 F.2d 1164, 1168 (5th Cir. 1986) ("The prosecution has no duty to turn over . . . evidence that does not exist."). Based on this resolution of the Derleth sub-allegation, we do not need to decide (as the habeas court did): (a) whether Derleth was part of "the State" for *Brady* purposes; (b) whether the State would have been excused from divulging this information because it was hearsay; (c) whether Derleth's information was material; or (d) whether this sub-allegation should be denied on laches grounds.

### b.  Charles Fletcher: Fennell's Behavior at Stacey's Funeral

As mentioned, Charles Fletcher made two allegations. First, Fletcher claimed that, in March 1996, at a barbeque outside of Fennell's apartment building, Fennell told Fletcher that he believed Stacey was "fucking a n*****." Second, Fletcher claimed that he attended Stacey's funeral service and witnessed Fennell behaving in a way that seemed inappropriate for the occasion.

We will first address Fennell's alleged behavior at Stacey's funeral. Specifically, Fletcher claimed in his affidavit that Fennell looked "cold, empty, and emotionless" before, during, and after Stacey's funeral. He described Fennell's behavior around this time as "odd" and said that "something was definitely off." According to Fletcher, he even asked Fennell's mother if Fennell was on medication. Fletcher was allegedly "so disturbed by [Fennell's] behavior" that it caused him "to question whether [Fennell] was involved in Stacey's death." Testifying at the -10 hearing, Fletcher further described Fennell as "lethargic" around the time of Stacey's funeral.

Regardless of whether this information is credible or historically accurate, it is immaterial. Grief is not a one-size-fits-all thing. Some behaviors at a funeral might in theory furnish evidence of guilt, but a person failing to show the "appropriate" level of sadness at his fiancée's funeral is not that kind of behavior. Further, Fennell's mother Thelma testified at the -10 hearing that she gave Fennell "a low dose of Xanax" the day of the funeral. If credited, this testimony could explain Fennell's emotional flatness at Stacey's funeral. Finally, BPD investigator David Board's offense report contained the contact information of a witness, Andrea Bunte, who "[t]hought it was strange that Jimmy Fennell wasn't that emotional during Stacy's [sic] funeral." Reed has never claimed that

he did not have access to this report before trial. Accordingly, if Reed's trial lawyers thought that evidence of Fennell's despondency (or lack thereof) at Stacey's funeral could have helped Reed's case, the record suggests that they had a means of at least attempting to put that evidence in front of the jury.

Because Reed has not shown that Fennell's "cold" behavior at Stacey's funeral was material evidence—evidence whose absence at trial should undermine our confidence in Reed's conviction—this *Brady* sub-allegation fails. Based on this resolution, we do not need to decide (as the habeas court did): (a) whether Fletcher's allegation about Jimmy's behavior at the funeral was credible or accurate; (b) whether it would have been "favorable" to the defense; (c) whether Fletcher was part of "the State" for *Brady* purposes; or (d) whether laches should bar relief on this sub-allegation.

### c. Charles Fletcher: Fennell's Racist Comment

That leaves what is undoubtedly the more disturbing of Fletcher's allegations: that, in March 1996, at a barbeque outside of Fennell and Stacey's apartment building, Fennell told Fletcher that he believed Stacey was "fucking a n*****." At the -10 hearing, Fletcher repeated this allegation, adding that he believed that Curtis Davis was there and had also heard Fennell's comment. On cross-examination, it came out that Davis passed away before the -10 hearing. The State later called Etta Wiley, Fletcher's ex-wife, as a witness. Wiley testified that Fletcher never mentioned any of this to her.

As we suggested in analyzing Reed's actual innocence claims, Reed has not proven this allegation to be true by a preponderance of the evidence. Fletcher waited twenty-three years to divulge this information, and he gave what we regard as an implausible explanation

for not coming forward sooner. According to Fletcher, he feared that if it were "perceived" that he was "going against local law enforcement," he could bring negative consequences on his family. But Fletcher did not explain why the risk of law-enforcement retaliation was less concerning to him now than it was before. Further, there is some tension between Fennell's dual claims that (1) he was "disturbed" by Fennell's comments at the barbeque and yet (2) he drove with Fennell to Corpus Christi for Stacey's burial. Fletcher's flirtation with the Ed-Selmala-was-murdered conspiracy theory only diminishes his believability. And on top of everything else, the -10 habeas judge, observing Fletcher's testimony and demeanor firsthand, described his account as "uncredible."

We acknowledge the evidence in the record that, if credited, would tend to corroborate Fletcher's allegation that Fennell suspected Stacey of sleeping with a black man. Jon Aldridge, Linda Westmoreland, Ron Moore, Duane Olney, James Robinson, Reed himself, Arthur Snow, Michael Bordelon, and Cynthia Schmidt all made statements that, if credited, would tend to increase the likelihood that Fennell harbored this particular suspicion. The problem for Reed is that, even adding these bricks to the wall, Fletcher's core claim about the historical facts (i.e., "In March 1996 Jimmy Fennell told me X") still falls well short of the more-likely-than-not line. Here again, we do not necessarily find that these witnesses are all lying or utterly incredible. We find only that, given the limitations inherent in each of these witnesses' accounts, they do not push Fletcher's (and by extension, Reed's) claim about the historical facts past the more-likely-than-not line. Even under the preponderance standard, a litigant claiming to be able to prove that someone

uttered a particular (and particularly odious) line *twenty-five years ago* calls for especially reliable evidence. And in our view, Reed's evidence is not up to the task.

Because Reed has not come forward with sufficient credible evidence to show that, more likely than not, Fennell told Fletcher that he thought Stacey was "fucking a n*****," Reed has not met his burden to show that the State suppressed evidence of this utterance. Therefore, this *Brady* sub-allegation fails. *Cf. Brogdon*, 790 F.2d at 1168 ("The prosecution has no duty to turn over . . . evidence that does not exist."). Based on this resolution, it is not necessary to for this Court to decide (as the habeas court did): (a) whether Fletcher's information regarding the utterance in question was favorable to Reed; (b) whether Fletcher was part of "the State" for *Brady* purposes; (c) whether Fletcher's information regarding the utterance in question was material; (d) whether laches should bar relief on this sub-allegation; or (e) as between Fletcher and Fennell, who the more credible witness was.

### d. Jim Clampit: Fennell's "You Got What You Deserved" Comment

The last sub-allegation in Reed's *Brady* claim involves the assertions of Jim Clampit, a former LCSO deputy. Specifically, Clampit said in an affidavit that he attended Stacey's funeral and heard Fennell say "something along the lines of, 'You got what you deserved,'" directing this comment at Stacey's body. Clampit claimed to have been "shocked and floored" by the comment. Testifying at the -10 hearing, Clampit stated that "when the publicity on Rodney Reed's case started coming out," he finally decided (in 2019) to contact Reed's habeas lawyer. On cross-examination, Clampit stated that the funeral home was fairly small and that there were a lot of people crowded into it for

Stacey's funeral. Asked how loudly Fennell had uttered the comment in question, Clampit said that Fennell's comment was "just as clear as it could be."

As we suggested in analyzing Reed's actual innocence claims, Clampit's uncorroborated claim is dubious at best, and his credibility is undermined by the fact that he was previously suspended from his job for perjuring himself. He waited twenty-three years to make this allegation, and he gave what we regard as an implausible explanation for the delay. According to Clampit, he did not realize the significance of Fennell's comments until 2019, *after* he saw news coverage of the Reed case. Coming from a member of Bastrop-area law enforcement, that explanation strains credulity.

On the other hand, there is at least one piece of evidence that might, in theory, corroborate Clampit's claim that Fennell made inappropriate comments at Stacey's funeral. Cynthia Schmidt testified at the -10 hearing that, at Stacey's funeral, she overheard Fennell muttering, "At least the bitch got to wear the damn dress." The problem for Reed is that, for a multitude of reasons, Schmidt's allegation seems just as unlikely (and Schmidt's credibility just as suspect) as Clampit's. So, even adding the "Schmidt" brick to the "Clampit" wall, Clampit's claim still seems to us less than fifty percent likely.

Because Reed has not come forward with enough credible evidence to show that, more likely than not, the events described in Clampit's affidavit and testimony actually happened, Reed has not met his burden to show that the State suppressed evidence. *Cf. Brogdon*, 790 F.2d at 1168 ("The prosecution has no duty to turn over . . . evidence that does not exist."). Based on this resolution, we do not need to decide (as the habeas court did): (a) whether Clampit was part of "the State" for *Brady* purposes; (b) whether Clampit's

information was "material"; (c) whether laches ought to bar relief on this sub-allegation; and (d) as between Clampit and Fennell, who the more credible witness was.

Having rejected each of Reed's sub-allegations, we conclude that his *Brady* claim lacks merit. To be clear, apart from Fletcher's allegation regarding Fennell's "cold" behavior at Stacey's funeral, we do not resolve Reed's *Brady* claim based on materiality. Instead, we find that the allegedly nondisclosed evidence did not come into being until well after Reed's trial. To the extent Reed's witnesses claim otherwise, we do not credit their accounts. Because Reed has failed to establish that this evidence was suppressed before or during his trial, it is unnecessary for us to conduct a materiality analysis. Claim one is denied.

### 4. CLAIM TWO: "The State presented false testimony [from] Mr. Fennell in violation of due process."

In claim two, Reed asserts that Fennell testified falsely at trial in three respects. According to Reed: (a) Fennell testified that he did not kill Stacey Stites, when in fact he did; (b) Fennell testified that he did not know Reed before Stacey's death, when in fact he was aware that Reed and Stacey were in a romantic, sexual relationship; and (c) Fennell testified that he and Stacey were in a happy, conflict-free relationship, when in fact their relationship was toxic.

The use of material false testimony to procure a conviction violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. *Ukwuachu v. State*, 613 S.W.3d 149, 156 (Tex. Crim. App. 2020); *see also Chabot*, 300 S.W.3d at 770–71. In any claim alleging the use of false testimony, a

reviewing court must determine: (1) whether the testimony was, in fact, false; and (2) whether the testimony was material. *Ukwuachu*, 613 S.W.3d at 156.

To establish falsity, the record must contain some credible evidence that clearly undermines the evidence adduced at trial, thereby demonstrating that the challenged testimony was, in fact, false. *See id*. While various types of evidence may serve to demonstrate falsity, the evidence of falsity must be "definitive or highly persuasive." *Id.* at 157. That said, the testimony need not be perjured in the penal-code sense for it to be false in the due-process sense—it is sufficient if, considered in its entirety, the witness's testimony left the jury with a false or misleading impression. *See id.* at 156. On habeas, the applicant has the burden to show falsity by a preponderance of the evidence. *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015).

As for materiality, the most favorable materiality standard that a false-testimony claimant can avail himself of is the *Agurs* standard: If there is a "reasonable likelihood" that the false testimony could have affected the jury's judgment, the testimony is material. *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Ex parte Chavez*, 371 S.W.3d 200, 206–07 (Tex. Crim. App. 2012). This standard "is equivalent to the standard for constitutional error, which requires the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error . . . did not contribute to the verdict." *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011) (some punctuation omitted).

### a. Fennell's testimony that he did not kill Stacey

At trial, Fennell testified that he did not kill Stacey. Proving this testimony factually false requires Reed to show that, more likely than not and as a matter of historical fact,

Fennell *did* kill Stacey. In essence, this is another iteration of the theory that Fennell killed Stacey. *See supra* p. 95. As we explained in analyzing Reed's actual innocence claims, Reed has failed to prove that theory by a preponderance of the evidence. As a result, Reed has failed to show to the requisite level of confidence that Fennell testified falsely. This sub-allegation fails.

### b. Fennell's testimony that, before Stacey was killed, he did not know Rodney Reed

At trial, Fennell was asked whether, "[p]rior to any of this happening," (presumably, Stacey being killed and Reed being accused of murdering her), he "ever kn[e]w a person named Rodney Reed." Fennell answered, "No sir." Proving this testimony factually false requires Reed to show that, more likely than not and as a matter of historical fact, Fennell *did* know who Reed was before Stacey was killed. The theory that Reed advances at this juncture is that "Fennell knew Ms. Stites was having an affair with a black man." As we explained in analyzing Reed's actual innocence claims, Reed has failed to make this showing by a preponderance of the evidence. *See supra* p. 97. As a result, this sub-allegation fails.

### c. Fennell's testimony that he and Stacey had a happy, open, "close-knit" relationship

At trial, Fennell was asked to describe his relationship with Stacey in his own words. Fennell answered, "It was a close-knit relationship." Fennell stated that he and Stacey were "open" with one another and that Stacey was "happy" and "very excited" about the wedding. Fennell acknowledged that he and Stacey occasionally "argued, just like

anybody." But he denied that they argued in public. Other trial witnesses described Fennell and Stacey as "happy" and "in love."

Regardless of whether this testimony was false or misleading, it was immaterial. Words and phrases like "close-knit," "open," "happy," "excited," and "in love" are so amorphous and subjective that it is unlikely a factfinder would have placed much stock in them at trial. The lion's share of the State's case, both in terms of presentation-of-evidence and jury argument, had more to do with historical facts (e.g., Stacey's shift starting at 3:30 a.m.), scientific facts (e.g., Reed's DNA being found in Stacey's body), and scientific opinions (e.g., that intact spermatozoa indicate recent sexual intercourse). Fennell's own description of his and Stacey's relationship played a relatively negligible role in the trial.

Further, the biggest impediment to the Fennell-killed-Stacey theory was not Fennell's self-serving assertion that he was "close-knit" and "open" with Stacey. It was the lack of any forensic evidence connecting Fennell to Stacey's murder, coupled with Ranger Wardlow's testimony that the Fennell-killed-Stacey theory was "logistically . . . not possible." Disproving Fennell's testimony about how happy he and Stacey were would not make those impediments go away.

Finally, Reed's trial attorneys already presented the jury with testimony undermining Fennell's suggestion that he and Stacey enjoyed a happy, conflict-free relationship. As we noted in our opinion disposing of Reed's -03 application:

> Tami Renee Hannath, Stacey's high-school friend, cast Fennell as controlling and possessive. She testified that when she and Stacey were on the phone, making arrangements for Stacey to come to Smithville for a visit, Fennell came home. Stacey then told [Fennell] about the upcoming plans . . . and then the phone was disconnected.

*Reed*, 271 S.W.3d at 712. Granted, giving the jury even more reason to doubt Fennell's testimony about his and Stacey's relationship could only have helped Reed's case at trial. But the fact that Reed already put evidence of this nature in front of the jury—and was convicted anyway—makes it that much harder for him to show materiality on habeas.

Having rejected each of Reed's sub-allegations, we conclude that his false testimony claim lacks merit. Claim two is denied.

## IV. CONCLUSION

In sum, Reed has failed to make an affirmative, persuasive showing that, likelier than not, he is innocent of Stacey Stites's murder. As a result, both his substantive, *Elizondo*-based actual innocence claim and his procedural, Section 5(a)(2)/*Schlup*-based actual innocence claim do not warrant relief. Accordingly, claim four is denied. In addition, Reed has failed to show that the State withheld material defense-favorable evidence in the State's possession at the time of Reed's capital murder trial. Therefore, claim one is denied. Finally, Reed has failed to show that the State presented materially false testimony at his capital murder trial. Claim two is denied.

As mentioned, claim three is an IAC claim. When he filed his -10 application, Reed did not demonstrate that claim three met the Section 5(a)(1) exception to the bar on subsequent-writ claims—if he had, we would have remanded that claim for "further development" along with Reed's *Brady*, false testimony, and actual innocence claims. Accordingly, for claim three to warrant further consideration, Reed would have had to show that it satisfies a different Section 5 exception. That leaves Section 5(a)(2) and

5(a)(3). Reed has offered no evidence or argument in satisfaction of Section 5(a)(3). And because we have concluded that Reed has not shown by a preponderance of the evidence that but for a violation of the United States Constitution no rational juror could have found him guilty beyond a reasonable doubt, we necessarily find that claim three does not surmount the Section 5(a)(2) bar. Accordingly, claim three is dismissed as an abuse of the writ under Section 5.

Based on the foregoing, Reed's ninth subsequent (-10) 11.071 application is denied in part and dismissed in part.

Delivered: JUNE 28, 2023

PUBLISH